# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-DR-00696-SCT

*STEPHEN ELLIOT POWERS*

*v.*

*STATE OF MISSISSIPPI*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 12/15/2000 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR PETITIONER: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: KRISSY CASEY NOBILE |
| | MARY JO WOODS |
| | SUE ANN WERRE |
| | BRANDON KYLE MALONE |
| ATTORNEYS FOR RESPONDENT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ASHLEY LAUREN SULSER |
| | LADONNA C. HOLLAND |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 09/28/2023 |
| MOTION FOR REHEARING FILED: | 07/31/2023 |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is denied. The original opinion is withdrawn, and this opinion is substituted.

¶2. A jury sentenced Stephen Elliot Powers to death for the attempted rape and murder of Elizabeth Lafferty. ***Powers v. State (Powers I)***, 883 So. 2d 20, 23, 25 (Miss. 2003). We

affirmed, *id.* at 24, and the Supreme Court of the United States denied certiorari. ***Powers v. Mississippi***, 543 U.S. 1155 (2005) (mem.). After we denied post-conviction relief, ***Powers v. State (Powers II)***, 945 So. 2d 386, 390 (Miss. 2006), Powers sought federal *habeas* relief in the United States District Court for the Southern District of Mississippi. The district court stayed federal *habeas* proceedings to give the Mississippi courts an opportunity to rule on unexhausted claims. Before the Court at present is Powers's First Successor Petition for Post-Conviction Relief.

¶3. In general, Powers argues that (1) he is mentally incompetent; (2) he was denied his right to a fair, impartial jury; (3) trial counsel was ineffective during jury selection for not challenging the prosecution's peremptory strikes based on ***Batson v. Kentucky***, 476 U.S. 79 (1986); (4) as a matter of federal due process, the attempted-rape evidence was insufficient; (5) trial and post-conviction counsel were ineffective concerning the guilt phase; (6) trial counsel's "total dereliction" at sentencing requires application of ***United States v. Cronic***, 466 U.S. 648 (1984), not ***Strickland v. Washington***, 466 U.S. 668 (1984); (7) even if ***Cronic*** is inapplicable, trial counsel was ineffective under ***Strickland***; and (8) cumulative error.

¶4. Powers also moves the Court to rehear its June 21, 2022 order denying his Motion to Hold Post-Conviction Proceedings in Abeyance Because of Petitioner's Incompetency. Corrected En Banc Order, ***Powers v. State***, No. 2017-DR-00696-SCT, at *2 (Miss. June 21, 2022).

**FACTS AND PROCEDURAL HISTORY**

2

¶5.     On the afternoon of June 13, 1998, Lafferty, Powers, and two other men cooked out and drank beer at Lafferty's home. *Powers I*, 883 So. 2d at 24. The other men eventually left, leaving Powers and Lafferty alone. *Id.* Early the next morning, Lafferty's body was found in the hallway. *Id.* With a .22 caliber gun, she had been shot five times—"three at a point-blank range in the back of the head, once under the chin, and once in the temple." *Id.* Crime-scene photos showed her body in a "prone position"—legs spread and nude from the waist down except for a pair of shorts wadded around one ankle. *Id.* She had injuries consistent with defensive posturing. *Id.*

¶6.     Authorities arrested Powers. *Id.* He waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and eventually led police to the murder weapon. *Powers I*, 883 So. 2d at 24. In a written statement, he admitted killing Lafferty, but he denied having sex with her. *Id.*

¶7.     A jury convicted Powers of capital murder with the underlying crime of attempted rape and sentenced him to death. *Id.* at 23, 25. The Court affirmed, *id.* at 24, and later denied post-conviction relief. *Powers II*, 945 So. 2d at 390.

¶8.     Powers petitioned the United States District Court for the Southern District of Mississippi for federal *habeas* relief. According to the district court, however, not all of his federal *habeas* claims had been exhausted in state court—*i.e.*, they had not been "fairly presented" here, *Fairchild v. Workman*, 579 F.3d 1134, 1151 (10th Cir. 2009) (internal quotation marks omitted) (quoting *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006))—which is prerequisite to seeking federal *habeas* relief. *Baldwin v. Reese*, 541 U.S.

3

27, 29 (2004) (quoting ***Duncan v. Henry***, 513 U.S. 364, 365 (1995)). Accordingly, in March 2017, the federal district court stayed federal *habeas* proceedings.

¶9.    As an abeyance motion and motion to amend were pending, Powers filed a successive post-conviction petition on January 4, 2022. Months later, the Court denied the abeyance motion and motion to amend without prejudice to Powers's right to seek a stay of execution at the proper time. Corrected En Banc Order, ***Powers v. State***, No. 2017-DR-00696-SCT, at **2–3 (Miss. June 21, 2022).

## ANALYSIS

> Leave [to proceed in the trial court] is granted only if the application, motion, exhibits, and prior record show that the claims are not procedurally barred and that they "present a substantial showing of the denial of a state or federal right." Well-pleaded allegations are accepted as true.
>
> In capital cases, non-procedurally barred claims are reviewed using "'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." "[W]hat may be harmless error in a case with less at stake becomes reversible error when the penalty is death."

***Evans v. State***, 294 So. 3d 1152, 1157 (Miss. 2020) (second alteration in original) (citations omitted) (quoting ***Ronk v. State***, 267 So. 3d 1239, 1247 (Miss. 2019)).

¶10.    As stated in the above quotation, petitioners must show that their claims are unbarred. Miss. Code. Ann. § 99-39-21(6) ( Rev. 2020). In capital cases, post-conviction relief must be sought within one year after conviction. Miss. Code Ann. § 99-39-5(2)(b) (Rev. 2020). Successive writs are barred. Miss. Code Ann. §§ 99-39-23(6), -27(9) (Rev. 2020). The doctrine of res judicata applies "to all issues, both factual and legal, decided at trial and on direct appeal." Miss. Code. Ann. § 99-39-21(3) (Rev. 2020).

4

¶11.     Claims can be waived in two ways.  First, claims that "were capable of determination at trial and/or on direct appeal" are waived.  Miss. Code. Ann. § 99-39-21(1) (Rev. 2020).  Second, "[t]he litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories . . . constitute[s] a waiver of all other state or federal legal theories which could have been raised under said factual issue."  Miss. Code. Ann. § 99-39-21(2) (Rev. 2020).  In either case, the Court may grant relief from the waiver bars if cause and actual prejudice are shown.  Miss. Code Ann. § 99-39-21(1)–(2) (Rev. 2020).  Cause exists "where the legal foundation upon which the claim for relief is based could not have been discovered with reasonable diligence at the time of trial or direct appeal."  Miss. Code. Ann. § 99-39-21(4) (Rev. 2020).  Actual prejudice is "limited to those errors which would have actually adversely affected the ultimate outcome of the conviction or sentence."  Miss. Code. Ann. § 99-39-21(5) (Rev. 2020).

¶12.     The bars and any exceptions apply to death-penalty petitioners.  *See Powers II*, 945 So. 2d at 395; *see also* En Banc Order, *Knox v. State*, No. 2014-DR-00849-SCT, at *2 (Miss. Mar. 10, 2022) ("Knox must . . . demonstrate that his claims should be excepted from the procedural bars.").  Because death-penalty petitioners are entitled to the effective assistance of post-conviction counsel, *Grayson v. State*, 118 So. 3d 118, 126 (Miss. 2013) (citing *Jackson v. State*, 732 So. 2d 187, 191 (Miss. 1999)), their ineffective-assistance-of-post-conviction-counsel claims are unbarred.  *Brown v. State*, 306 So. 3d 719, 748 (Miss. 2020); *see also Walker v. State*, 131 So. 3d 562, 564 (Miss. 2013) ("Walker's claim of ineffective

assistance of post-conviction counsel is sufficient to overcome the procedural bars and allow this Court to reach the merits of his claim.").

## PART ONE:  COMPETENCY

**I.     Whether the Court should address Powers's claim based on *Dusky v. United States*, 362 U.S. 402 (1960).**

¶13.   To be deemed competent to stand trial, ***Dusky*** requires a defendant to have the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and . . . a rational as well as factual understanding of the proceedings against him." ***Beasley v. State***, 136 So. 3d 393, 398 (Miss. 2014) (alterations in original) (internal quotation marks omitted) (quoting ***Dusky***, 362 U.S. at 402).

*Denial of Powers's Abeyance Motion*

¶14.   Before filing the instant successive post-conviction petition, Powers moved to hold post-conviction proceedings in abeyance due to his alleged incompetency.  That motion is incorporated by reference in his petition.  With the motion, he attached supporting affidavits from Drs. Bhushan S. Agharkar and Robert H. Ouaou.

¶15.   The Court denied the abeyance motion, reasoning as follows:

> We are persuaded by the State's argument that Powers has no right to competency in post-conviction proceedings.  *See **Ryan v. Gonzales***, 568 U.S. 57, 64-65, 133 S. Ct. 696, 702–03, 184 L. Ed. 2d 528 (2013) (stating that the Sixth Amendment right to counsel does not imply a right to competence and holding that death-row inmates seeking federal *habeas* relief have no statutory right to stay proceedings when found incompetent).  To be sure, ***Neal v. State***, 687 So. 2d 1180, 1183 (Miss. 1996) (citing ***Rumbaugh v. Procunier***, 753 F.2d 395 (5th Cir. 1985)), said that defendants "must be competent at all stages of the criminal process," including post-conviction proceedings. But ***Rumbaugh*** concerned competency to waive the right to collateral review of a conviction and sentence, not whether there is a constitutional or statutory right to

6

competency during post-conviction proceedings. 753 F.2d at 398; ***Dickerson v. State***, 291 So. 3d 344, 354–55 (Miss. 2020) (Coleman, J., specially concurring).

Corrected En Banc Order, ***Powers v. State***, 2017-DR-00696-SCT, at * 1–2 (Miss. June 21, 2022).

¶16.   In a separate written statement, Presiding Justice Kitchens, joined by Presiding Justice King and Justice Ishee, objected to the order "in the strongest terms." Corrected En Banc Order, ***Powers v. State***, 2017-DR-00696-SCT, at * 1–2 (Miss. June 21, 2022) (Kitchens, P.J., objecting to the order with separate written statement). Presiding Justice Kitchens wrote that the right to competency in post-conviction proceedings has stood for more than two decades, *id.* at *1 (citing ***Neal***, 687 So. 2d at 1183), and the Court has previously remanded cases for competency hearings. *Id.* (citing ***Dickerson***, 291 So. 3d at 347). If criminal defendants must be competent at trial, on direct appeal, and at execution, they asked why post-conviction proceedings—"a critical stage of the death-penalty appeal process at the state level[,]" *id.* at * 2 (internal quotation mark omitted) (quoting ***Grayson***, 118 So. 3d at 126)—should be any different? *Id.*

¶17.   Because ***Ryan*** concerned federal *habeas* proceedings, Presiding Justice Kitchens distinguished it. *Id.* Federal *habeas* review, he wrote, is solely record based. *Id.* (quoting ***Shinn v. Ramirez***, 142 S. Ct. 1718, 1732 (2022)). Conversely, state post-conviction proceedings require fact-intensive investigation of matters outside the record. *Id.* at * 2–3. Without a competent petitioner aiding that endeavor, post-conviction counsel "face an impossible task." *Id.* at * 3. The Court's ruling was especially "confounding," Presiding

Justice Kitchens said, given that death-penalty petitioners are entitled to effective assistance of post-conviction counsel. *Id.* (citing *Grayson*, 118 So. 3d at 126).

¶18. Presiding Justice Kitchens also stressed stare decisis and the Court's adherence to precedent unless the prior decision(s) was "'pernicious,' 'impractical,' or 'mischievous in . . . effect, and resulting in detriment to the public.'" *Id.* (internal quotation marks omitted) (quoting *Caves v. Yarbrough*, 991 So. 2d 142, 152 (Miss. 2008)). He criticized the majority for providing no "reasoned explanation" for abandoning precedent. *Id.* For Presiding Justice Kitchens, "it is the removal of the right to mental competence during post-conviction proceedings that appears pernicious, impractical, and mischievous." *Id.* at * 3–4. Other states, he wrote, "have recognized, to some degree, a due process right of mental competency in post-conviction proceedings." *Id.* (citing *Haraden v. State*, 32 A.3d 448, 452 (Me. 2011)).

¶19. Presiding Justice Kitchens found that Powers showed compelling evidence of incompetence: While incarcerated, he has had multiple strokes; he has been diagnosed with a cerebral aneurysm; and he has been deemed "'seriously cognitively impaired' with 'no signs of malingering'" by a physician. *Id.* at * 4. He also has mental deficits, including vascular dementia; lacks any memory of the crime; and is unable to discuss his case rationally with counsel. *Id.*

¶20. Going forward, Presiding Justice Kitchens said the Court's ruling "will foster the deplorable outcome of a mentally incompetent post-conviction petitioner proceeding through

the justice system while completely incapable of communicating rationally with counsel."

*Id.*

*Powers's Rehearing Motion*

¶21. Powers moves for rehearing. He argues that the Court erred by abolishing the longstanding right to mental competency in post-conviction proceedings. Without a competent petitioner, he argues, post-conviction proceedings' reliability decreases, and the risk of wrongful execution increases. To the latter point, he contends that since 1973, at least 189 death-row inmates in twenty-seven states—including seven in Mississippi—have been exonerated. The seven in Mississippi, he adds, were all competent.

¶22. Powers contends a competent petitioner's assistance is vital for two reasons. First, the petitioner has key insights. Having been at trial, he or she can help pinpoint prosecutorial misconduct or counsel's ineffectiveness. The petitioner's assistance is essential for finding missing evidence (including evidence of actual innocence) and creating a social history. Second, petitioners must have "an actual opportunity to challenge the lawfulness and justness of [their] death sentence." That opportunity is lost, however, if they are incompetent.

Specifically, Powers argues six points.

¶23. *First*, he argues that "removing the right to mental competency in state post-conviction eviscerates the function, accuracy, and integrity of Mississippi's capital post-conviction regime." He stresses the importance of rational attorney-client communications. Without hours of extensive, probing attorney-client communications, he maintains, important post-conviction issues may never surface. The issues include:

9

- coerced confessions;

- post-arraignment use of jailhouse informers;

- ineffective assistance of counsel at trial, sentencing, or on appeal;

- excessive courtroom security;

- improper contacts between jurors and court officers or others during trial;

- prosecutorial suppression or misrepresentation of evidence; and,

- in a capital case, the excessiveness of the penalty given the circumstances of the offense and background and status of the client.

Though post-conviction counsel's staffing and resources are helpful, Powers maintains they cannot aid situations (as here) in which only the petitioner possesses certain facts, yet lacks capacity to contribute meaningfully.

¶24. Powers highlights post-conviction counsel's professional and ethical duties. American Bar Association Guidelines require capital post-conviction counsel to "*know and fully explain* to the client: . . . the practices, policies and concerns of the particular jurisdiction, the judge and prosecuting authority . . . ." ***Wilson v. State***, 81 So. 3d 1067, 1092 (Miss. 2012) (alterations in original) (internal quotations mark omitted) (quoting Am. Bar Ass'n Guideline 10.9.1.B.7). The Mississippi Rules of Professional Conduct require counsel to "communicate with a client about the scope of the representation, objectives of representation, and 'the means by which [the client's objectives] are to be pursued.'" M.R.P.C. 1.2, cmt. 1).

¶25. In addition, Powers asserts that the Mississippi Uniform Post-Conviction Collateral Relief Act "embodies a right to mental competency." Mississippi Code Section 99-39-9(1)(d) (Rev. 2020) requires post-conviction motions to include "[a] separate statement of the specific facts which are within the personal knowledge of the petitioner and which shall be sworn to by the petitioner . . . ." Mississippi Code Section 99-39-9(3) (Rev. 2020) requires the motion to be "verified by the oath of the petitioner."

¶26. Finally, Powers offers some historical context for why robust, accurate state post-conviction proceedings are crucial. Historically, he contends, there has been "a societal aversion to condemning individuals who cannot participate in their defenses, which stems not only from the moral imperative of upholding human dignity but also from the functional concern of protecting against false conviction." He quotes from Sir Matthew Hale's *The History of the Pleas of the Crown* and William Blackstone's *Commentaries*. Though he concedes that Blackstone did not mention a right to competency in *habeas* proceedings, Powers maintains the procedural stages Blackstone did reference (*i.e.*, arraignment, trial, judgment, and execution) signify that the right attaches and continues throughout the criminal process.

¶27. In more recent times, Powers writes "the primary safeguard against excessive punishment" was once executive clemency. From 1924 to 1966, he argues, Florida commuted nearly a quarter of its death sentences. From 1909 to 1954, North Carolina commuted more than a third. But by 1987 and 1988, only nine of the nearly six hundred death sentences in the United States were commuted.

11

¶28.    *Second*, Powers argues that the Court misrelied on **Ryan**.  **Ryan** concerned federal *habeas* proceedings under the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. §§ 2241 to 2255 (Supp. III 1997).  In those proceedings, federal *habeas* attorneys' role is more passive because review is solely record based.  **Ryan**, 568 U.S. at 69.  "Given the backward-looking, record-based nature of most federal habeas proceedings," **Ryan** said, "counsel can generally provide effective representation to a habeas petitioner regardless of the petitioner's competence."  **Ryan**, 568 U.S. at 68.  State post-conviction proceedings, in contrast, can concern matters outside the record.  **Jackson**, 732 So. 2d at 190.

¶29.    *Third*, Powers argues that the right to competency ensures robust state post-conviction proceedings—something the AEDPA evinces.  State courts, he maintains, are "the primary guardians of federal constitutional rights." (citing **Engle v. Isaac**, 456 U.S. 107, 128 (1982)).  Before federal *habeas* review can be sought, state remedies must be exhausted.  **Jackson**, 732 So. 2d at 190.  State courts' decisions are afforded deference: *habeas* relief is not granted unless the state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).  Accordingly, federal *habeas* proceedings' role, while important, Powers continues, are "secondary and limited."  **Barefoot v. Estelle**, 463 U.S. 880, 887 (1983).  Federal courts, thus, depend on the function, accuracy, and integrity of state post-conviction procedures and rulings.

¶30.    *Fourth*, Powers maintains **Ford v. Wainwright**, 477 U.S. 399 (1986), "supports the need for a competency hearing."  **Ford** bars executing inmates who are insane.  **Ford**, 477

U.S. at 401.  Powers points to Justice Powell's concurrence in **Ford**.  Justice Powell found only "slight merit" to the theory that "the prohibition against executing the insane was justified as a way of preserving the defendant's ability to make arguments on his own behalf."  **Ford**, 477 U.S. at 419–20 (Powell, J., concurring in part and concurring in the judgment).  He reasoned that "[m]odern practice provides far more extensive review of convictions and sentences."  *Id.* at 420.  Powers argues Justice Powell's view "reinforces the importance of competence to pursue state collateral review."

¶31.  *Fifth,* Powers disputes the State's assertion that the successive post-conviction petition (featuring "fifteen affidavits, including five from experts, and several other records") shows that current post-conviction counsel can litigate the case even if he is incompetent.  Powers contends that current post-conviction counsel is "handicapped in pursuing an actual innocence claim."  In an affidavit, former Capital Post-Conviction Counsel Director Scott Johnson avers that Powers could once recall detailed information—including information about actual innocence.  Now, Powers cannot recall the crime, the victim, or even the victim's name.  His inability is significant, Powers argues, given that no one witnessed the crime, no forensic evidence tied him to the crime, and the "scant evidence" is questionable.  For one thing, nothing shows that Powers's trial or post-conviction counsel knew about developed film from Lafferty's camera or her diary.  For another, "trial counsel failed to question witnesses about [Lafferty's] boyfriend, that the backdoor was kicked in, or the appearance of a bloody handprint on [Lafferty's] arm and a bloody footprint in the hallway."

13

Still more, Powers maintains his purported confession is suspect because he was drunk at the time of his arrest.

¶32. Powers maintains that actual innocence is *always* grounds for relief. As shown in *Gill v. State*, 962 So. 2d 552 (Miss. 2007), the Court has the inherent power to correct its judgments. In 1961, the Court affirmed Clyde Kennard's burglary conviction and sentence. *Kennard v. State*, 242 Miss. 691, 701, 128 So. 2d 572, 576 (1961). Decades later, and long after Kennard had died, a codefendant admitted that he had testified falsely against Kennard and that Kennard was innocent. *Gill*, 962 So. 2d at 553. So several people and the State jointly petitioned the circuit court to exonerate Kennard. *Id.* The circuit court granted the motion and denied a group of citizens' request to intervene. *Id.* at 553–54. In dismissing the intervenors' subsequent appeal, the Court said that "[a]ll courts have the inherent power to correct and make their judgments speak the truth." *Id.* at 554 (alteration in original) (internal quotation marks omitted) (quoting *Turner v. State*, 212 Miss. 590, 594, 55 So. 2d 228 (1951)). "[T]he power to correct an error in the record of a judgment rendered by it at a former term," the Court said, "is inherent in the court system." *Id.* (citing *Claughton v. Ford*, 202 Miss. 361, 30 So. 2d 805 (1947)).

¶33. No matter his own guilt or innocence, Powers contends the implications here extend beyond his case. The right to competency ensures that post-conviction proceedings function as intended for all petitioners—not just him.

¶34. *Sixth*, Powers argues that "principles of stare decisis . . . should preclude abandonment of the right to mental competency in post-conviction proceedings." Powers first focuses on

14

*Neal*. The June 21, 2022 order recognized that *Neal* said "defendants 'must be competent at all stages of the criminal process,' including post-conviction proceedings." Corrected En Banc Order, ***Powers v. State***, No. 2017-DR-00696, at * 1 (Miss. June 21, 2022) (quoting *Neal*, 687 So. 2d at 1183). As authority for that statement, *Neal* cited ***Rumbaugh***. ***Id.*** And ***Rumbaugh***, the order said, "concerned competency to waive the right to collateral review of a conviction and sentence, not whether there is a constitutional or statutory right to competency during post-conviction proceedings." ***Id.*** at *1–2 (citing ***Rumbaugh***, 753 F.2d at 398). Powers contends that ***Rumbaugh*** was merely a "generalized cite," not the basis for the decision in *Neal*. *Neal* cited ***Rumbaugh***, he argues, "simply as more support for the proposition that, in Mississippi, 'a defendant must be competent at all stages of the criminal process.'" (citing *Neal*, 687 So. 2d at 1183).

¶35.    For Powers, then, petitioners' right to competency in post-conviction proceedings flows from four places: (1) ethical obligations, (2) the Uniform Post Conviction Collateral Relief Act, (3) the federal *habeas* scheme, and (4) precedent.

¶36.    The State opposes rehearing. Rehearing is unmerited, it argues, because Powers fails to show "law or fact . . . [that] the [C]ourt . . . overlooked or misapprehended." M.R.A.P. 40(a). The State gives at least nine counterarguments.

¶37.    *First*, broadly speaking, the State maintains that Powers has had full opportunity to challenge his sentence: Trial is the "main event," ***Shoop v. Twyford***, 142 S. Ct. 2037, 2044 (2022) (internal quotation mark omitted) (quoting ***Wainwright v. Sykes***, 433 U.S. 72, 90 (1977)), and direct appeal is "the principal means of reviewing all criminal convictions and

sentences[.]" Miss. Code. Ann. § 99-39-3(2) (Rev. 2020). Now, at the post-conviction stage, the burden shifts: Rather than defending against criminal charges, Powers is collaterally attacking his conviction and sentence. In doing so, he has the benefit of competent post-conviction counsel. However, no constitutional or statutory law provides a right to competency in post-conviction proceedings. Nor, the State argues, does Powers point to any claim that requires his input.

¶38. *Second*, putting aside disagreement about how *exoneration* is defined, the State maintains prior exonerations of certain death-row inmates is irrelevant to competency. Three of the Mississippi exonerations, it maintains, were based on newly discovered DNA evidence; one concerned a violation under ***Brady v. Maryland***, 373 U.S. 83 (1963); and another involved a ***Batson*** violation. "Powers," the State contends, "fails to explain how successful ***Brady***, ***Batson***, and DNA-evidence claims require a petitioner's input."

¶39. *Third*, the State is unconvinced that claims like "coerced confessions; post-arraignment use of jailhouse informers; ineffective assistance of counsel . . . ; excessive courtroom security; improper contacts between jurors and [others]; prosecutorial suppression or misrepresentation of evidence; and . . . the excessiveness of the penalty given the circumstances of the offense and background and status of the client" may not surface absent a competent petitioner's input. To start, coerced-confession, jailhouse-informant, and excessive-courtroom-security claims are "capable of determination at trial and/or on direct appeal" and are thus waived in post-conviction proceedings. Miss. Code. Ann. § 99-39-21(1). As for juror misconduct, a petitioner would be unaware of improper juror communication,

16

nor is it likely that a petitioner would have any knowledge about a ***Brady*** claim: If the he or she has the evidence, then the ***Brady*** claim is invalid. Finally, Mississippi Code Section 99-19-105(3) (Rev. 2020) requires a proportionality review by the Court of all death sentences.

¶40. *Fourth*, the State contends its "brief skim" of recent ineffective-assistance claims by death-row inmates shows that the claims were "primarily based on expert opinions that the petitioner has some mental disorder that the defense team allegedly did not detect." Even if affidavits from collateral sources are needed, the Mississippi Office of Capital Post-Conviction Counsel's two mitigation specialists and investigator are capable of locating and interviewing those sources if the petitioner is incompetent.

¶41. *Fifth*, the State disputes that a petitioner's sworn statement of facts and verification are required. In ***Hutto v. State***, for example, the Court denied the State's motion to dismiss Hutto's post-conviction application based on his failure to comply with those requirements. En Banc Order, ***Hutto v. State***, No. 2017-DR-01207-SCT (Miss. Oct. 3, 2019).

¶42. *Sixth*, the State argues ***Ryan*** is instructive. The State concedes it "may be true" that, unlike state post-conviction petitioners, federal *habeas* petitioners are bound by the record. The State insists, however, that the distinction does not render ***Ryan*** irrelevant. ***Ryan*** said that "counsel can generally provide effective representation to a *habeas* petitioner regardless of the petitioner's competence." ***Ryan***, 568 U.S. at 68. The same is true in state post-conviction proceedings, the State contends. As shown here, without Powers's assistance, apparently, current post-conviction counsel filed a 154 page petition with fifteen supporting

affidavits. In other cases too, the State maintains, litigation has continued despite the petitioner's alleged incompetence. Order, *Le v. State*, No. 2016-00079(3) (Jackson Cnty., Miss., Cir. Ct. 2005) (noticing multiple witnesses before an indefinite stay based on alleged incompetence); Order, *Hutto v. State*, No. 2017-DR-01207-SCT (Miss. Oct. 4, 2022) (pursuing successive post-conviction application despite petitioner's alleged incompetence); Order, *Corrothers v. State*, (Lafayette Cnty., Miss., Cir. Ct. Aug. 19, 2022); Motion, *Corrothers v. State*, No. L17-309 (Lafayette Cnty., Miss., Cir. Ct. filed Feb. 2, 2018) (alleging incompetence but continuing to litigate post-conviction case).

¶43. *Seventh*, the State maintains *Ford* is unsupportive. "If anything," the State writes, "*Ford* serves as a reason not to find a right to [post-conviction] competence because Powers can litigate his competence after his execution date has been set." (citing *Panetti v. Quarterman*, 551 U.S. 930 (2007)). Until then, he "has more safeguards than could have been imagined at common law, including the right to effective assistance of counsel at trial, on direct appeal, and in initial [post-conviction] proceedings."

¶44. *Eighth*, the State asserts that Powers's actual-innocence claim is barred regardless of his competency. *See* En Banc Order, *Underwood v. State*, No. 2015-DR-01378-SCT, at *11 (Miss. Dec. 16, 2021) ("This Court has recognized that actual innocence is a recognized exception to procedurally defaulted federal *habeas* claims. *Howard v. State*, 945 So. 2d [326,] . . . 369 [(Miss. 2006)]. But, the post-conviction relief act does not provide an exception to the procedural bars for a claim of actual innocence.")

18

¶45.    *Ninth*, the State argues Powers's defense of *Neal* fails, and as to stare decisis, the State maintains "[i]ndefinitely staying a capital murderer's lawful sentence of death because he has allegedly become incompetent during proceedings he is not even entitled to (successive [post-conviction] proceedings), where neither the constitution nor any statute conveys a right to competence, is surely mischievous and detrimental to the public."  The State cites *Moffett v. State*, 351 So. 3d 936, 943 (2022) (quoting Miss. Const. art. 3, § 24), which said, in part, that "[t]he citizens of our State and the victims of crimes . . . have an interest that 'justice shall be administered without sale, denial or *delay*.'"  We find that the motion for rehearing should be denied.  To start, Powers misrelies on Rule 40(a). That rule provides, in pertinent part, that

> [a] motion for rehearing may be filed within 14 days after *a decision is handed down on the merits of a case* by the Supreme Court or the Court of Appeals. . . . .  The motion for rehearing should be used to call attention to specific errors of law or fact which the *opinion* is thought to contain . . . .

M.R.A.P. 40(a) (emphasis added).  The June 21, 2022 order was a ruling on two motions, not a merits opinion or decision.  The applicable rule, then, is Rule 27(h), which governs reconsideration of rulings on motions.  M.R.A.P. 27(h).

¶46.    Even so, Powers's proceeding under Rule 40(a) is not dispositive. *See* Order, *Hudson v. Gavin*, No. 2014-TS-01049 (Miss. May 21, 2015) (treating a Rule 40 rehearing motion as a Rule 27(h) motion and dismissing it as untimely); Order, *Germany v. Stowers*, No. 2013-M-00155-SCT, (Miss. Aug. 15, 2013) (denying a motion to strike a Rule 40 rehearing motion because Rule 27(h)(3) allowed reconsideration); Order, *Thompson v. Cent. Indus.*, No. 2007-M-01013-SCT (Miss. Aug. 24, 2007) (treating a Rule 40 rehearing motion as a

19

Rule 27(h) motion and denying relief). "Substance is considered over form." *Arnona v. Smith*, 749 So. 2d 63, 66 (Miss. 1999) (internal quotation marks omitted) (citing *West v. Combs*, 642 So. 2d 917, 920 (Miss. 1994)).

¶47.    Substantively, of course, Powers seeks reconsideration of the June 21, 2022 order. Rule 27(h) provides, in part, that "[m]otions for reconsideration, vacation or modification of rulings of the Supreme Court . . . on motions are generally not allowed." M.R.A.P. 27(h). However, Rule 27 contains eight exceptions. M.R.A.P. 27(h)(1)–(8). Applicable here, "within 14 days after a decision is handed down on the motion," reconsideration may be sought "in extraordinary cases, by suspension of the rules for good cause shown under Rule 2(c)." M.R.A.P. 27(h)(8).

¶48.    Powers fails to demonstrate good cause for suspending the rules and granting rehearing. The Court did not overlook Powers's argument that *Ryan* is distinguishable. Presiding Justice Kitchens, joined by Presiding Justice King and Justice Ishee, argued that and highlighted the importance of state post-conviction proceedings. Corrected En Banc Order, *Powers v. State*, No. 2017-DR-00696-SCT, at *2 (Miss. June 21, 2022) (Kitchens, P.J., objecting to the order with separate written statement).

¶49.    In *Ryan*, the Supreme Court held that neither 18 U.S.C. § 3599 nor 18 U.S.C. § 4241 requires suspension of federal *habeas* proceedings when state petitioners are found to be incompetent. 568 U.S. at 60–61, 64. Section 4241, it said, is inapplicable to federal *habeas* proceedings. *Id.* at 71–73. As to § 3599(a)(2), which "guarantees federal *habeas* petitioners on death row the right to federally funded counsel," the Supreme Court held that it does not

20

provide petitioners a "'statutory right' to competence." *Id.* at 64, 71. Not only is there no basis for such right in the statutory text, it said, but also "the assertion that the right to counsel implies a right to competence is difficult to square with . . . constitutional precedents." *Id.* at 65. That is because the right to competence flows from due process, not the right to counsel. *Id.* at 65–66. The Supreme Court was unpersuaded that a petitioner's incompetence "'eviscerate[s] the statutory right to counsel' in federal *habeas* proceedings":

> Given the backward-looking, record-based nature of most federal *habeas* proceedings, counsel can generally provide effective representation to a *habeas* petitioner regardless of the petitioner's competence. Indeed, where a claim is "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d) (2006 ed.), counsel should, in most circumstances, be able to identify whether the "adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), without any evidence outside the record. *See Cullen v. Pinholster*, 563 U.S. [170, 181–82,] 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011) ("[R]eview under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. . . . . This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time—*i.e.*, the record before the state court"). Attorneys are quite capable of reviewing the state-court record, identifying legal errors, and marshaling relevant arguments, even without their clients' assistance.

*Id.* at 68 (alterations in original).

¶50. Though the Supreme Court held that incompetency does not *require* a stay, it recognized federal district courts' discretionary authority to grant one and addressed the "outer limits" of that discretion. *Id.* at 74. A stay is generally unmerited, it said, if the petitioner's exhausted claims are record based; however, a limited stay may be merited for claims that are "both unexhausted and not procedurally defaulted[.]" *Id.* at 76. Indefinite

21

stays are improper. *Id.* at 76. To that point, the Supreme Court emphasized the AEDPA's purpose of reducing delays and promoting finality. *Id.* "At some point," the Supreme Court said, "the State must be allowed to defend its judgment of conviction." *Id.* The next two sentences are especially relevant here:

> If a district court concludes that the petitioner's claim could substantially benefit from the petitioner's assistance, the district court should take into account the likelihood that the petitioner will regain competence in the foreseeable future. Where there is no reasonable hope of competence, a stay is inappropriate and merely frustrates the State's attempts to defend its presumptively valid judgment.

*Id.* at 76–77. In other words, a hopelessly incompetent petitioner is not entitled to a stay even if the petitioner's assistance could substantially benefit the claim. *See id.*

¶51.    Faced with a similar issue as here, the Supreme Court of Arizona found *Ryan* instructive. *Fitzgerald v. Myers*, 402 P.3d 442, 448 (Ariz. 2017). In *Fitzgerald*, a capital petitioner argued that an Arizona statute and rule entitled him to a competency determination. *Id.* at 446. The statute required the Supreme Court of Arizona to appoint death-row inmates post-conviction counsel, *id.* (citing Ariz. Rev. Stat. Ann. § 13-4041(B)), and a rule governing those proceedings required that post-conviction petitions "be accompanied by a declaration by the defendant stating under penalty of perjury that the information contained is true to the best of the defendant's knowledge and belief." *Id.* (internal quotation mark omitted) (quoting Ariz. R. Crim. P. 32.5).

¶52.    The Supreme Court of Arizona held that the statutory right to appointed counsel does not require that capital petitioners be competent. *Id.* at 447, 449. First, unlike other Arizona statutes, the particular statute at issue there neither mentioned competence nor provided any

22

right to effective counsel-client communication. *Id.* at 447. Second, the court rejected the argument that American Bar Association Guidelines establish a statutory right to competency. They are merely guides, it wrote; and "[s]ubject to constitutional constraints," only the legislature can enact substantive laws for criminal proceedings. *Id.* at 448. Third, while conceding that state post-conviction proceedings "are not strictly 'record based'" and "might be aided by[] the petitioner's competent input," the court found *Ryan* instructive in concluding that the statute does not "create or include 'a "statutory right" to competence.'" *Fitzgerald*, 402 P.3d at 448 (quoting *Ryan*, 568 U.S. at 68, 71). Finally, the court wrote that indefinite suspension "unduly delay[s] relief for a deserving petitioner" and that any purported prejudice caused by a petitioner's incompetency could be addressed in a successive post-conviction petition. *Id.* at 449.

¶53.    As for the rule requiring a declaration under penalty of perjury, the court said that that rule neither mentioned nor required competency. *Id.* Even if a petitioner lacks competency to sign the declaration, then his or her "attorney—acting as next friend—can sign for his client, thus allowing the [PCR] petition to go forward." *Id.* (alteration in original) (citing *Whitmore v. Arkansas*, 495 U.S. 149 (1990)).

¶54.    As in *Fitzgerald*, *Ryan* is instructive in the case *sub judice*. The June 21, 2022 order left open the possibility of discretionary stays. Corrected En Banc Order, *Powers v. State*, No. 2017-DR-00696-SCT, at *2 (Miss. June 21, 2022) (citing *Ryan*, 568 U.S. at 74); *see also Kocaker v. State*, 311 So. 3d 814, 819–20 (Fla. 2020) (stating that *Carter v. State*, a pre-*Ryan* case, "recognized a defendant's limited, due process-based right to a competency

23

determination 'when there are reasonable grounds to believe that a capital defendant is incompetent to proceed in postconviction proceedings in which factual matters are at issue, the development or resolution of which require the defendant's input.'"(quoting *Carter v. State*, 706 So. 2d 873 (Fla. 1997)). The Court declined to grant one here because Powers represents that he cannot be rehabilitated. *Id.* *Ryan* said that a hopelessly incompetent petitioner is not entitled to stay federal *habeas* proceedings even if the petitioner's assistance could substantially benefit his or her claim. That being the case, it is hard to see how a similarly situated petitioner in state-court post-conviction proceedings has the right to stay those proceedings *unless* state law affords the right.

¶55. Contrary to Powers's arguments, *Neal* relied on *Rumbaugh* to support that competence is required in post-conviction proceedings. *Neal* specifically said the following:

> Neal correctly argues that a defendant must be competent at all stages of the criminal process, "whether trial, *Gammage v. State*, 510 So. 2d 802 (Miss. 1987); appeal, *Tarrants v. State*, 231 So. 2d 493 (Miss. 1970); post-conviction, *Rumbaugh v. Procunier*, 753 F.2d 395 (5th Cir. 1985); or at the point of execution, *Billiot v. State*, 478 So. 2d 1043 (Miss. 1985), *cert. denied*, 475 U.S. 1098, 106 S. Ct. 1501, 89 L. Ed. 2d 901 (1986)."

*Neal*, 687 So. 2d at 1183. For each stage of the criminal process, *Neal* cited a case. And for the post-conviction stage, it cited *Rumbaugh*.

¶56. Powers fails to persuade with his citation of professional guidelines and ethical rules. Those same duties, it seems, would have required a different result in *Ryan*, and as *Fitzgerald* pointed out, American Bar Association Guidelines are merely guides, not substantive law. 402 P.3d at 448.

24

¶57. As for Mississippi Code Sections 99-39-9(1)(d) and -9(3) (Rev. 2020), neither establishes a right to competency. Mississippi Code Sections 99-39-9(1)(d)–(e) (Rev. 2020) require post-conviction motions to include "[a] separate statement of the specific facts which are within the personal knowledge of the petitioner and which shall be sworn to by the petitioner" and "[a] specific statement of the facts which are not within the petitioner's personal knowledge." Mississippi Code Section 99-39-9(3) (Rev. 2020) provides "[t]he motion shall be verified by the oath of the petitioner." In *Fitzgerald*, the Supreme Court of Arizona said a provision similar to those statutes did not require competency. *Fitzgerald*, 402 P.3d at 449–50. If a petitioner lacks competency to sign a declaration under penalty of perjury, it said, then "his attorney—acting as next friend—can sign for his client, thus allowing the [PCR] petition to go forward." *Id.* (internal quotation mark omitted) (citing *Whitmore*, 495 U.S. at 162–63). "'[N]ext friends,'" according to *Whitmore*, "appear in court on behalf of detained prisoners who are unable, usually because of mental incompetence or inaccessibility, to seek relief themselves." *Whitmore*, 495 U.S. at 162 (citing *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 13 n.3 (1955)); *see also* Miss. Code Ann. § 99-19-57(2)(a) (Rev. 2020) (allowing "a person acting as . . . next friend" to file a post-conviction application for a mentally ill offender who is sentenced to death).

## II. Whether the Court should reconsider the denial of Powers's *Ford v. Wainwright*, 477 U.S. 399 (1986), claim.

¶58. After filing the abeyance motion, Powers moved to amend it "to stay his execution because of his mental health deficits and other combined psychological shortfalls which have diminished his rational understanding of the punishment imposed on him." Specifically, he

25

requested a hearing to determine if he satisfies *Ford*, *Panetti,* 551 U.S. 930 (2007), and *Madison v. Alabama*, 139 S. Ct. 718 (2019).

¶59. In its June 21, 2022 order, the Court denied Powers's motion to amend "without prejudice to his right to seek a stay of execution at the proper time." Corrected En Banc Order, *Powers v. State*, No. 2017-DR-00696-SCT, at *2–3 (Miss. June 21, 2022).

¶60. Powers concedes that, typically, a *Ford* motion is unripe at the present time; however, he argues that his case is atypical and that addressing his *Ford* claim now would expedite finality. The State, on the other hand, maintains the *Ford* claim can be litigated once an execution date is set. Reconsideration of Powers's *Ford* claim is denied.

¶61. In *Tompkins v. Secretary, Department of Corrections*, 557 F.3d 1257, 1260 (11th Cir. 2009), the United States Court of Appeals for the Eleventh Circuit said that a *Ford*/*Panetti* claim is unripe until the time of execution:

> The reason the *Ford* claim was not ripe at the time of the first petition in *Panetti* is not that evidence of an existing or past fact had not been uncovered at that time. Instead, the reason it was unripe was that no *Ford* claim is ever ripe at the time of the first petition because the facts to be measured or proven—the mental state of the petitioner at the time of execution—do not and cannot exist when the execution is years away.

557 F.3d at 1260. The United States Court of Appeals for the Eighth Circuit, too, said that "in both [*Stewart v. Martinez-Villareal*, 523 U.S. 637, (1998),] and *Panetti*, the Supreme Court indicated the setting of an execution date caused the applicants' *Ford* based incompetency claims to become ripe." *Nooner v. Norris*, 499 F.3d 831, 834 (8th Cir. 2007) (citing *Panetti*, 127 S. Ct. at 2852; *Martinez-Villareal*, 523 U.S. at 643).

26

¶62.   *Tompkins* and *Nooner* are consistent with the Supreme Court's more recent opinion in *Madison*.   There, the Supreme Court returned the case to state court "for renewed consideration of Madison's competency (*assuming Alabama sets a new execution date*)." *Madison*, 139 S. Ct. at 731 (emphasis added).

## PART TWO: IMPARTIAL JURY

¶63.   Assistant district attorneys Charles Gray Burdick and Robert Helfrich were the primary prosecutors.   Accompanying them were District Attorney Lindsay Carter and assistant district attorneys Rick Fortenberry and Vanessa Jones.   Dan A. McIntosh III, a thirty-six-year trial veteran, represented Powers.

*Voir Dire Proceedings*

¶64.   During voir dire, the following occurred with respect to Jurors Roger M. Bickford, Faye C. Eppling, Kevin Cuevas, William Russell, Murphy Bond—the five jurors at issue.

¶65.   After the trial judge asked Juror Bickford if his church's views on the death penalty would affect him,   Prosecutor Helfrich disclosed that he and Juror Bickford "play golf together and that kind of stuff."   The judge asked Juror Bickford if that posed a problem, and Juror Bickford answered, "No, sir."   Later, when prospective jurors were questioned about any relationship with trial participants, Juror Bickford said, "I play golf with Bob."

¶66.   Later, Juror Eppling volunteered that she knew Prosecutor Burdick.  Prosecutor Burdick was an associate professor, and Juror Eppling either had been or was at that time one of his students.   "[Prosecutor Burdick] tells me that you're an A student," the judge remarked.  When the judge first asked Juror Eppling if her student-teacher relationship with

27

Prosecutor Burdick would "have any bearing with [her] in the trial," she answered, "Yes." The judge replied that he "th[ought] [she] [had] answered the[] same questions . . . back in chambers." He then twice asked if she could be fair and impartial: "Can you be fair and impartial? . . . . Could you listen to the testimony and receive the evidence and that coupled with the instructions of law arrive at a verdict that could be fair and impartial to both sides; could you do that?" Both times, she answered, "Yes."

¶67. Moving on, the judge asked if any prospective juror knew Lafferty, her parents, or her brother, Todd. Juror Cuevas said he knew Lafferty, or "Mary Beth" as he called her. Twice, the judge asked Juror Cuevas if Lafferty was a close personal friend or an acquaintance. Both times, Juror Cuevas answered, "Acquaintance." Juror Cuevas said nothing about that acquaintanceship would affect him at trial. He denied any knowledge about the alleged facts and affirmed that he could be fair and impartial.

¶68. The judge then turned to Juror Russell. Juror Russell said he knew Todd "real well." They had been high-school classmates. When asked if Todd was a personal friend or an acquaintance, Juror Russell answered, "Personal friend." Even so, Juror Russell said he neither had spoken to Todd about the case nor knew any of the alleged facts. Juror Russell affirmed that he had formed no opinion about the case and that he could be fair and impartial.

¶69. Continuing on, the judge read aloud a list of potential witnesses and asked prospective jurors if they knew anyone on the list. Juror Bond knew two: Hattiesburg Police Department (HPD) Chief Charlie Sims and Detective Robbie Suber. For nearly a year and a half, from May 1997 to October 1998—during the time of Lafferty's murder—Juror Bond had worked

with HPD. ***Powers I***, 883 So. 2d at 24. Yet Juror Bond said that he neither had investigated anything in the case nor knew anything about the facts. Jurors Cuevas and Russell interjected that they, too, knew Chief Sims. In fact, many prospective jurors knew people on the list.

¶70. Rather than question prospective jurors individually, the judge asked them collectively if anything about their relationship with any potential witness would affect them. "Anything whatsoever," the judge said, "even if it's just a small scintilla or anything that would remotely cause you to feel one way of the other just because you know them." No one responded. The judge added that some potential witnesses were law-enforcement officers and asked if that affected anyone. Again, no one responded.

¶71. The judge then asked if anyone had ever been forensic pathologist Dr. Steven Hayne's or Dr. Michael West's patient. Juror Cuevas disclosed that he had been Dr. West's patient twelve years earlier but said that that would not affect him at trial.

¶72. Finally, the trial judge asked prospective jurors collectively:

> Is there anything about your knowledge of, acquaintance with either the parties, the witnesses, attorneys, whether it is a matter of like or dislike or whether it arises from friendship, personal association, business association, fraternal affiliation, church membership or otherwise that would in any manner affect you in the trial of this case? If so, raise your hand. Anybody whatsoever?
>
> . . . .
>
> Going one by one or row by row. Is there anybody . . . who has heard anything at all about the alleged facts of this case whether it was at the time that it occurred or subsequently either by way of radio, television newspaper or whatever? . .

A few prospective jurors responded but not Jurors Bickford, Eppling, Cuevas, Russell, or Bond. And all prospective jurors affirmed that they would "accept and be governed by" the court's instructions."

¶73. The judge said the "sole purpose" of the questions he had asked (and that counsel would ask) was to "get a jury that will be fair and impartial to both sides." "It's possible," he said, "that I may not have asked you a particular question necessary for you to speak up, but whether or not I have asked the appropriate question, at this time are there any among you who feel you cannot be fair and impartial to both sides in the trial of this case? If you will, raise your hand." No one did.

¶74. At the end of jury selection, Powers had three unused peremptory challenges. Powers affirmed that he had had input in selecting the jury and that he was satisfied with the jury's composition.

¶75. At some point before trial (when, exactly, is unclear), the judge administered the capital oath. That oath requires jurors to swear "to 'well and truly try the issue between the state and the prisoner, and a true verdict give according to the evidence and the law.'"

¶76. At both the guilt and sentencing phases, the jury was instructed, in part, to (a) "determine the facts and to determine them from the evidence produced in open court"; (b) "not be influenced by bias, sympathy, or prejudice"; and (c) reach a decision "only after an impartial consideration of the evidence."

*Powers II*

30

¶77.   In *Powers II*, 945 So. 2d 386, Mississippi Office of Capital Post Conviction Counsel attorneys Robert M. Ryan, Louwlynn Vanzetta Williams, and Williams J. Clayton represented Powers.

¶78.   Powers argued, in part, that the trial court "den[ied] the right to trial before an[] impartial jury." As support, he offered an affidavit from Juror Charlotte Duckworth, the only African-American on the jury. "During [jury] deliberations," she said, "[Juror Cuevas] mentioned that he was acquainted with [Lafferty]. He stated that she would deliver[] packages to him via UPS. He stated [Lafferty] was very nice and outgoing." According to Powers, Juror Cuevas conveyed that information "after a question arose during the course of deliberation as to why so many people were at Ms. Lafferty's home." Powers first argued that "[a] juror's interjection of unique personal experiences or knowledge into jury deliberations constitutes misconduct because it creates a risk that the juror acts as an expert witness not subject to examination in court." *Id.*   Second, he asserted that Juror Cuevas conveyed improper, nonrecord character evidence:

> The information . . . regarding Ms. Lafferty's employment and character was not a part of the evidence presented at trial yet it found its way into the jury room and into deliberations. Juror Cuevas had stated during voir dire that he was acquainted with Ms. Lafferty but did not provide any additional information. What should be noted is that Juror Cuveas did refer to Ms. Lafferty by a nickname "Mary Beth" rather than by "Elizabeth" which is the name used by the court in voir dire. The use of which tends to indicate more than a passing acquaintance especially given that Juror Cuveas was aware of her "outgoing" personality.

Powers thus requested an evidentiary hearing "to determine the extent of the extraneous information and what effect th[e] information had on the jury during the course of

31

deliberations."  The ***Powers II*** Court rejected his claim. 945 So. 2d at 397.  It held that the issue could have been raised on direct appeal and was thus barred.  Bar aside, it held that the claim lacked merit:

> Powers claims that during the course of deliberations, [Juror] Cuevas made it known that he was personally acquainted with the victim because she had delivered packages to his door.  Powers claims bias on the part of the juror because he purportedly told another juror that the victim had an outgoing personality.  The record reflects, however, that [Juror] Cuevas stated during voir dire that he was an acquaintance of the victim, Elizabeth Lafferty. Powers cannot now claim surprise or any other prejudice to his defense.

***Id.***

 **I.**  **Whether Powers was denied the right to trial by a fair, impartial jury.**

¶79. The federal and Mississippi Constitutions guarantee the right to a fair trial by an impartial jury. ***Johnson v. State***, 476 So. 2d 1195, 1209 (Miss. 1985) (citing ***Adams v. State***, 220 Miss. 812, 72 So. 2d 211 (1954)); *see also* ***Irvin v. Dowd***, 366 U.S. 717, 722 (1961) ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.").

¶80. Powers argues that he was denied that right and is entitled to post-conviction relief for four reasons.  First, Juror Cuevas told the jury nonrecord character evidence about Lafferty.  Second, the trial judge failed to ensure that the empaneled jury was impartial. Third, trial counsel was ineffective for failing to challenge Jurors Cuevas, Russell, Bickford, Eppling, and Bond for cause.  Fourth, post-conviction counsel were ineffective for failing to properly investigate and present juror bias and trial counsel's ineffectiveness regarding that issue.

¶81. Before reaching those arguments, Powers first asserts that the federal district court's ruling in itself requires an evidentiary hearing.

### A. Whether the federal district court's ruling that Powers's impartial-jury claims are "sufficiently meritorious to warrant consideration" requires an evidentiary hearing.

¶82. Powers's argument centers on the federal district court's finding that his claims concerning Jurors Cuevas, Russell, Bickford, and Eppling were "sufficiently meritorious to warrant consideration." He reasons as follows. To merit a stay under **Rhines v. Weber**, the unexhausted claims need only be "*potentially* meritorious." **Rhines v. Weber** 544 U.S. 269, 278 (2005) (emphasis added). Here, however, the federal district court found his claims "*sufficiently* meritorious." "Sufficiently meritorious," Powers maintains, is synonymous with a *prima facie* showing—which, according to him, is all the UPCCRA requires to merit an evidentiary hearing.

¶83. Powers maintains that the UPCCRA has a *prima facie* pleading standard. Mississippi Code Section 99-39-27(5) (Rev. 2020) requires that "a substantial showing of the denial of a state or federal right" be shown "from the face of the application, motion, exhibits and the prior record." "[F]rom the face," he argues, means a "*prima facie* showing." **Robertson v. State**, 669 So. 2d 11 (Miss. 1996), and **Archer v. State**, 986 So. 2d 951 (Miss. 2008), say that such showing merits an evidentiary hearing. **Robertson** said that

> [a] *prima facie claim* must be stated by the defendant in his petition to the lower court in order to obtain an evidentiary hearing on the merits of an ineffective assistance of counsel issue.
>
> > We adhere to the principle that a post-conviction relief petition which meets *basic pleading requirements* is sufficient to mandate an evidentiary hearing unless it appears beyond doubt

> that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

669 So. 2d at 13 (emphasis added) (citations omitted). *Archer* said that "[i]f [Archer's] [post-conviction] application states a *prima facie claim*, he then will be entitled to an evidentiary hearing on the merits of that issue in the [trial court]." 986 So. 2d at 957 (emphasis added).

¶84. So by promoting a *prima facie* pleading standard and equating *prima facie* to "sufficiently meritorious," Powers reasons that the federal district court already found that he has made the necessary showing to require an evidentiary hearing.

¶85. Were the Court now to deviate from the *prima facie* standard, he contends, the Court would violate due process and lose the deference its findings are ordinarily afforded in federal *habeas* proceedings. More than once, he maintains, the United States Court of Appeals for the Fifth Circuit has found due-process problems in how we have applied an evidentiary-hearing standard. *See Wiley v. Epps*, 625 F.3d 199, 211–13 (5th Cir. 2010). If no evidentiary hearing is granted here, he adds, the Court will be acting as "quasi-fact finders," effectively conducting "an evidentiary hearing 'on the papers.'"

¶86. The State disagrees. It contends the federal district court's "sufficiently meritorious" finding related solely to the court's determination that Powers's claims "were not 'plainly meritless' for purposes of a *Rhines* stay." In any event, the State contends Powers must persuade the *Mississippi Supreme Court*—not a single federal district court judge—that he satisfies Section 99-39-27(5).

¶87.   We hold that the federal district court's "sufficiently meritorious" finding does not require an evidentiary hearing.

¶88.   First, **Robertson** is inapplicable, and **Archer** stated the standard imprecisely. **Robertson** concerned a post-conviction petition filed *in the trial court*—not a post-conviction application filed here. 669 So. 2d at 13 ("A prima facie claim must be stated by the defendant *in his petition to the lower court* in order to obtain an evidentiary hearing . . . ." (emphasis added) (citing **Brooks v. State**, 573 So. 2d 1350, 1353 (Miss. 1990))). **Archer**, on the other hand, indeed said that an evidentiary hearing would be merited if Archer's post-conviction application stated a prima face claim. **Archer**, 986 So. 2d at 957. More precisely, the Court grants leave only if "the application, motion, exhibits, and prior record show that the claims are not procedurally barred and that they 'present a *substantial showing* of the denial of a state or federal right.'" **Evans**, 294 So. 3d at 1157 (emphasis added) (quoting **Ronk**, 267 So. 3d at 1247).

¶89.   "[A] substantial showing of the denial of a constitutional right" is what federal *habeas* petitioners seeking a certificate of appeal ability must show. **Miller-El v. Cockrel**, 537 U.S. 322, 327 (2003) (internal quotation marks omitted) (quoting 28 U.S.C. § 2253(c)(2)). That means "demonstrating that jurists of reason could disagree with the [federal] district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." **Id.** (citing **Slack v. McDaniels**, 529 U.S. 473, 484 (2000)).

¶90.   Second, whether to grant any form of post-conviction relief is a decision for the Court. *It* must examine "[the original motion, together with all files, records, transcripts and

35

correspondence relating to the judgment under attack," Miss. Code. Ann. § 99-39-27(4) (Rev. 2020), and find that the claims are unbarred and present a "substantial showing of the denial of a state or federal right." § 99-39-27(5); *see* ***Williams v. State***, 158 So. 3d 309, 312 (Miss. 2015) ("Because *we* find that Williams's motion presents no 'substantial showing of the denial of a state or federal right,' we affirm the judgment of the circuit judge." (emphasis added)). Only then is the Court "empowered to grant the application." Miss. Code. Ann. § 99-39-27(6) (Rev. 2020).

**B.      Whether Juror Cuevas's giving nonrecord character evidence violated Powers's right to a fair trial.**

¶91.    The presumption of jury impartiality can be overcome "by evidence that extrinsic factual matter tainted the jury's deliberations." ***United States v. O'Keefe***, 722 F.2d 1175, 1179 (5th Cir. 1983) (citing ***United States v. Winkle***, 587 F.2d 705, 714 (5th Cir.)), *cert. denied*, 444 U.S. 827 (1979).

*Juror Cuevas-Related Claim*

¶92.    Powers argues that by describing Lafferty's character in a positive light during jury deliberations, Juror Cuevas introduced highly prejudicial, nonrecord character evidence, contradicted his assurances of impartiality, and broke his juror oath. As discussed already, the ***Powers II*** Court held that the Juror Cuevas-related claim was barred and meritless. ***Powers II***, 945 So. 2d at 397. Yet Powers asserts, in part, that post-conviction counsel were ineffective in presenting the claim.

¶93.    Under ***Strickland***, counsel are ineffective when their "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having

36

produced a just result." ***Brown***, 306 So. 3d at 749 (internal quotation mark omitted) (quoting ***Grayson***, 118 So. 3d at 126–27). Two prongs must be met. ***Id.*** (quoting ***Grayson***, 118 So. 3d at 126–27). First, a petitioner must show that his or her counsel was deficient—*i.e.*, "that 'counsel made errors so serious that [he or she was] not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" ***Id.*** (alteration in original) (quoting ***Grayson***, 118 So. 3d at 126–27). Second, a petitioner must show prejudice—*i.e.*, "that 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" ***Id.*** (quoting ***Grayson***, 118 So. 3d at 126–27). There must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Id.*** (internal quotation marks omitted) (quoting ***Grayson***, 118 So. 3d at 126–27). "Put differently, 'there must be "[a] reasonable probability that at least one juror would have struck a different balance."'" ***Ronk***, 267 So. 3d at 1248 (quoting ***Isham v. State***, 161 So. 3d 1076, 1089 (Miss. 2015)). A strong presumption exists "that counsel's conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy." ***Brown***, 306 So. 3d at 749 (internal quotation marks omitted) (quoting ***Grayson***, 118 So. 3d at 126–27).

¶94. "The ***Strickland*** standard must be applied with 'scrupulous care.'" ***Cullen***, 563 U.S. at 197 (citing ***Harrington v. Richter***, 562 U.S. 86, 105 (2011)). "[S]urmounting [its] high bar is never an easy task." ***Id.*** (internal quotation marks omitted) (second alteration in original) (quoting ***Richter***, 562 U.S. at 105).

¶95. Here, Powers argues that Juror Duckworth's affidavit in *Powers II* was either newly discovered evidence (and thus excepted from the bars under Mississippi Code Section 99-39-5(2)(a)(i) (Rev. 2020)) *or* post-conviction counsel were ineffective for failing to argue that—*or* both. He faults post-conviction counsel's ineffectiveness for what he deems the *Powers II* Court's erroneous decision on the Juror Cuevas-related claim. Powers likens his case to *Brake v. Speed*, 605 So. 2d 28 (Miss. 1992). There, the plaintiff appealed a personal-injury verdict, arguing, in part, that the trial court erred by refusing to hold a hearing to determine if certain jurors were improperly influenced. *Brake*, 605 So. 2d at 29. Specifically, according to plaintiff's counsel, certain jurors claimed that they had seen the plaintiff playing with her grandchild during one or more court recesses; another juror believed that he or she had seen the plaintiff playing golf before trial. *Id.* Though the Court declined to decide the improper-jury-influence claim because the issue was not properly before it, it said that "[the information in question . . . [wa]s information sufficient to meet the 'outside influence' threshold." *Id.* at 37. "If the information is outside the record of proceedings in open court," it said, "it is an outside influence under the rule." *Id.*

¶96. In response, the State contends that even if the *Powers II* Court had deemed Juror Duckworth's affidavit newly discovered evidence and excepted the claim, the result would have been the same. The newly-discovered-evidence exception requires "evidence, not reasonably discoverable at the time of trial, which is of such nature that it would be *practically conclusive* that had such been introduced at trial it would have caused a different result in the conviction or sentence." § 99-39-5(2)(a)(i) (emphasis added). That exception would have been unmet in *Powers II*, the State argues, because the Court held that the claim

38

was barred *and meritless*. So it is not "practically conclusive" that Juror Duckworth's affidavit would have caused a different result. Further, the State questions the value of Juror Duckworth's affidavit because it was obtained in violation of the procedure set forth in *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407 (Miss. 1993).

*Bars*

¶97.    Powers argues his claim is unbarred for two reasons. First, he maintains waiver bars of Sections 99-39-21(1) and (2) are inapplicable. Section 99-39-21(1) is inapplicable, he argues, because the claim was incapable of determination at trial or on direct appeal—it is based on facts (*i.e.*, Juror Duckworth's affidavit) outside the direct-appeal record. Section 99-39-21(2), by contrast requires the factual issue(s) to have been litigated both at trial *and* on direct appeal. They were not here, he contends, because he first learned of Juror Cuevas's comments post-conviction. Second, he argues that Section 99-39-21(3)'s *res judicata* bar is inapplicable because it requires the claim to have been "*decided* at trial *and* on direct appeal." Neither occurred here, he maintains, nor was the claim even capable of determination at those stages. Still more, he argues "the common-law doctrine of *res judicata* does not apply to post-conviction claims of constitutional dimensions." **Fluker v. State**, 170 So. 3d 471, 475 (Miss. 2015)).

¶98.    If any bar applies, he argues that relief from the bar(s) is merited for five reasons: (1) post-conviction counsel's ineffectiveness; (2) the Court's inherent power to overrule erroneous precedent, *see* **J.K. v. R.K.**, 30 So. 3d 290, 296 (Miss. 2009) (citing **Simpson v. State Farm Fire & Cas. Co.**, 564 So. 2d 1374, 1377 (Miss. 1990), *abrogated in part by* **Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n**, 964 So. 2d 1100 (Miss. 2007));

39

(3) the fundamental-rights exception, *see Johnson*, 476 So. 2d at 1209 ("The right to a fair trial by an impartial jury is fundamental and essential to our form of government."); (4) the federal district court's entering a *Rhines* stay to allow the Court to review his impartial-jury claims; and (5) the State's conceding that the Court should address juror bias.

¶99. In response, the State maintains the claim is waived, *res judicata* barred, and meritless. The State stresses that the *Powers II* Court held that the Juror Cuevas-related claim not only was barred but also was meritless, and the State contends impartial-jury claims are not a recognized fundamental-rights exception. Still more, the State denies any concession and maintains that a *Rhines* stay alone does not merit relief from the bars.

¶100. No relief is merited. Powers's claim lacks any arguable basis to merit relief from the bars even if they applied. Juror Cuevas's comment was not "qualitatively different from the evidence properly before the jury[.]" *Brake*, 605 So. 2d at 36 ("Where [a juror's] extra-record facts affect an issue of importance in the case and are qualitatively different from the evidence properly before the jury, a new trial may be ordered." (quoting *Salter v. Watkins*, 513 So. 2d 569, 571 (Miss. 1987))). Moreover, Powers does not present a substantial showing that post-conviction counsel were ineffective.

¶101. Addressing the bars first, *res judicata* has been applied to claims that were considered and rejected in prior post-conviction proceedings. *Jordan v. State*, 213 So. 3d 40, 43 (Miss. 2016) (applying *res judicata* when the "exact issue" was considered and rejected in prior post-conviction proceedings); *Grayson*, 118 So. 3d at 141 (applying *res judicata* to a claim that was considered and rejected in prior post-conviction proceedings); *Brawner v. State*, 166 So. 3d 22, 23 (Miss. 2012) (mem.) (applying *res judicata* to claims that were "previously

40

litigated . . . in this Court on post-conviction review and in federal *habeas* corpus proceedings" (citing ***Brawner v. Epps***, No. 2:07-cv-16-MPM, 2010 WL 383734 (N.D. Miss. Jan. 27, 2010)). Here, the ***Powers II*** Court held the Juror Cuevas-related claim was barred *and* meritless. 945 So. 2d at 397. Hence, *res judicata* applies.

¶102. The successive-writ bar also applies. *See **Fluker***, 170 So. 3d at 475 ("[The common-law doctrine of *res judicata* does not apply to post-conviction claims of constitutional dimensions. Rather, *res judicata* concerns attendant to a successive motion for PCR are governed by the statutory successive-pleadings bar." (citing ***Smith v. State***, 149 So. 3d 1027, 1032 (Miss. 2014))).

¶103. In any event, no matter whether Powers's claim meets a fundamental-rights exception, his ineffective-assistance-of-post-conviction-counsel claim is unbarred. *See **Brown***, 306 So. 3d at 748 (citing ***Grayson***, 118 So. 3d at 126).

¶104. As for Powers's arguments that the bars are inapplicable based on the ***Rhines*** stay and the State's purported concession, neither argument has merit. Powers effectively concedes that a ***Rhines*** stay alone does not except his claims from the bars. To support his concession argument, he cites page four of the State's response opposing a prior motion. However, nothing on that page indicates a concession. The State simply argued that Powers's assistance was unnecessary for current post-conviction counsel to argue his claims here—especially the impartial-jury claims.

¶105. Turning to the merits, the claim neither has any arguable basis nor does Powers present a substantial showing that post-conviction counsel were ineffective.

¶106. Juror Cuevas's comment was not "qualitatively different from the evidence properly before the jury." **Brake**, 605 So. 2d at 36 (quoting **Salter**, 513 So. 2d at 571). At least twice during trial, the jury heard evidence similar to Juror Cuevas's description of Lafferty as "very nice and outgoing." When Amanda Parrigin, who had known Lafferty all her life, was asked if she was surprised that Lafferty had invited three Black men to her house for a barbeque, Parrigin said, "Oh, no, sir." "When it came to [Lafferty]," Parrigin elaborated, "as far as friends, it didn't matter if you were black, white, rich or poor. She liked everyone." Likewise, Eddie Barnes, who actually attended the barbeque and had known Lafferty for three to four weeks, described Lafferty as friendly:

> Q. What kind of relationship did you have with her? How would you characterize the relationship?
>
> [Barnes]. A friendly one, a trustful one. Me and -- I met Beth during the time that I was mowing yards in her neighborhood and happened to come to her one day. I was sweating, and she just asked me did I want a cold glass of water, and she also offered me a beer.
>
> Q. Would you characterize her as a open, friendly girl?
>
> [Barnes]. Yeah. Beth was, I'd say, more of -- she was an open person.
>
> Q. She liked everybody?

[Barnes]. That the way she was with me. I mean, you know, we were real good friends.

¶107. As for whether Juror Cuevas's referring to Lafferty as "Mary Beth" suggested that the two were more than mere acquaintances, Juror Duckworth's affidavit does not offer support. Juror Duckworth's affidavit said only that Lafferty "delivered packages to [Juror Cuevas] via UPS." Even those brief interactions would have enabled Juror Cuevas to perceive (correctly, it appears) Lafferty as "very nice and outgoing."

42

¶108. It follows, then, that post-conviction counsel were not ineffective. Their performance was not deficient. They clearly argued that the nonrecord employment and character evidence Juror Cuevas conveyed to the jury denied Powers the right to a fair trial by an impartial jury. They cited Juror Duckworth's affidavit, in which she said that she disclosed Juror Cuevas's comment nearly a year after the direct-appeal mandate had issued. In the post-conviction petition, they said that "Lafferty's employment and character *was not part of the evidence presented at trial* yet it found its way into the jury room and into deliberations."

¶109. As for Powers's contention (echoed by the federal district court) that the Court in *Powers II* erred by applying the bar, the *Powers II* Court also held that the claim was meritless. *Powers II*, 945 So. 2d at 391. Powers could not allege surprise or prejudice, it reasoned, because Juror Cuevas had disclosed that he was an acquaintance of Lafferty. *Id.* As the federal district court noted, that reasoning is questionable: "Powers could not have anticipated that [Juror] Cuevas would give his opinion of [Lafferty's] character to the jury during deliberations," it said. But still, it is not "practically conclusive" that Juror Duckworth's affidavit concerning Juror Cuevas's comment would have changed the result. § 99-39-5(2)(a)(i). As discussed already, the jury heard trial evidence similar to what Juror Cuevas conveyed to them.

¶110. We hold that Powers's Juror Cuevas-related claim neither has any arguable basis nor does he present a substantial showing that post-conviction counsel were ineffective.

    **C.    Whether the trial judge failed to ensure that the empaneled jury could render an impartial verdict, or alternatively, whether trial**

**and post-conviction counsel were ineffective in failing to raise the issue.**

¶111.  Voir dire—the "process through which 'a judge or lawyer' examines 'a prospective juror' to see if 'the prospect is qualified and suitable to serve on a jury,'" ***United States v. Parker***, 872 F.3d 1, 3 n.1 (1st Cir. 2017) (quoting *Voir Dire*, Black's Law Dictionary (10th ed. 2014)), helps ensure that the right to an impartial jury is honored.  ***Rosales-Lopez v. United States***, 451 U.S. 182, 188 (1981); *see also* ***Smith v. Phillips***, 455 U.S. 209, 217 (1982) (describing voir dire as a "safeguard[] of juror impartiality").

¶112.  Prospective jurors may be challenged either for cause or peremptorily.  "[G]enerally a juror who may be removed on a challenge for cause is one against whom a cause for challenge exists that would likely [affect] his competency or his impartiality at trial."  ***West v. State***, 820 So. 2d 668, 671 (Miss. 2001) (internal quotation marks omitted) (quoting ***Billiot v. State***, 454 So. 2d 445, 457 (Miss. 1984)).  Peremptory challenges, on the other hand, can be made for any reason except an unconstitutional basis, such as race, gender, or ethnic origin.  ***United States v. Blanding***, 250 F.3d 858, 860, 860 n.2 (4th Cir. 2001); ***Hernandez v. New York***, 500 U.S. 352, 374 (1991) (O'Connor, J., concurring) ("Absent intentional discrimination violative of the Equal Protection Clause, parties should be free to exercise their peremptory strikes for any reason, or no reason at all.")

¶113.  "One of the purposes of challenges, for cause and peremptory, is to eliminate jurors who have expressed or implied prejudices . . . ."  ***Taylor v. State***, 656 So. 2d 104, 111 (Miss. 1995).  "A juror is biased if his 'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  ***Buckner v. Davis***,

44

945 F.3d 906, 910 (5th Cir. 2019) (citing *Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009)). Bias "may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as matter of law." *United States v. Wood*, 299 U.S. 123, 133 (1936).

¶114. "Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (internal quotation marks omitted) (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997)). It can come to light in two ways: "by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed." *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) (citing *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972)). "[D]oubts about the existence of actual bias should be resolved against permitting the juror to serve." *Virgil v. Dretke*, 446 F.3d 598, 606–07 (5th Cir. 2006) (internal quotation marks omitted) (quoting *Nell*, 526 F.2d at 1230).

¶115. Implied bias is "confined to a narrow range of cases." *Brooks v. Dretke*, 418 F.3d 430, 433 (5th Cir. 2005). The Supreme Court disfavors imputing bias to jurors, and only "extreme situations" justify doing so. *Solis v. Cockrel*, 342 F.3d 392, 396 (5th Cir. 2003) (emphasis omitted) (internal quotation marks omitted) (quoting *Andrews v. Collins*, 21 F.3d 612, 620 (5th Cir. 1994)); *Gonzales v. Thomas*, 99 F.3d 978, 987 (10th Cir. 1996) ("The implied bias doctrine should not be invoked lightly."); *Hunley v. Godinez*, 975 F.2d 316, 320 (7th Cir. 1992) ("[The 'implied bias' test should rarely apply.")

¶116. In a concurring opinion in *Phillips*, Justice O'Connor gave three examples of "extreme situations that would justify a finding of implied bias": (1) "a revelation that the

45

juror is an actual employee of the prosecuting agency"; (2) "that the juror is a close relative of one of the participants in the trial or the criminal transaction"; or (3) "that the juror was a witness or somehow involved in the criminal transaction." 455 U.S. at 222. The question is "whether an average person in the position of the juror in controversy would be prejudiced." *United States v. Mitchell*, 690 F.3d 137, 142 (3d Cir. 2012) (internal quotation marks omitted) (quoting *Torres*, 128 F.3d at 45). Most "cases embracing the implied bias doctrine . . . have done so because the juror had a close relationship with one of the important actors in the case or was otherwise emotionally involved in the case, usually because the juror was the victim of a similar crime." *Solis*, 342 F.3d at 398–99 (citing *United States v. Greer*, 285 F.3d 158, 172 (2d Cir. 2002)).

¶117. Circuit courts of appeals are split on whether the implied-bias doctrine is clearly established federal law. *Uranga v. Davis*, 893 F.3d 282, 288 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1179 (2019). The Fifth Circuit's position is unclear. *Compare Buckner*, 945 F.3d at 913 (noting that *Uranga* said "it was unclear whether [the Fifth Circuit] has recognized the implied-bias doctrine as clearly established federal law" (citing *Uranga*, 893 F.3d at 288)), *with Brooks*, 418 F.3d at 433 ("[W]e are persuaded that the principle of implied bias is settled federal law . . . .").

¶118. In implied-bias cases, "[a] prospective juror's assessment of her own ability to remain impartial is irrelevant . . . ." *Mitchell*, 690 F.3d at 143 (citing *Torres*, 128 F.3d at 45); *Craaybeek v. Lumpkin*, 855 F. App'x 942, 948 (5th Cir. 2021) ("[A] juror's assurance that he can be fair and impartial is irrelevant in a true implied bias context . . . ." (citing *Brooks v. Dretke*, 444 F.3d 328, 331(5th Cir. 2006))), *cert denied*, 142 S. Ct. 495 (2021). Otherwise,

46

"jurors take their oaths and responsibilities seriously, and when a prospective juror assures the court that, despite the circumstance that raises some question as to his qualification, this will not affect his verdict, this promise is entitled to considerable deference." *Patton v. State*, 248 So. 3d 763, 769 (Miss. 2018) (quoting *Scott v. Ball*, 595 So. 2d 848, 850 (Miss. 1992)). When "potential jurors have disclosed the grounds for possible bias but have stated that they could be fair, [the Fifth Circuit] ha[s] held that the defendant was not denied an impartial jury." *Buckner*, 945 F.3d at 911 (citing *Green v. Quarterman*, 213 F. App'x 279, 281 (5th Cir. 2007).

¶119. "It is the duty of the court to see that a competent, fair and impartial jury is empaneled." *Marshall Durbin, Inc. v. Tew*, 381 So. 2d 152, 154 (Miss. 1980) (internal quotation marks omitted) (quoting *Miss. Power Co. v. Stribling*, 191 Miss. 832, 3 So. 2d 807, 810 (1941))); *Ross v. State*, 954 So. 2d 968, 988 (Miss. 2007) (affirming that "it is the obligation of the trial court to insure that the jury impaneled in a case can render an impartial judgment" (citing *Puckett v. State*, 737 So. 2d 322, 332 (Miss. 1999))); *see also Hudson v. Taleff*, 546 So. 2d 359, 362–63 (Miss. 1989) ("Respect for the sanctity of an impartial trial requires that courts guard against even the appearance of unfairness for 'public confidence in the fairness of jury trials is essential to the existence of our legal system.'" (quoting *Mhoon v. State*, 464 So. 2d 77, 81 (Miss. 1985))). "[I]n determining whether to excuse prospective jurors, including those challenged for cause," trial judges have "wide discretion." *Bell v. State*, 725 So. 2d 836, 846 (Miss. 1998) (citing *Scott*, 595 So. 2d at 849).

¶120. As for trial counsel, "protect[ing] [their] client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the

47

defense" has been described as one of their "most essential responsibilities." ***Miller v. Francis***, 269 F.3d 609, 615 (6th Cir. 2001). Counsel's "actions during voir dire are considered to be a matter of trial strategy," however, "and as such, cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" ***Bell v. State***, 879 So. 2d 423, 436 (Miss. 2004) (quoting ***Burns v. State***, 813 So. 2d 668, 675–76 (Miss. 2001)). "[N]o sound trial strategy . . . support[s] counsel's effective waiver of [a] [p]etitioner's basic Sixth Amendment right to trial by impartial jury." ***Hughes***, 258 F.3d at 463.

¶121. Because Powers's ineffective-assistance claims here are "based on his trial counsel's failure to strike a biased juror, [he] must show that the juror was actually biased against him." ***Miller v. Webb***, 385 F.3d 666, 674 (6th Cir. 2004) (citing ***Hughes***, 258 F.3d at 458); ***Goeders v. Hundley***, 59 F.3d 73, 75 (8th Cir. 1995) ("Goeders'[s] claim of ineffective assistance of counsel is grounded in the claim that counsel failed to strike a biased juror. To maintain a claim that a biased juror prejudiced him, however, Goeders must show that the juror was actually biased against him." (citing ***Phillips***, 455 U.S. at 215)).

*Impartial-Jury Claims*

¶122. Powers asserts that Jurors Cuevas, Eppling, Russell, Bickford, and Bond were biased. He first argues that the trial judge failed to ensure impartiality by making no substantive inquiry into those jurors' relationships to the parties. Second, he argues that trial counsel was ineffective for not striking them. Third, he argues that post-conviction counsel were ineffective for failing to ensure that he received a fair, impartial jury—specifically, they

48

neglected to investigate and to argue trial counsel's ineffectiveness in failing to strike biased jurors. Finally, he asserts that cumulative error merits relief.

¶123. Powers begins with Jurors Cuevas, Russell, and Bickford. Juror Cuevas not only knew Lafferty and HPD Chief Sims, but also had been one of Dr. West's patients. Juror Russell, too, knew HPD Chief Sims and was friends with Lafferty's brother. Juror Bickford golfed with Prosecutor Helfrich. Yet neither the trial judge nor trial counsel questioned those jurors more in depth about the nature of those relationships. "[G]olf," Powers writes, "entails spending hours together . . . in close proximity and relative isolation." That Juror Bickford golfed with Prosecutor Helfrich and referred to him as "Bob," then, suggests that the two were more than mere acquaintances. Powers then highlights Juror Eppling and Prosecutor Burdick's student-teacher relationship. Because of that relationship, Powers argues Juror Eppling faced the same pressures as an employee of the prosecuting agency—*i.e.*, out of loyalty, fear of retribution, or embarrassment from contradicting an authority figure's wishes, she felt more inclined to vote guilty.

¶124. Potential retribution, he maintains, is sufficient to presume prejudice. *See Brooks*, 418 F.3d at 430. In *Brooks*, for example, the Fifth Circuit vacated a death sentence because of a juror's implied bias. *Brooks*, 418 F.3d at 430–31. During sentencing there, a juror was arrested for unlawfully carrying a gun into the courthouse and faced future prosecution by the same district attorney's office that was prosecuting Brooks. *Id.* Based on "the sum of all factual circumstances," the Fifth Circuit found implied bias. *Id.* at 435. Though the district attorney there did nothing to exploit his power over that juror, that power presented "an intolerable risk of working its will without the raising of a hand or a nod . . . ." *Id.* at 435.

"[I]n practical ways," the court said, the juror's future was in the district attorney's office's hands even more so than if the juror had been an employee of that office. *Id.*

¶125. Citing Mississippi Code Section 37-3-2(12)(f) (Rev. 2019) (authorizing disciplinary action against licensed teachers who "engage[] in unethical conduct relating to an educator/student relationship") and *Ambach v. Norwick*, 441 U.S. 68, 78–79 (1979) (recognizing teachers' influence in a case addressing whether a state may impose a citizenship requirement for elementary and secondary school teachers), Powers contends Prosecutor Burdick, likewise, had power over Juror Eppling. Teachers' power over students, he claims, is undeniable.

¶126. Powers argues that *Treesh v. Bagley*, 612 F.3d 424 (6th Cir. 2010), is distinguishable. There, the United States Court of Appeals for the Sixth Circuit held that trial counsel were not ineffective for failing to strike a juror who had taken a class taught by the prosecutor. *Treesh*, 612 F.3d at 436–38. The court reasoned that no actual or implied bias was shown. *Id.* at 437–38. In analyzing actual bias, the court said that (a) nothing showed the juror and prosecutor had a close relationship; (b) the juror said that she could be fair and impartial; and (c) "she swore 'to well and truly try the issue joined between the parties in th[e] case and a true verdict enter according to the evidence." *Id.* at 438. As for implied bias, the court said that (a) "there is no Supreme Court precedent recognizing implied bias from a mere student-teacher relationship"; (b) the prosecutor's paralegal had attended the class more than the prosecutor; and (c) "nothing in the record . . . indicate[d] that [their] relationship rose to the level of the sort of extreme or exceptional case where bias is conclusively presumed." *Id.* at 437. What makes *Treesh* distinguishable, Powers argues, is that the juror there was

50

the prosecutor's *former* student; but here, Juror Eppling was Prosecutor Burdick's *current* student. Had the same been true in **Treesh**, he maintains, the result there would have been different.

¶127. Powers maintains the closeness of Juror Eppling and Prosecutor Burdick's relationship, plus Prosecutor Burdick's "superiority," "implicit leverage," and "inherent influence" over her are shown by Prosecutor Burdick's telling the trial judge "in chambers"—and off the record, apparently—about Eppling's "A" grade. "Such [off-the-record] discussion," Powers argues, "is violative of [his] constitutional right to a fair and impartial trial. . . ."

¶128. Powers also emphasizes Juror Eppling's admission that she could not be fair and impartial. When the trial judge first asked if her student-teacher relationship with Prosecutor Burdick would have "any bearing with [her] in the trial of this case[,]" she answered, "Yes." That admission, Powers argues, voids her subsequent assurances of fairness and impartiality, and it should have spurred more questioning. Yet trial counsel neither followed up nor moved to strike her.

¶129. As support, Powers points to **Brown v. State**, 164 So. 3d 1046 (Miss. Ct. App. 2014). There, the Court of Appeals held that trial counsel was ineffective for allowing a biased juror to sit on the jury. **Brown**, 164 So. 3d at 1051. During voir dire, the juror said that "[i]t would be hard to be impartial[,]" *id.* at 1048 (emphasis omitted), and when asked if it would be better if she did not sit on the jury, the juror answered, "Probably so." **Id.** (emphasis omitted). No one inquired further. **Id.** The Court of Appeals held that was error: the juror's responses clearly indicated bias and merited further inquiry. **Id.** at 1051. "[W]hen a juror

51

makes a statement that she thinks she can be fair, but immediately qualifies it with a statement of partiality," the court said, "actual bias is presumed when proper juror rehabilitation and juror assurances of impartiality are absent[.]" *Id.* at 1051 (second alteration in original) (internal quotation marks omitted) (quoting *Miller*, 385 F.3d at 675).

¶130. *Brown* discussed *Hughes*, *Miller*, and *Virgil*. In *Hughes*, the Sixth Circuit held that trial counsel was ineffective for failing to respond to a juror's express admission of bias. 258 F.3d at 462–64. The juror at issue there said that she did not think she could be fair and gave no assurance of impartiality. *Id.* at 459–60. Yet neither the trial court nor trial counsel asked follow-up questions to try and clarify or rehabilitate her. *Id.* at 460. "When a venire person expressly admits bias on *voir dire*, without a court response or follow-up," the court said, "for counsel not to respond in turn is simply a failure 'to exercise the customary skill and diligence that a reasonably competent attorney would provide.'" *Id.* at 462 (quoting *Johnson v. Armontrout*, 961 F.2d 748, 754 (8th Cir. 1992)).

¶131. The Sixth Circuit relied partly on *Hughes* in *Miller*. *Miller*, 385 F.3d at 674. In *Miller*, it held that counsel was ineffective for failing to respond to a juror's qualified statement of impartiality. 385 F.3d at 678. The juror at issue there equivocated. She said she thought she could be fair, but then qualified her statement. *Id.* at 674–75. "[W]hen a juror makes a statement that she thinks she can be fair, but immediately qualifies it with a statement of partiality," the court said, "actual bias is presumed when proper juror rehabilitation and juror assurances of impartiality are absent. . . ." *Id.* at 675.

¶132. And in *Virgil*, the Fifth Circuit held that trial counsel was ineffective for failing to challenge two jurors. 446 F.3d at 613–14. The two jurors there "unequivocally expressed

their inability to serve as fair and impartial jurors," *id.* at 613, and counsel never tried to "clarify, confirm, or rehabilitate th[eir] testimony." *Id.* at 604. The Fifth Circuit faulted counsel's lack of response. *Id.* at 609. "We hold that [the jurors'] unchallenged statements during voir dire that they could not be 'fair and impartial' obligated Virgil's counsel to use a peremptory or for-cause challenge on th[o]se jurors," it wrote. *Id.* at 610.

¶133. Powers argues *Virgil* proves trial counsel's ineffectiveness here. When prospective juror Downing, another of Prosecutor Burdick's students, vaguely answered, "Not that I know[]" when asked if her student-teacher relationship with him would "have a bearing with [her] in the trial of this case[,]" trial counsel probed no further. When Juror Eppling admitted bias, trial counsel did nothing to clarify, confirm, or rehabilitate her admission. As in *Virgil*, then, Powers maintains, someone who expressed an inability to be fair and impartial sat on the jury. Juror Eppling's unchallenged admission of bias coupled with the trial judge and Prosecutor Burdick's off-the-record statements about her being an "A" student proves that he was denied an impartial jury.

¶134. Next, Powers turns to Juror Bond. From May 1997 to October 1998—during the time of Lafferty's murder on or about June 13, 1998—Juror Bond worked with the Hattiesburg Police Department. Powers argues that Juror Bond's employment with the "investigating, arresting, charging, and prosecuting agency" made him implicitly biased. Powers stresses the significance of *when* Juror Bond worked with the police—*i.e.*, before Lafferty's murder, during the ensuing investigation, and after Powers's arrest. That, Powers alleges, made Juror Bond the prosecution's "star" juror. Of the seventy-two prospective jurors listed on the prosecution's venire list, only Juror Bond has a star beside his name.

¶135. Powers likens Juror Bond's situation to the facts in ***United States v. Scott***, 854 F.2d 697 (5th Cir. 1988)—a case "on all fours," he maintains—and ***Bell v. Epps***, No. 3:04 cv 212-8, 2008 WL 2690311 (N.D. Miss. June 20, 2008), *aff'd in part*, 347 F. App'x 73 (5th Cir. 2009). In ***Scott***, the Fifth Circuit held that juror bias required reversal. 854 F.2d at 697, 700. During voir dire there, the trial judge asked prospective jurors collectively if any of them were "serving as law enforcement officials, or are any close relatives." *Id.* at 698. Two prospective jurors said that their spouses were law enforcement officials, and they were excused. *Id.* A third, however, did not disclose that his brother was a deputy sheriff in the office that did some investigation in the case. *Id.* That prospective juror became the jury foreperson, and his law-enforcement connection came to light post-trial. *Id.* At a post-trial hearing, he said that he did not disclose the connection because he did not think it would affect his judgment. *Id.* The Fifth Circuit said that the foreperson's familial law-enforcement connection and his explanation for not disclosing that information raised "a genuine prospect of actual bias[.]" *Id.* at 700. Had he disclosed the relationship, it said, there was no doubt that he would have been challenged and excused for cause, *id.* at 698, and the sincerity of his belief was insufficient. *Id.* at 699. The issue was whether he was biased, and the record implied that he was:

> [The foreperson] consciously censored the information. He believed that it was *his* place, and not the place of the court or defense counsel, to determine whether his relations were a bar to jury service in this case. There is a strong inference that [he] wanted to serve on this jury and thought it unlikely that the court or defense counsel would permit him to do so.
>
> [He] was hostile to what he correctly perceived to be the interests of the defense and the court. This in itself constitutes bias.

54

*Id.*

¶136.  ***Scott***, Powers argues, proves that law enforcement agencies that perform just some of the investigation qualify as a prosecuting agency, and, here, the police department did the *full* investigation.  Still more, Juror Bond was not merely related to a Hattiesburg Police Department law-enforcement official—he was one.  Had trial counsel challenged Juror Bond for cause, then, Powers insists that Juror Bond would have been excused.

¶137.  Shifting to ***Bell***, the federal district court denied death-row inmate Bell's *habeas* petition, finding, in part, that he failed to show that any seated juror was biased. 2008 WL 2690311, at *1, *29, *100.  Six jurors had ties to law enforcement: one's brother-in-law "was on the police force"; a second's husband's first cousin "was on the police force"; a third's husband had been a deputy sheriff four or five years before the murder; a fourth's father had been a deputy sheriff in another county years before the murder; a fifth's brother and uncle were "on the police force," and she was first cousins with an investigator on the case; and a sixth's granddaughter was married to the sheriff's nephew.  The federal district court found that counsel's decision on whether to challenge those jurors was strategic and that Bell failed to show that that decision "permeated his trial with unfairness."  ***Id.*** at *29 (citing ***Teague v. Scott***, 60 F.3d 1167, 1172 (5th Cir. 1995)).  "[Bell] cannot establish bias merely by demonstrating that a relationship existed between seated jurors and members of law enforcement," it said.  ***Id.***  (citing ***United States v. Crooks***, 83 F.3d 103, 107 n.16 (5th Cir. 1996)).  In addition, the jurors at issue affirmed their ability to be impartial. ***Id.***

¶138.  Powers argues ***Bell*** is distinguishable in two ways.  First, unlike ***Bell***, the problem here is not Juror Bond's familial ties to the investigating agency—it is that Juror Bond

55

himself had been a law-enforcement official with the investigating agency. Powers stresses that his challenge to Juror Bond is based on Juror Bond's employment with the prosecuting agency at the time of the crime and afterwards. Juror Bond's police department employment and the time frame thereof, Powers insists, fits squarely with the first extreme situation that Justice O'Connor said "would justify a finding of implied bias": "a revelation that the juror is an actual employee of the prosecuting agency." *Smith*, 455 U.S. at 222. Second, Powers maintains Juror Bond was never asked if his prior employment with Hattiesburg Police Department would affect his ability to be fair and impartial.

¶139. Finally, Powers invokes the cumulative-error doctrine, which "holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross*, 954 So. 2d at 1018 (citing *Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003)). Post-conviction relief is merited here, he argues, based on the "cumulative effect of having almost half of jurors with a clear bias either towards [Lafferty], her family, the prosecutor, or the investigating agency . . . ." He contends that the statistical aberration of so many biased jurors inflicted the panel with an intolerable potential for bias.

¶140. As support, Powers cites *Toyota Motor Corp. v. McLaurin*, 642 So. 2d 351 (Miss. 1994). There, 60 percent of the jury panel had some relationship either with the plaintiff or her counsel, *McLaurin*, 642 So. 2d at 355, and eight seated jurors either had been represented by plaintiff's counsel or had family members who had. *Id.* at 356. The Court held that Toyota was not afforded a fair, impartial jury. *Id.* at 358. "Due to the number of persons on the venire and on the jury who either he/she, or a member of that person's family,

had been represented by [plaintiff's counsel] in the past or would go to him should the need for legal assistance arise in the future," the Court said, "the opportunity for th[o]se persons to exercise their influence over the remainder of the jury was too great a risk to be taken . . . ." *Id.*

In response, the State argues that Powers's claims lack merit for at least five reasons.

¶141. *First*, it argues, a good indication of the claims' lack of merit is the fact that they have gone unraised until now. Powers replies that that argument only strengthens his stance: claims have gone unraised, he maintains, because of trial and post-conviction counsel's ineffectiveness.

¶142. *Second*, the State contends the jurors at issue here disclosed their relationships and swore that the relationships would not affect their ability to be fair and impartial. Such assurances, combined with no evidence of bias, have supported a trial court's finding that jurors could be fair and impartial. *Patton*, 248 So. 3d at 766, 770 (holding that the trial court did not err by declining to strike two jurors who said that their relationship with the victim's brother would not cause them any problems); *see also **Havard v. State***, 928 So. 2d 771, 780–82 (Miss. 2006) (rejecting a claim that trial counsel was ineffective for not striking a juror who, during voir dire, expressed uncertainty about her ability to be fair, but in the extensive questioning that followed gave no indication that she was unable to be fair and impartial); ***Wilcher v. State***, 863 So. 2d 719, 754–55 (Miss. 2003) (rejecting a claim that trial counsel was ineffective for failing to strike a juror whose son was an Assistant United States Attorney, another whose husband worked in United States customs, and a third whose son was in law enforcement when nothing showed that those jurors "could not have been, or in

57

fact were not, fair and impartial"); *Le v. State*, 913 So. 2d 913, 953–55 (Miss. 2005), (rejecting a claim that trial counsel was ineffective for failing to use counsel's final strike on (a) a juror who had been robbed three times, (b) another whose brother-in-law served as an assistant police chief, or (c) one of two jurors who said that they had heard about the case in the media when each juror said that he or she could be fair and impartial), *overruled on other grounds by* **Bonds v. State**, 138 So. 3d 914 (Miss. 2014)).

¶143. Even when a prospective juror has a preconceived opinion about the accused's guilt or innocence, he or she may serve on the jury if he or she "takes an oath that he or she can be fair and impartial in fulfilling the duties of a juror and the trial court is satisfied by that oath . . . ." **Jordan v. State**, 995 So. 2d 94, 103 (Miss. 2008). Here, all jurors took an oath to be fair and impartial. Powers replies that the trial judge here erred by believing the jurors' oaths. *Archer*, 986 So. 2d at 959 ("Archer has failed to show why the trial court's belief in the juror's oath to remain fair and impartial throughout was error."). For one, as discussed later, the judge was surprised about **Batson**. For another, the judge knew of Juror Eppling's admission that her student-teacher relationship with Prosecutor Burdick would affect her ability to be fair and impartial.

¶144. *Third*, the State contends that neither being a law-enforcement officer nor being acquainted with a party merits removal for cause. The Court has said that "there is no reason why an officer or an officer's relative should not serve on a jury if otherwise qualified to follow the law and the evidence," **Patton**, 248 So. 3d at 768 (internal quotation marks omitted) (quoting **Bell**, 725 So. 2d at 846), nor, the Court added, is "[m]ere acquaintance or even family relationships with parties or those related to parties . . . sufficient to require that

58

a juror be excused for cause." *Id.* (internal quotation marks omitted) (quoting *Bell*, 725 So. 2d at 846).

¶145. *Fourth*, as to implied bias, the State maintains it is unclear if the Fifth Circuit recognizes the doctrine as clearly established federal law, and even it is, it is disfavored and justified only in extreme situations—which is not the case here.

¶146. The State maintains *Scott* and *Brooks* are the only cases in which the Fifth Circuit has held that extreme situations merited implied bias. In contrast, the State cites seven cases in which the Fifth Circuit declined to find implicit bias. *See Craaybeek*, 855 F. App'x at 947 (declining to apply implied bias when juror had a law-enforcement background, served as a reserve officer, and knew eight of the prosecution's nine witnesses); *Buckner*, 945 F.3d at 912–14 (declining to impute bias when, in a child sexual-assault case, a juror allegedly had a personal and family history of sexual abuse); *Uranga*, 893 F.3d at 287–89 (declining to impute bias when, at sentencing, evidence showed that, in committing a prior felony, the defendant had driven through and damaged a juror's yard while fleeing from police); *Solis*, 342 F.3d at 393, 399 (declining to impute bias in a burglary trial even though juror believed "that Solis and his brothers had a reputation for breaking into houses"); *United States v. Wilson*, 116 F.3d 1066, 1087 (5th Cir. 1997) ("[F]riendship with the victim of a defendant's alleged crime does not, standing alone, justify a finding of bias." (citing *Montoya v. Scott*, 65 F.3d 405, 420 (5th Cir. 1995), *reh'g en banc granted, opinion vacated sub nom. United States v. Brown*, 123 F.3d 213 (5th Cir. 1997), *and on reh'g en banc,* 161 F.3d 256 (5th Cir. 1998); *Andrews*, 21 F.3d at 620–21 (declining to impute bias to a juror whose "daughter had been married to the victim's grandson"); *Jones v. Butler*, 864 F.2d 348, 361–62 (5th Cir.

59

1988))) (finding no. . . .bias when prospective juror "had lived near the victim and knew her by sight, had visited the funeral home to view her body, had worked at Angola prison for eighteen months six years before the trial, and had worked four years earlier as a hospital lab clerk for a doctor who testified for the State").

¶147. *Craaybeek* in particular, the State argues, is relevant here. There, Craaybeek was convicted of "aggravated assault by threat on a public servant" for shooting at law-enforcement officers, including an officer with the Olney Police Department and Young County Sheriff's deputies. *Craaybeek*, 855 F. App'x at 943. The jury foreperson had worked in law enforcement for twenty-six years, including "a year and a half or so with the Young County Sheriff's Office" that employed two of the prosecution's witnesses/victims. *Id.* at 944. At the time of trial, he served as a reserve officer for the Olney Police Department and knew eight of the prosecution's nine witnesses/victims. *Id.* The Fifth Circuit held that "th[o]se facts f[e]ll 'outside the extreme genre of cases Justice O'Connor pointed to in her concurring opinion in [*Phillips*].'" *Id.* at 947 (citing *Uranga*, 893 F.3d at 288). It wrote that the facts in *Craaybeek* were not the functional equivalent of those extreme situations. *Id.* (citing *Scott*, 854 F.2d at 699). No evidence showed that the foreperson had a close relationship with any witness or was "'emotionally involved' in the case." *Id.* (quoting *Solis*, 342 F.3d at 399). The Fifth Circuit "emphasize[d] that [the foreperson] disclosed the affiliations and acquaintances at issue during voir dire, and trial counsel examined him as to his ability to remain impartial." *Id.* at 948.

¶148. If implied bias was unjustified in *Craaybeek*, the State argues, then surely it is unjustified here. Juror Bond fully disclosed that he worked in some unspecified capacity at

the police department for only a year and a half, knew one witness for the state, and knew nothing about the investigation or facts of the case. Powers replies that *Craaybeek* is distinguishable because the juror there was not an actual employee of the prosecuting agency.

¶149. The State concedes that in *Taylor*, 656 So. 2d at 109–11, the Court held that the trial court should have struck a juror whose sister was employed as an assistant district attorney, but the State contends *Patton* limited *Taylor* to its facts. *Patton*, 248 So. 3d at 770. In *Patton*, Patton argued that the trial court erred by not striking two prospective jurors who knew the decedent's son—one had worked with him and the other's brother had been friends with him. *Patton*, 248 So. 3d at 766–67. The Court disagreed. *Id.* at 770. Unlike *Taylor*, it reasoned, the disclosed relationships were "insufficient to disturb the trial court's judgment that both prospective jurors on their oaths could be impartial . . . ." *Patton* 248 So. 3d at 770. The Court said that "[n]o general rule can be stated which would control every conceivable situation with respect to a juror's qualifications[.]" *Id.* at 767 (internal quotation mark omitted) (quoting *Walls v. State*, 371 So. 2d 411, 413 (Miss. 1979)). "[E]ach case," rather, "must be decided on its own merits in light of the facts before the court." *Id.* (internal quotation mark omitted) (quoting *Walls*, 371 So. 2d at 413).

¶150. The State thus concludes that "this Court has never held that it would find implied bias based on a juror's disclosed relationship with anyone involved in the case unless the juror was challenged at trial and is a close relative of a prosecutor in the office trying the case."

¶151. *Fifth*, the State, citing *Phillips*, 455 U.S. at 217, contends Powers received the safeguards of juror impartiality—*voir dire* and protective instructions from the trial judge.

Jurors were instructed "not be influenced by bias, sympathy, or prejudice[]" and to decide the case "after an impartial consideration of the evidence." They are presumed to have followed those instructions. *Evans v. State*, 226 So. 3d 1, 26 (Miss. 2017) ("This Court presumes that jurors have followed the instructions of the court, because to presume otherwise would render the judicial system inoperable." (citing *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985))).

*The Bars*

¶152. Powers argues that his impartial-jury claims are neither waived nor *res judicata*, and any bar is overcome because post-conviction counsel were ineffective for never raising trial counsel's ineffectiveness in failing to strike biased jurors. The State counters that the claims could have been raised either at trial, direct appeal, or both and are thus waived.

¶153. Addressing the bars first, because the trial-judge and ineffective-assistance-of-trial-counsel claims were "capable of determination at trial and/or on direct appeal," *see* Miss. Code. Ann. § 99-39-21(1), we hold that the waiver bar applies. Powers raised ineffective assistance of trial counsel on direct appeal, *Powers I*, 883 So. 2d at 27–36, so he could have incorporated the arguments advanced here into his direct-appeal claim. *See* Miss. Code. Ann. § 99-39-21(1). *Res judicata* applies too. *See* En Banc Order, *Underwood v. State*, No. 2015-DR-01378-SCT, at *3 (Miss. Dec. 16, 2021) ("res judicata . . . extends to those claims that could have been raised in prior proceedings but were not." (internal quotation marks omitted) (quoting *Brown*, 306 So. 3d at 730)).

¶154. Powers's ineffective-assistance-of-post-conviction-counsel claim, however, is unbarred. *Brown*, 306 So. 3d at 748).

¶155. On the merits, we note first that the trial-judge claim has no arguable basis. We agree with the State. Because Powers had three unused peremptory strikes remaining when jury selection ended, the trial judge cannot be faulted for failing to remove jurors. *Ambrose v. State*, 254 So. 3d 77, 112 (Miss. 2018) ("[A] party who chooses not to challenge a juror peremptorily when he has unused challenges may not thereafter seek to put the trial court in error because the court declined to permit the juror to be challenged for cause." (internal quotation marks omitted) (quoting *Archer*, 986 So. 2d at 957–58)).

¶156. Second, Jurors Cuevas, Russell, Bickford, Eppling, and Bond were neither actually nor implicitly biased; so Powers's ineffective-assistance-of-trial-counsel claim has no arguable basis. It follows, then, that his ineffective-assistance-of-post-conviction-counsel claim is meritless.

¶157. The case *sub judice* is not one in which any juror expressed an inability to be impartial. *Contra Hughes*, 258 F.3d at 460 (finding that juror expressly admitted bias); *Virgil*, 446 F.3d at 613 (stating that two jurors "unequivocally expressed that they could not sit as fair and impartial jurors"). None equivocated, *contra Miller*, 385 F.3d at 675 (presuming actual bias when juror qualified her statement of partiality), and it is speculative to assume that more questioning would have shown bias. *See Durousseau v. State*, 218 So. 3d 405, 412 (Fla. 2017) ("We have . . . rejected 'alleg[ations] that if counsel had "followed up" during voir dire with more specific questions, there would have been a basis for a for-cause challenge' as 'mere conjecture.'" (quoting *Reaves v. State*, 826 So. 2d 932, 939 (Fla. 2002))).

¶158. Taking each juror in turn, neither Juror Cuevas's acquaintance with Lafferty, his knowing Chief Sims, nor his having been Dr. West's patient years earlier showed bias. "Mere acquaintance or even family relationships with parties or those related to parties is not sufficient to require that a juror be excused for cause." *Patton*, 248 So. 3d at 768 (internal quotation marks omitted) (quoting *Bell*, 725 So. 2d at 846). More specific to Juror Cuevas, "United States Courts of Appeals have consistently held that knowing the victim of a defendant's crime does not, standing alone, justify a finding of bias requiring excusal for cause." *United States v. Calabrese*, 942 F.2d 218, 225 (3d Cir. 1991) (citing *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir. 1987)). "Nor is excusal required where the juror knows another participant in the proceedings." *Id.* (citing *United States v. Frank*, 901 F.2d 846, 849 (10th Cir. 1990)). Juror Cuevas disclosed his acquaintance with Lafferty, said the relationship would not affect him at trial, and affirmed that he could be impartial. As for Chief Sims, Juror Cuevas gave no response when the trial judge asked prospective jurors collectively if anything about their relationship with any potential witness would affect them, and with Dr. West, Juror Cuevas affirmed that nothing about having been Dr. West's patient more than a decade earlier would affect him at trial. Still more, Juror Cuevas gave no response when the trial judge twice invited prospective jurors to speak up or raise their hand if anything might affect their ability to be impartial.

¶159. The same goes for Juror Russell. He too affirmed that he could be impartial, and he gave no response when the trial judge asked prospective jurors collectively if anything about their relationship with any potential witness (or anything else) would affect them.

¶160. Likewise with Juror Bickford, being golfing buddies with the one of the prosecutors is not cause for disqualification if the juror's responses to questions "negate any danger of bias." *Wise v. Commonwealth*, 337 S.E.2d 715, 717 (Va. 1985); *see also* *Lane v. United States*, 321 F.2d 573, 577 (5th Cir. 1963) ("[A] juror is not per se disqualified because he is acquainted with or a friend of counsel in the case, whether advocating the cause of a private litigant or prosecuting in a criminal trial." (internal quotation mark omitted) (quoting *Roberson v. United States*, 249 F.2d 737, 740 (5th Cir. 1957))). Juror Bickford affirmed that he could be impartial. When asked if his "play[ing] golf . . . and that kind of stuff" with Prosecutor Helfrich was "going to be [a] problem," he answered, "No, sir." As the State notes, similar statements have been deemed sufficient indicia of impartiality. *See Patton*, 248 So. 3d at 766 (affirming the trial judge's ruling that a prospective juror could be impartial when the juror answered, "No," when defense counsel asked, "Would you have a problem—would it cause you some problem to sit here?" (internal quotation marks omitted)). Like Jurors Cuevas and Russell, Juror Bickford did not respond to the trial judge's invitations for prospective jurors to speak up or raise their hand if anything might affect their ability to be impartial.

¶161. What is more, the record shows that trial counsel was not oblivious to prospective jurors who were friends with Prosecutor Helfrich. In voir dire, prospective juror Kim Bradley disclosed that she had been friends with Prosecutor Helfrich for years and expressed doubt about her ability to be fair and impartial. Trial counsel later struck her.

¶162. As for Juror Eppling, it appears from the record she was not Prosecutor Burdick's student. Juror Eppling's and Prospective Juror Downing's jury questionnaires show their

different educational attainment and employment status at the time of Powers's trial. Juror Eppling's jury questionnaire shows that she had an undergraduate degree and a masters degree in psychology and was a licensed professional counselor. Downing had an undergraduate degree and worked as a lab technician. She noted that she did not receive employment benefits because she worked "only part time while in graduate school."

¶163. Downing was among the prospective jurors questioned individually in chambers. Juror Eppling was not. During that questioning, Prosecutor Burdick disclosed that he had taught Downing, and when the trial judge asked Downing if that would "have a bearing with [her] in the trial," she answered, "Not that I know of." Then, back in open court, the trial transcript records that Juror Eppling disclosed that she knew Prosecutor Burdick. The trial judge then asked, "You are one of his students or have been one of his student[s]? . . . [D]oes that have any bearing with you in the trial of this case?" After she answered, "Yes," the trial judge remarked, "I think you answered these same questions for us *back in chambers*." (Emphasis added.) He then twice asked if she could be fair and impartial; both times, she said, "Yes."

¶164. That the person questioned in open court had answered the same questions "back in chambers" indicates that the open-court exchange was with Downing, not Juror Eppling. Accordingly, the student-teacher relationship is a nonissue because Downing did not sit on the jury.

¶165. Moreover, even if the transcript is correct and Juror Eppling had a student-teacher relationship with Prosecutor Burdick, Powers's argument still has no arguable basis. In *Treesh*, the Sixth Circuit held that a juror's having taken a class taught by the prosecutor did

not make that juror implicitly or actually biased. *Treesh*, 612 F.3d at 436–38. As discussed already, the court reasoned that (a) "there is no Supreme Court precedent recognizing implied bias from a mere student-teacher relationship"; (b) the prosecutor's paralegal attended the class more than the prosecutor; (c) nothing showed that the juror and prosecutor's relationship "rose to the level of the sort of extreme or exceptional case where bias is conclusively presumed"; (d) the juror said that their former student-teacher relationship did not render her unable to be impartial; and (e) the juror swore to base her verdict on the evidence. *Id.* at 437.38. That Juror Eppling was Prosecutor Burdick's student at the time of trial is immaterial. Not only is "there is no Supreme Court precedent recognizing implied bias from a mere student-teacher relationship," but also nothing shows that Juror Eppling and Prosecutor Burdick's student-teacher relationship "rose to the level of the sort of extreme or exceptional case where bias is conclusively presumed." *Id*. Prosecutor Burdick's knowledge of Juror Eppling as an "A" student does not show that the two had a close relationship, and even assuming that teachers have power over students, that power is incomparable to that of an employer's power over an employee. Nor does it approach the level of power that a prosecutor has over an accused. *Contra Brooks*, 418 F.3d at 430–31, 435. Like the juror in *Treesh*, Juror Eppling said that she could be fair and impartial and swore "to 'well and truly try the issue between the state and the prisoner, and a true verdict give according to the evidence and the law.'"

¶166. Powers emphasizes Juror Eppling's initial affirmance that her relationship with Prosecutor Burdick would have bearing with her at trial. However, the voir dire examination did not end there. *See Havard*, 928 So. 2d at 781 ("Though juror Sylvester initially

67

commented that she did not think she could be fair because of her niece's experience, the voir dire examination did not end there . . . ."). Powers's reasoning forecloses clarification or rehabilitation. Here, right after indicating that her student-teacher relationship would have "bearing with [her] in the trial of th[e] case," the trial judge asked, "Can you be fair and impartial?" She answered, "Yes." Then the judge again asked, "Could you listen to the testimony and receive the evidence and that coupled with the instructions of law arrive at a verdict that could be fair and impartial to both sides; could you do that?" Again, she answered, "Yes." Powers himself concedes that assurances of impartiality carry much weight.

¶167. We likewise hold that the claim related to Juror Bond, *i.e.*, his relationship to the police department, has no arguable basis. *Scott* is distinguishable. *Scott*, 854 F.2d 697. There, juror bias was based not just on the jury foreperson's familial ties to the investigating agency, but also on his failure to disclose those ties. *Id.* at 699. Here, by contrast, Juror Bond fully disclosed his prior police department employment both on his jury questionnaire and at trial.

¶168. Key here is Juror Bond's *prior* police department employment. Justice O'Connor said "a revelation that the juror *is* an actual employee of the prosecuting agency" might justify a finding of implied bias. *Phillips*, 455 U.S. at 222 (emphasis added). Here, Juror Bond *had* worked with Hattiesburg Police Department, and the nature of that employment is unknown. The trial transcript records only that he "worked with the [Hattiesburg Police Department] from May of 1997 to October of 1998." According to his jury questionnaire, he had an education degree; had "training, education, knowledge[,] or experience" in computer

68

sciences and law enforcement; and "data processing" was his "trade/occupation."  At the time of trial, he worked for Sunbeam Corporation as "Manager Manufacturing Systems," which "required [him] [to] know application software and midrange, large computers." Whether he was ever an officer or investigator of some sort, then, is unclear, and even if he were, that alone would not make him biased.  *See **Patton***, 248 So. 3d at 768 (quoting ***Bell***, 725 So. 2d at 846).

¶169.  Understandably, Powers emphasizes that Juror Bond worked with the police at the time of Lafferty's murder.  Yet Juror Bond said that he neither investigated nor knew anything about the alleged facts, and he gave no response when the trial judge asked prospective jurors if anything, including their relationship(s) with potential witnesses, would affect their ability to be fair and impartial.

¶170.  ***United States v. Mitchell***, 556 F.2d 371 (6th Cir. 1977), is instructive.  There, two men appealed drug-related convictions for activities that occurred in Memphis, Tennessee, and Oxford, Mississippi.  ***Mitchell***, 556 F.2d at 373–74.  They argued, in part, that the federal district court erred by failing to excuse for cause juror Bernie R. J. Ray.  ***Id.*** at 378.  Two years before trial, Ray had retired from "detective work and uniform" with the Memphis Police Department.  ***Id.*** at 378 (internal quotation marks omitted). Ray admitted "being acquainted" with a Memphis Police Department lieutenant who testified at trial.  ***Id***.  Ray denied, however, that he had ever been a liaison officer with federal law-enforcement officials, and Ray said that he could be fair and impartial.  ***Id.***  The Sixth Circuit found no error:

69

While it would have been the better practice to have excused juror Ray under the circumstances, we are unable to hold that the failure to do so was such an abuse of discretion as to warrant the reversal of Mitchell's conviction. Neither personal knowledge by Ray of appellant's case nor any prejudice by Ray was disclosed. Ray was not at the time of the trial a member of the police department. In any event, "the mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial." If there was any other basis for probing into Ray's objectivity, counsel did not seek to pursue it. To reverse a trial judge on these facts would severely limit the broad discretion that traditionally is accorded a district judge in this area.

*Id.* at 379 (citations omitted).

¶171. Granted, it is unclear from ***Mitchell*** whether Ray was employed with the Memphis Police Department at the time of the crimes at issue there, but at the very least, he had previously been employed with an agency (*i.e.*, the Memphis Police Department) that had some involvement in the case—otherwise, the Memphis Police Department lieutenant would not have testified. *Id.* at 378. Also, Ray was acquainted with the testifying lieutenant. *Id.*

¶172. Here, Juror Bond worked with the police department in some capacity at the time of Lafferty's murder and knew two potential witnesses: Chief Sims and Detective Suber. Of the two, only Detective Suber testified. Because implicit bias applies only in extreme situations and given Juror Bond's representations and lack of response to the trial judge's questions regarding impartiality, no bias is shown. Based on Juror Bond's disclosures and assurances, it is speculative to assume that more questioning would have shown otherwise.

D. **Whether current post-conviction counsel must interview jurors who served at Powers's trial in order to fully develop his impartial-jury claims.**

¶173. To fully develop his impartial-jury claims, Powers argues that current post-conviction counsel must interview jurors who served at his trial. They have not done so to date, he

70

maintains, because of uncertainty about whether the procedure set forth in *Gladney* applies. In *Gladney*, the Court adopted a "prophylactic method to uniformly execute juror inquiry, under M.R.E. 606(b) . . . ." *Gladney* 625 So. 2d at 418. To start, "the trial court and opposing counsel must be made aware of any potential juror misconduct when this evidence is manifested." *Id.* at 418. So "if a juror approaches an attorney for one of the parties or the court itself, or if either subsequently learns such through alternative means, all parties involved should be made aware of the allegation as expeditiously as possible." *Id.* Next, to determine if an investigation is merited, "the party contending there is misconduct must make an adequate showing to overcome the presumption . . . of jury impartiality." *Id.* At a minimum, that requires a showing of "sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information." *Id.* at 419. To protect the parties' and jurors' interests, the trial court must supervise the post-trial investigation, and inquiry is allowed outside the trial court's presence only "upon written request and trial court permission." *Id.* Finally, if a "threshold showing of external influences" is made, then the trial court should conduct a post-trial hearing. *Id.*

¶174. Powers maintains the *Gladney* procedure should apply only when the trial court still has jurisdiction to do something about the alleged misconduct. Eppling the *Gladney* procedure at the prepetition, post-conviction stage, he argues, is a "bad," "prejudicial" fit. By that time, trial ended long ago, and post-conviction counsel have a duty to "investigate the entire case for potential claims as soon as the direct appeal is decided, not wait for suggestions of due process violations simply to 'arise.'" Barring juror contact during post-conviction counsel's prepetition investigation, then, "effectively foreclose[s] a death row

71

inmate's right to raise juror bias as a challenge to his conviction and sentence before he has the chance to assert it." "That neither the State nor this Court has previously objected to or prevented counsel from doing that in other cases," he adds, "evinces a longstanding, though implicit, recognition of that basic necessity of post-conviction practice."

¶175. As support, he cites *Batiste v. State (Batiste II)*, 337 So. 3d 1013 (Miss. 2022), and *Carr v. State*, 873 So. 2d 991 (Miss. 2004). From those cases, he argues the following:

> [A]t the earliest stage of the post-conviction process, when an inmate's legal team is investigating possible claims, it is permissible to ask jurors about their experiences at trial and to record reports of bias, misconduct, or extraneous influences in an affidavit if a juror is willing to submit it. That is how allegations of juror bias or misconduct would "arise" in the post-conviction context. And the first court to review such allegations in a post-conviction petition would be . . . the Supreme Court of Mississippi. Then, if this Court decides to remand a claim for juror bias, it would naturally entrust the proper procedure for overseeing an investigation into that claim to the trial court.

¶176. The State counters that *Batiste*, 337 So. 3d 1013—decided two months after Powers filed the successive post-conviction petition—moots his argument that *Gladney* is inapplicable in capital post-conviction cases. *Batiste II*, according to the State, clearly held that *Gladney* applies in capital post-conviction cases. There, the Court rejected Batiste's assertion that *Gladney* is inapplicable in post-conviction cases and faulted the Office of Capital Post-Conviction Counsel for not following *Gladney*. *Batiste II*, 337 So. 3d at 1025.

¶177. In reply, Powers concedes that *Batiste II* applied *Gladney* in the post-conviction context. Even so, he urges the Court to reconsider *Gladney*'s applicability to post-conviction proceedings. *Gladney* does not fit in such context, he argues, because (1) the trial court lacks jurisdiction; (2) post-conviction counsel must investigate evidence outside the record—they "cannot simply sit in the office and hope a juror or other non-party with knowledge of a

72

possible constitutional violation knocks on the door one day"; and (3) post-conviction counsel's lack of investigation will cause federal *habeas* courts to find that they were ineffective, which will cause more delay.

¶178. Because the ***Batiste*** Court has already answered the instant question adversely to Power's arguments, the instant issue is without merit.

## PART THREE: *BATSON*

¶179. With every post-trial stage, Powers has contended that jury selection in his trial violated ***Batson***. At every rung on the post-trial ladder, his contentions have been without merit. As more fully developed below, the only potential avenue for relief remaining to him now is a claim that his first post-conviction counsel failed to competently present the issue. He makes that claim, but it fails because he cannot make a substantial showing of ineffectiveness or ***Strickland*** prejudice.

*Trial Proceedings*

¶180. With their summonses, prospective jurors received questionnaires. The questionnaires lacked a place for them to mark their race. At the start of the jury-selection process, sixty or so prospective jurors were individually questioned in-chambers about their questionnaire responses concerning the death penalty or other matters, such as hardship or general excuses. Of the sixty, the prosecution asked three—Rolanda Boyd, Cynthia Hill, and Michael Tate—if Lafferty's being white and Powers's being Black would influence them. Each said no:

> [Prosecutor Burdick]. The girl involved here is white. Would that have an influence on you?

> [Boyd]. No.

73

. . . .

[Prosecutor Burdick]. When it comes to considering the death penalty, the fact that the defendant is black and the victim is white, will that have any bearing?

[Hill]. No.

. . . .

[Prosecutor Burdick]. Stephen Powers is the defendant and victim in this case is white. Would that make a difference to you?

[Tate]. None whatsoever.

¶181. As jury selection proceeded, the prosecution used six peremptory strikes. ***Powers I***, 883 So. 2d at 30. Powers's counsel, McIntosh, used nine, leaving three unused. ***Id.*** Powers failed to raise ***Batson***.

¶182. Before proceeding with trial, the trial judge asked Powers if he was satisfied. "I want to make certain you had input into the selection of the jury and that you are satisfied with the composition of the jury that has been selected," the trial judge said. Powers answered, "Yes, sir."

¶183. In a post-trial motion, McIntosh argued that "the *court* erred in not requiring ***Batson*** challenges during jury selection." ***Powers I***, 883 So. 2d at 30. At a hearing on that motion, the trial judge said that he was "shocked," "appalled," and "surprised" that ***Batson*** was not raised:

> [L]et me say that I'm not casting any aspersions in this record, but I was shocked and appalled that ***Batson*** was not raised, but as I understand and appreciate the law . . . a trial judge does not have the authority to invoke [***Batson***] on his own initiative; there must be an objection by either the defense or the prosecution, and the objecting party must establish a prima facie case of racial discrimination before a ***Batson*** inquiry is held. Though I was surprised

74

that it wasn't raised, as I understand and appreciate the law . . . this [c]ourt cannot, on its own initiative, institute *Batson* . . . .

McIntosh agreed that counsel, not the court, must raise *Batson*. "As part of the record," McIntosh said, "I agree that we have to raise [*Batson*]." *Powers I*, 883 So. 2d at 30.

*Powers I*

¶184. On direct appeal, appellate counsel moved to remand for record supplementation or, alternatively, for post-conviction relief. They argued that McIntosh's failure to raise *Batson* was "inexplicable based on the existing record." To expedite and preserve Powers's ineffective-assistance claim, then, appellate counsel sought a stay and asked the Court to remand the case for an evidentiary hearing. The Court granted the motion.

¶185. At the ensuing evidentiary hearing, McIntosh testified. In his thirty-six years of practicing law, including three or four years as a public defender, he had "gone to trial" in "[s]everal murder cases," but not in a capital-murder case. In the trials, he never raised *Batson*. Before Powers's trial, McIntosh attended a jury-selection seminar. Though *Batson* was a topic "to some degree," it was not the seminar's main "focus" or "thrust." On direct, the following exchange occurred:

> Q.    Can you tell me what the burden of proof is on a party challenging peremptory strikes under *Batson* . . . .
>
> [McIntosh]. Not as an expert on it, no. It basically has to do with race or prejudicial matters, but I am not an expert on *Batson*. I have read *Batson*, but I would certainly not consider myself an expert on *Batson* or challenges.
>
> Q.    You did not make an effort to become "an expert" on *Batson* prior to the beginning of this trial?
>
> [McIntosh]. No, sir.

Q.      You realize that Mr. Powers was facing a trial where he faced the death penalty?

[McIntosh]. Yes, sir.

Q.      And as a critical aspect of that trial, you had to participate in the selection of the jury; isn't that correct?

[McIntosh]. Yes, sir.

Q.      You made no effort as the defense attorney to become familiar with the basic requirements of *Batson*; is that correct?

[McIntosh]. I think I would have to say yes to that.

THE COURT: Yes, you did or, yes, you didn't make any effort?

Q.      Thank you, Your Honor. You made no effort to become familiar with the requirements of *Batson* prior to the inception of this trial; is that correct?

[McIntosh]. I reread *Batson*, but that was basically all; yes, sir.

Q.      You made no *Batson* challenges during jury selection?

[McIntosh]. No, sir.

McIntosh said he raised *Batson* in the post-trial motion in "hop[es] that another appeal attorney might find it useful." On cross-examination, McIntosh said that he was familiar with *Batson* "to a degree" but "certainly wouldn't claim to be an expert." "I have read *Batson* several times," he said, "and that is all I can say about that." On redirect, he was asked if it was "fair to say that [he] did not come to [Powers's] trial prepared to raise *Batson* issues[.]" He answered, "No. I would have to say, no. I obviously did not raise [*Batson*,] and I was not fully prepared to raise it. That is the only way that I know to answer your question. I did not raise it, nor was I fully ready to raise it."

76

¶186. McIntosh also admitted that, in preparing the jury questionnaires, he omitted a place for prospective jurors to indicate their race, nor could he find his notes where had marked prospective jurors' race and gender. "We only ended up with one African-American on the jury," he said; "most were let off because of their feelings toward the death penalty."

¶187. After the evidentiary hearing, direct appeal proceeded. The Court rejected Powers's claim that McIntosh was ineffective for failing to raise *Batson*. *Powers I*, 883 So. 2d at 30–31. In its analysis, the Court discussed the following:

- McIntosh filed and brought on for hearing a pretrial motion seeking information about prospective jurors, including their race, and noted that information's importance for challenging the prosecution's strikes. *Id.*

- The State used six peremptory strikes. *Id.*

- The struck jurors' race was unknown. *Id.*

- Powers affirmed that he had input in jury selection and was satisfied with the jury's composition. *Id.*

- When McIntosh asserted in a post-trial motion that the trial court should have allowed *Batson* challenges, the trial judge "indicated surprise" that *Batson* was not raised; however, the judge said that it was not the court's duty to raise *Batson*, and McIntosh agreed. *Id.*

¶188. The *Powers I* Court found that Powers failed to show "the requisite deficiency and prejudice." *Id.* at 30. After noting that the direct-appeal record omitted the struck jurors' race, the Court concluded that "[t]here was no[] . . . *Batson* issue for [McIntosh] to raise." *Id.* at 30–31. It then discussed that the record showed race-neutral reasons for each of the prosecution's strikes:

- S-1 "knew one of the testifying officers and had child care problems." *Id.* at 31.

77

- S-2 "was on medication, was concerned about her health, migraine headaches, and did not wish to serve." *Id.*

- S-3 "was taken on individual voir dire, having indicated that she did not believe in the death penalty on her questionnaire but having scratched through the response and indicated she wanted to be heard in chambers on the issue." *Id.*

- S-4 "thought she was related to the District Attorney, although she did not know him," and "indicated that she was not pleased with the outcome of a lawsuit she had filed." *Id.*

- S-5's "questionnaire indicated some distrust of police testimony, having indicated that the police 'try to tell the truth,' as opposed to 'always tell the truth' or other choices." *Id.*

- S-6 "requested to be removed citing preoccupation with her sick mother who was in the care of this juror and this juror's sister," and was "concerned about the potential length of trial." *Id.*

¶189. The ***Powers I*** Court thus found that Powers had no "viable ***Batson*** challenge." *Id.* "[I]t is inconceivable," the Court said, "how [McIntosh] could have been ineffective, and thus Powers's case prejudiced by failure to raise such a challenge." *Id.*

*Powers II*

¶190. In Powers's first post-conviction petition, post-conviction counsel argued that McIntosh was ineffective for failing to raise ***Batson***. To merit relief from the bars, they asserted ***Miller-El*** as an intervening decision. There, the Supreme Court held that purposeful discrimination was at least debatable for four reasons. ***Miller-El***, 537 U.S. at 342–48. First, statistical evidence raised concerns. *Id.* at 342. Of the 108 prospective jurors, twenty were Black. *Id.* at 331. Of those twenty, nine were excused for cause or by agreement, and of the remaining eleven, the prosecution peremptorily struck all but one. *Id.* "In total," then, "[ten] of the prosecutors' [fourteen] peremptory strikes were used against African-Americans." *Id.*

78

at 342. "Happenstance," the Supreme Court said, "is unlikely to produce [such] disparity." *Id.* Second, there was evidence of disparate treatment. *Id.* at 342–43. Not only did three of the prosecution's stated reasons for striking Black prospective jurors pertain equally to unchallenged whites who served on the jury, but also voir dire questions varied by race. *Id.* at 344–45. For example, slightly more than half of the Black prospective jurors received "an explicit account of the execution process," while only 6 percent of whites received the same account. *Id.* at 344. Third, the prosecution engaged in a practice called jury shuffling. *Id.* at 346. Finally, the Supreme Court "accord[ed] some weight to . . . historical evidence of racial discrimination by th[at] District Attorney's Office." *Id.*

¶191. In addition to relying on *Miller-El*, post-conviction counsel attached a venire list that the trial court had reviewed in-camera and had ordered disclosed to post-conviction counsel. Post-conviction counsel said the venire list showed that "the prosecution color coded the venire panel[]":

> The prosecution placed a "B" beside each African-American venire member. The State used its peremptory strikes to exclude all African-Americans except one[, Juror Duckworth]. This resulted in a jury of eleven Whites and only one African-American. In *Miller-El*, ten of fourteen "peremptory strikes were used against African-Americans. Happenstance is unlikely to produce this disparity."

¶192. "Why," post-conviction counsel asked, "did the prosecution specifically list the race of African-American jurors but not those of other races?" Also, "[w]hy did the prosecution overwhelmingly] provide notations beside the jurors that were non-White but not those that were?"

¶193. Continuing on, post-conviction counsel argued that McIntosh was ineffective for failing to follow American Bar Association Guidelines. "[McIntosh] readily admitted that he was not prepared to raise **Batson** issues during jury selection." That admission alone, they argued, established his ineffectiveness.

¶194. After discussing McIntosh's failure to challenge Jurors Cuevas and Russell, post-conviction counsel questioned why McIntosh did not challenge the prosecution's strike of a person who suffered from migraines even though Juror Duckworth suffered the same malady. They then asserted generally that "[o]ther members of the venire were allowed to serve who also had similar problems and concerns as those of the African-American Jurors who were 'tagged' and not selected to serve on the jury."

¶195. "At the very minimum," they concluded, "[Powers] should be afforded an evidentiary hearing to determine the racial make-up of those jurors who were struck by the State and for a **Batson** hearing on this issue."

¶196. The venire list attached to Powers's first post-conviction petition is initialed "RBH" at the top. Of the seventy-two names listed, a "B" along with the following handwritten notations appear beside eight (quotation marks reflect handwritten notations):

> "B" 3. ~~Veronica A. Harris~~ "S-1–Bored–Left Hand–Child Care 4 Kids 73 yr old mother"
>
> "B" 8. Charlotte L. Duckworth "– migraines"
>
> "?" "B" 10. ~~Rolanda Yvette Boyd~~ "cell phone went off during voir dire – got up + moved"
>
> "?" "B" 34. ~~Cynthia P. Hill~~ "– moving – S –"
>
> "?" "B" 40. Ann[]ie K. Bolden "– Diabetic"

80

"?"  "B"  41. Terrea L. Hoze "– problems w/kids –"

"B"  44. Michael A. Tate "–S"

"?"  "B"  50. Brandy Elizabeth Quarles

¶197. Handwritten notations appear beside other names too. In addition to markings showing who was struck for cause or peremptorily, there are notes about certain individuals. Next to Juror Bond, for example, is "Dad terminally ill." And next to Prospective Juror Downing is "Final Exam Pending."

¶198. In response, the State argued that statutory *res judicata* barred Powers's claim. *Miller-El* was not intervening decision, it argued, because *Miller-El* did not change *Batson*. As for the RBH venire list, the State dismissed Powers's argument that the "B" notations showed discriminatory intent. "In almost every case that is presented to this Court dealing with [a] jury list," it said, "that is the method of identifying the race of the jurors." "What is more important," it said, "when we look to the jury list, we find that the State exercised only one strike against a juror with a 'B' beside their name[]": Harris. "Looking further down the list," it continued, "one thing becomes readily apparent, the rest of the jurors excused peremptorily were all white." The State thus deemed Powers's "racial motive theory" as "specious."

¶199. As it turns out, the State's response was inaccurate. The RBH venire list does show that the prosecution struck Harris as S-1, Gay C. Hanberry as S-2, Estelle C. Butler as S-3, Jettie Vell Stogner as S-4, Ann C. Atteberry as S-5, William Patrick McCoy as S-6, and Myra Grey Rachal as S-7. Of the seven, Harris indeed is the only person with a "B" beside his or her name, but the trial transcript shows that the prosecution's third strike was actually Boyd,

who had a "B" beside her name. So two of the prosecution's first three strikes were on individuals with a "B" beside their name. In addition, the prosecution struck Hill, who also had a "B" beside her name, as an alternate juror.

*Powers II*

¶200. The ***Powers II*** Court held that the ***Batson*** issue was barred and meritless. ***Powers II***, 945 So. 2d at 394. ***Miller-El***, it said, failed to satisfy the intervening-decision exception:

> While the decision in ***Miller-El*** stands for the proposition that it is possible for potential jurors to be excluded on the basis of race despite the presentation of a race-neutral reason for the exercise of a peremptory strike, it does not change the basic holding of ***Batson*** that the use of peremptory strikes based upon race is prohibited. Powers's trial jury unquestionably had only one African-American juror; however, this Court on direct appeal specifically held that, from the totality of the record on this issue, there was no viable ***Batson*** claim to be raised by trial counsel and that it was "inconceivable how counsel could have been ineffective, and thus Powers's case prejudiced by failure to raise such a challenge."

***Powers II***, 945 So. 2d at 394 (citations omitted).

**I.      Whether trial counsel was ineffective during jury selection for not making *Batson* objections to the State's peremptory strikes.**

¶201. Defendants "have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." ***Ronk***, 267 So. 3d at 1289 (internal quotation mark omitted) (quoting ***Powers v. Ohio***, 499 U.S. 400, 404 (1991)). Parties cannot strike prospective jurors based solely on race. ***Eubanks v. State***, 291 So. 3d 309, 319 (Miss. 2020) (citing ***Batson***, 476 U.S. at 89).

¶202. To determine if a jury was selected in a discriminatory manner, courts follow a three-step inquiry. ***Pitchford v. State***, 45 So. 3d 216, 224 (Miss. 2010). First, the objector to the peremptory strike "must make a prima facie showing that race was the criterion for the

strike." *Eubanks*, 291 So. 3d at 319 (quoting *H.A.S. Elec. Contractors, Inc. v. Hemphill Constr. Co.*, 232 So. 3d 117, 133 (Miss. 2016)). That showing is made "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). "[A]ll relevant circumstances" should be considered. *Batson*, 476 U.S. at 96. Second, if *a prima facie* showing is made, "the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror." *Eubanks*, 291 So. 3d at 319 (quoting *H.A.S. Elec. Contractors, Inc.*, 232 So. 3d at 133). Third, the trial court must decide if the objector met the burden of proving purposeful discrimination—*i.e.*, that the State's race-neutral reason(s) were a pretext for discrimination. *Id.* (quoting *H.A.S. Elec. Contractors, Inc.*, 232 So. 3d at 133).

¶203. Powers claims that McIntosh was ineffective for failing to raise *Batson*. Had McIntosh done so, he argues, there is a reasonable probability that the *Batson* objections would have been successful. Powers's claim that McIntosh's performance as to *Batson* was constitutionally ineffective, however, has been raised on direct appeal and on post-conviction relief. It is barred now. Also, because Powers fails to make a sufficient showing of *Strickland* prejudice, *i.e.*, that the outcome of the trial would have been different, we hold that he fails to articulate a claim sufficient to be allowed to proceed in the trial court.

¶204. Having shown (in his view) that McIntosh's performance was clearly deficient, Powers proceeds to argue that *Strickland* prejudice should be presumed because a *Batson* violation is a structural error. Structural errors are "a limited class of fundamental constitutional errors . . . that are not subject to harmless-error analysis and require automatic

reversal." **Smith v. State**, 986 So. 2d 290, 300 (Miss. 2008) (citing **Neder v. United States**, 527 U.S. 1, 7 (1999)).

¶205. Powers contends, "[t]he Supreme Court has always treated racial discrimination in jury selection as structural error." As support, he points to **Weaver**. There, the Supreme Court said that it "has granted automatic relief to defendants who prevailed on claims alleging race or gender discrimination in the selection of the petit jury, though the Court has yet to label those errors structural in express terms." **Weaver v. Massachusetts**,582 U.S. 286 (2017). Powers adds that pre-**Weaver** in **Rivera v. Illinois**, 556 U.S. 148, 161 (2009), the Supreme Court included **Batson** among "automatic reversal precedents." *See also* **Vasquez v. Hillery**, 474 U.S. 254, 263–64 (1986) ("[D]iscrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review.")

¶206. The Mississippi Supreme Court, too, according to Powers, has said "the harmless error standard has no place in the **Batson** analysis." **Manning v. State**, 765 So. 2d 516, 521 (Miss. 2000). In **Hardison v. State**, 94 So. 3d 1092, 1102 (Miss. 2012), the Court held that "when a trial judge erroneously denies a defendant a peremptory strike by failing to conduct the proper **Batson** analysis, prejudice is automatically presumed . . . ."

¶207. For Powers, **Weaver** is "telling." The issue there was whether "the prejudice inquiry is altered when [a] structural error is raised in the context of an ineffective-assistance-of-counsel claim." **Weaver**, 582 U.S. at 290. The structural error there was a public-trial violation—specifically, courtroom closure during jury selection—to which no objection was made. *Id.* at 1906–08. The Supreme Court held that when an ineffective-

84

assistance claim is based on counsel's failure to object to courtroom closure during jury selection, **Strickland** prejudice must be shown. **Weaver**, 137 S. Ct. at 1907, 1911.

¶208. **Weaver** explained that there "at least three broad rationales" for why an error is structural: (1) "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest"; (2) "the effects of the error are simply too hard to measure"; or (3) "the error always results in fundamental unfairness." **Id.** at 295 After analyzing the public-trial right, the Supreme Court concluded that not all public-trial violations result in fundamental unfairness. **Id.** at 1909. It reasoned that "the nature of the error and the difference between a public-trial violation preserved and then raised on direct review and a public-trial violation raised as an ineffective-assistance-of-counsel claim" merit requiring **Strickland** prejudice. **Weaver**, 137 S. Ct at 1911–12. If first raised in an ineffective-assistance claim, it said, the trial court has no chance to cure the violation. **Id.** at 1912. Further, the Supreme Court highlighted differences in direct review versus post-conviction review:

> When an ineffective-assistance-of-counsel claim is raised in postconviction proceedings, the costs and uncertainties of a new trial are greater because more time will have elapsed in most cases. The finality interest is more at risk and direct review often has given at least one opportunity for an appellate review of trial proceedings. These differences justify a different standard for evaluating a structural error depending on whether it is raised on direct review or raised instead in a claim alleging ineffective assistance of counsel.

**Id.** (citation omitted).

¶209. From **Weaver**, Powers infers that "structural errors that always result in fundamental unfairness—like **Batson** violations—merit a presumption of **Strickland** prejudice." Unlike the courtroom closure in **Weaver**, which he deems "a uniquely poor candidate" to merit

85

presumed prejudice, *Batson* violations are different: There are no exceptions; fundamental unfairness always results; and *Batson* protects the "defendant, juror, and justice alike." Accordingly, he maintains that he need only show deficient performance here. That is shown, he argues, by a showing of a reasonable probability that he would have succeeded in making a *Batson* claim.

¶210. Conversely, the State maintains that *Strickland* prejudice is required. Not only has the Supreme Court not yet labeled *Batson* violations structural errors, but also *Weaver* rejected the argument that *Strickland* prejudice is waived when a structural error is raised via an ineffective-assistance claim. To support its position, the State cites three cases: *Powers I*, 883 So. 2d at 30; *Turner v. State*, 953 So. 2d 1063 (Miss. 2007); and *Brown v. State*, 749 So. 2d 82 (Miss. 1999).

¶211. We hold that Powers must show *Strickland* prejudice. First, the Supreme Court limited *Weaver* to "the context of trial counsel's failure to object to the closure of the courtroom during jury selection" and declined to address treatment of a *Batson* violation raised in an ineffective-assistance claim on collateral review. 582 U.S. at 286. Second, the cases Powers cites are unpersuasive. In *Drain v. Woods*, the Sixth Circuit effectively presumed prejudice after holding that trial counsel was ineffective for failing to object to the way in which the trial court addressed a *Batson* violation. *See Drain v. Woods*, 595 F. App'x 558, 582–83 (6th Cir. 2014). On the other hand, in *Ex parte Mitcham*, 542 S.W.3d 561 (Tex. Crim. App. 2018) the federal district court considered deficiency and prejudice. *Id*. at 562. *Yazzie v. United States* was decided solely on the absence of *Strickland* prejudice. *Yazzie v. United States*, No. 14 CIV 0894, 2022 WL 1101807, at *4 (D. N.M. Apr. 13, 2022). Third, the cases cited by the

86

State support that the Court requires *Strickland* prejudice for *Batson*-based ineffective-assistance claims. *See Powers I*, 883 So. 2d at 30 ("Powers has not demonstrated the requisite deficiency and prejudice."); *Turner*, 953 So. 2d at 1069 (holding that even if there was a basis for a *Batson* objection, Turner failed to show prejudice); *Brown*, 749 So. 2d at 88 (holding that Brown failed to show either deficiency or prejudice). The *Turner* Court specifically said that if no *Batson* objection was made (as here), trial counsel will not be deemed ineffective unless prejudice is shown. 953 So. 2d at 1070 ("[A]n attorney's decision not to make a *Batson* challenge does not amount to ineffective assistance of counsel absent a showing of prejudice to the defendant." (internal quotation mark omitted) (quoting *Smith v. State*, 877 So. 2d 369, 383 (Miss. 2004))).

¶212. Turning to the bars, Powers argues that neither statutory nor common-law *res judicata* bar his *Batson*-based ineffective-assistance claim. He highlights Section 99-39-21(3)'s text: "The doctrine of *res judicata* shall apply to all issues, both factual and legal, *decided* at trial *and* on direct appeal." At his trial, the *Batson* issue was not decided—nor could it have been due to McIntosh's ineffectiveness. That ineffectiveness then left the *Powers I* Court unable to properly decide the *Batson* issue because the direct-appeal record lacked the prospective jurors' race, the prosecution's race-neutral reasons for its peremptory strikes, Powers's rebuttal, and the trial court's *Batson* ruling. As for common-law *res judicata*, he maintains the statutory bars are valid and applicable only because the Court adopted them, *see McClendon v. State*, 539 So. 2d 1375, 1377 n.2 (Miss. 1989), and the Court has said that "the common-law doctrine of *res judicata* does not apply to post-conviction claims of constitutional dimensions." *Fluker*, 170 So. 3d at 475.

¶213. The State counters that Powers's *Batson*-based ineffective-assistance claim is barred and meritless: the *Powers I* Court already held that McIntosh was not ineffective for failing to make *Batson* objections.

¶214. If any bar applies, Powers argues that his claim is excepted for four reasons: (1) Section 99-39-5(2)(a)(i)'s intervening-decision exception; (2) the fundamental-rights exception; (3) trial, appellate, and post-conviction counsel's ineffectiveness; and (4) Section 99-39-5(2)(a)(i)'s newly-discovered-evidence exception.

¶215. Section 99-39-5(2)(a)(i)'s intervening-decision exception provides the time bar is inapplicable if "there has been an intervening decision of the Supreme Court of either the State of Mississippi or the United States which would have actually adversely affected the outcome of [the petitioner's] conviction or sentence . . . ." Powers contends *Snyder v. Louisiana*, 552 U.S. 472 (2008), *Foster v. Chatman*, 578 U.S 488 (2016), and *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019), satisfy that exception by "applying, clarifying, and reinforcing *Batson*."

¶216. *Snyder*, he argues, clarified that "all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder*, 552 U.S. at 478 (emphasis omitted) (citing *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005)). There, the Supreme Court held that the trial court erred by overruling Snyder's *Batson* objection to one struck Black prospective juror, Jeffrey Brooks. 552 U.S. at 477–78. Brooks was a college senior trying to complete his student-teaching requirement. *Id.* at 478. The prosecutor gave two reasons for striking him. *Id.* First, the prosecutor said that Brooks "looked very nervous" during questioning. *Id.* The Supreme Court could not "presume that the trial judge credited [that] assertion," however,

because the trial judge never made an on-the-record finding about Brooks's demeanor. *Id.* at 479. Second, because Brooks had said that he was going to miss class, the prosecutor feared that "[Brooks] might, to go home quickly, come back with guilty of a lesser verdict so there wouldn't be a penalty phase." *Id.* at 478. The Supreme Court deemed that justification "suspicious": jury service "would not have seriously interfered with [his] ability to complete his required student teaching." *Id.* at 482–83. And the Supreme Court said the scenario of Brooks's favoring a lesser-included offense to avoid a penalty-phase was "highly speculative." *Id.* at 482. The explanation's implausibility was only "reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious . . . ." *Id.* at 483.

¶217. For *Foster*, Powers emphasizes its factual similarity to his case. There, the Supreme Court held that "prosecutors were motivated in substantial part by race when they struck" two Black prospective jurors. *Foster*, 578 U.S. at 514. Five Black prospective jurors were qualified to serve. *Id.* at 492. After one was removed for cause, the prosecution peremptorily struck the remaining four. *Id.* at 493. During state *habeas* proceedings, Foster obtained the prosecution's trial file. *Id.* Its contents included the following:

- Copies of the jury venire list, with Black prospective jurors' names highlighted in green. *Id.* at 493. The green, according to a legend on the list, "represent[ed] Blacks." *Id.* (internal quotation marks omitted). In addition, each black prospective juror's name had a "B" beside it. *Id.* (internal quotation marks omitted). An investigator who assisted the prosecution during jury selection said that the highlighted lists circulated in the district attorney's office during jury selection. *Id.* at 493–94.

- A draft affidavit prepared by the same investigator. *Id.* at 494. The affidavit was to be submitted in response to Foster's motion for a new trial. *Id.* Under the name of one Black prospective juror, the investigator

89

wrote, in part, that "[i]f it comes down to having to pick one of the black jurors, [this one] might be okay." *Id.* (internal quotation mark omitted). That and other related text was crossed out by hand and omitted from affidavit filed that was filed in the trial court. *Id.*

• Handwritten notes on three Black prospective jurors, denoted as "'B # 1,' 'B# 2,' and 'B# 3[.]'" *Id.*

• A typed list of all qualified jurors, with "Ns" beside ten names. *Id.* at 495 (internal quotation marks omitted). According to the investigator, the "Ns" "signif[ied] the ten jurors that the State had strikes for during jury selection." *Id.* (alteration in original) (internal quotation marks omitted). All five qualified Black prospective jurors had an "N" beside their names. *Id.* (internal quotation marks omitted).

• "A handwritten document titled 'definite NO's,' listing six names." *Id.* Of the six, the first five were the five qualified Black prospective jurors. *Id.*

• "A handwritten document titled 'Church of Christ,'" with a notation that said: "'*NO*. No *Black* Church.'" *Id.*

• Jury questionnaires from several Black prospective jurors, with the responses indicating the juror's race circled. *Id.*

¶218. Foster's **Batson** claim concerned two Black prospective jurors. **Foster**, 578 U.S. at 744. Based on "all of the circumstantial evidence that 'bear[s] upon the issue of racial animosity'"—*i.e.*, accepting similarly situated nonBlack prospective jurors, "shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file"—the Supreme Court was firmly convinced that the strikes "were 'motivated in substantial part by discriminatory intent.'" *Id.* at 512–13 (alteration in original) (quoting **Snyder**, 552 U.S. at 478). "The sheer number of references to race in th[e] [prosecution's] file," it said, "is arresting." *Id.* at 513. "[T]he focus on race in the

90

prosecution's file," it added, "plainly demonstrates a concerted effort to keep black prospective jurors off the jury." *Id.* at 514.

¶219. Powers and the State disagree on whether the Court recognized *Foster* as an intervening decision in *Brown*. Powers maintains it did. In *Brown*, Brown raised *Batson* in a successive post-conviction application and argued that his claim was unbarred based on *Foster*. *Brown*, 306 So. 3d at 728, 743. In *Foster*, the *Brown* Court said, "newly discovered evidence sufficiently showed that the prosecution's strikes were motivated by improper discriminatory intent." *Id.* at 744 (citing *Foster*, 136 S. Ct. at 1742). Based on *Foster*, then, the *Brown* Court concluded that it had to decide if Brown's evidence was newly discovered evidence, which would merit relief from the bars. *Id.* at 744. It held that Brown's evidence not only failed to meet that standard, but also that *Foster* was distinguishable. *Id.* The State concedes that the *Brown* Court addressed "Brown's claim that his barred *Batson* claims were excepted given *Foster*," but the State argues the Court "did so only under a newly discovered evidence exception analysis."

¶220. Powers further argues that *Flowers* reinforced *Batson*. *Flowers* itself said that it "br[o]k[e] no new legal ground"; it "simply enforce[d] and reinforce[d] *Batson* by applying it to the extraordinary facts of th[at] case." 139 S. Ct. at 2251. Those extraordinary facts led the Supreme Court to hold that the trial court clearly erred by ruling that the State's peremptory strike of a Black prospective juror was not "motivated in substantial part by discriminatory intent." 139 S. Ct. at 2235 (internal quotation marks omitted) (quoting *Foster*, 578 U.S. at 513). In that case, four evidentiary categories "loom[ed] large." *Id.* at 2244. First, the history of the State's peremptory strikes in Flowers's prior trials showed its

determination to remove as many Black prospective jurors as possible. *Id.* at 2245–46. Second, in the trial at issue there (Flowers's sixth), the State struck five of the six Black prospective jurors. *Id.* at 2246. Though that meant the State had accepted one Black juror, the case's history suggested that the State may have done so to obscure its "'otherwise consistent pattern of opposition to' seating black jurors." *Id.* (quoting *Miller-El*, 545 U.S. at 251). Third, the State engaged in disparate questioning: it "spent far more time questioning the black prospective jurors than the accepted white jurors." *Id.* at 2247. Finally, the record showed that "the peremptory strike of at least one of the black prospective jurors . . . was motivated in substantial part by discriminatory intent." *Id.* at 2248. The State struck that particular Black prospective juror even though she was similarly situated to white prospective jurors that it did not strike. *Id.* at 2248–51.

¶221. Powers maintains *Snyder*, *Foster*, and *Flowers* show that *Powers I* and *II* are "out of step with *Batson* and its progeny." *Batson*'s first step—a *prima facie* showing of discrimination—is a light burden. (citing *Price v. Cain*, 560 F.3d 284, 287 (5th Cir. 2009)). If met, the *prosecution* must proffer race-neutral reasons for the strike. *Flowers*, 139 S. Ct. at 2243. However, in *Powers I*, *the Court* contrived its own race-neutral reasons. By doing so, Powers argues that the *Powers I* Court assumed executive-branch authority and thus violated separation-of-powers principles. *Powers II*, he maintains, is "in the territory of *Foster*": The prosecution's notes on the two venire lists show a premeditated plan to strike all Black prospective jurors except Juror Duckworth. As in *Foster*, race was a factor here. Still more, Powers faults *Powers I* and *II* for failing to address (1) whether a *prima facie* case

was shown; (2) whether a *Batson* objection should have been raised; (3) whether there was disparate treatment.

¶222. In response, the State counters that Powers's *Batson*-based ineffective-assistance claim is *res judicata* barred and that the intervening-decision exception is inapplicable. That exception applies only to the time and successive-writ bars: Section 99-39-5(2)(a)(I) refers only to the time bar, and Sections 99-39-23(6) and -27(9) refer to the successive-writ bar. The State concedes that the *Powers II* Court applied the intervening-decision exception to the *res judicata* bar. The State argues that was error, however; Section 99-39-27(9) "clearly relates" only to the successive-writ bar. The State adds that cause and actual prejudice do not merit relief from the *res judicata* bar either. *Walker v. State*, 863 So. 2d 1, 27 (Miss. 2003) ("[T]he *res judicata* bar is not subject to the cause and actual prejudice test." (citing Miss. Code Ann. § 99-39-21(3))). Even if the intervening-decision exception applies, the State argues that *Snyder*, *Foster*, and *Flowers* do not qualify because they did not change *Batson* law—they merely applied, clarified, and reinforced it. The State contends the Court implicitly rejected those cases as intervening decisions in *Knox v. State*, No. 2014-DR-00849-SCT. There, Knox asserted that *Snyder*, *Foster*, and *Flowers* were intervening decisions. Steve Knox's Second Amended Motion for Leave to File Successor Petition for Post-Conviction Relief, *Knox v. State*, No. 2014-DR-00849-SCT, at 38–39 (Miss. filed July 10, 2020). In denying relief, the Court ruled that Knox's claims were "procedurally barred without applicable exceptions." En Banc Order, *Knox v. State*, No. 2014-DR-00849-SCT, at *3 (Miss. Mar. 10, 2022). So according to the State, it follows that "the Court necessarily rejected [Knox's] claim that *Snyder*, *Foster*, and *Flowers* satisfied the intervening decision exception." Regardless, the

93

State insists that *Snyder*, *Foster*, and *Flowers* are distinguishable: none were cases (as here) in which trial counsel made no *Batson* objection at all.

¶223. Powers replies that *Snyder*, *Foster*, and *Flowers* need not change *Batson*'s holding in order to satisfy the intervening-decision exception. They need only "have actually adversely affected the outcome of his conviction or sentence." Miss. Code. Ann. § 99-39-5(2)(a)(i). To illustrate, Powers points to *Flowers*. In 2016, the Supreme Court vacated the Court's judgment and remanded *Flowers* for further consideration in light of *Foster*. *Flowers v. Mississippi*, 579 U.S. 913 (2016). When *Flowers* returned to the Supreme Court in 2019, the Supreme Court listed *Foster* and *Snyder* among cases that had "vigorously enforced and reinforced [*Batson*], and guarded against any backsliding." *Flowers*, 139 S. Ct. at 2243. Ultimately, of course, in its 2019 decision, the Supreme Court reversed the Court's decision on *Batson* and remanded the case. *Id.* at 2251. On initial remand, then, had the Court correctly applied *Batson* in light of *Foster*, the outcome would have been different—*i.e.*, adversely affected. Here, likewise, Powers reasons, correctly applying *Batson* per *Snyder*, *Foster*, and *Flowers* will adversely affect Powers's conviction and sentence.

¶224. Finally, Powers argues that the notated venire lists satisfy the newly-discovered-evidence exception—*i.e.*, "(1) [they] w[ere] discovered after the trial; (2) [they] could not by due diligence have been discovered before trial; (3) [they] [are] material to the issue and not merely cumulative or impeaching; and (4) [they] would probably produce a different result or verdict in the new trial," *Brown*, 306 So. 3d at 744 (citing *Crawford v. State*, 867 So. 2d 196, 203–04 (Miss. 2003))—and that the Court has never "squarely" or "fully" addressed that evidence. The first three factors, he maintains, are easily met. As for the fourth, he argues

that the "'or' between result and verdict in the statute[] [indicates] a different result can be something other than a different verdict." In any event, he argues that *Foster* and *Flowers* show that the notated venire lists would probably produce both a different result and a different verdict.

¶225. We hold that *res judicata* applies to all but Powers's claim of ineffective assistance of post-conviction relief counsel. Powers argues that it is inapplicable because *Batson* was not decided both at trial and on direct appeal. *See* Miss. Code. Ann. § 99-39-21(3). Yet *Batson* was raised in a post-trial motion and at the post-trial supplemental hearing. In *McGilberry v. State*, 843 So. 2d 21, 29 (Miss. 2003), the Court applied statutory *res judicata* when the issue was raised in a motion for a directed verdict and decided on direct appeal. Further, the Court has applied *res judicata* to issues that were decided only on direct appeal. In *Branch v. State*, 882 So. 2d 36, 73 (Miss. 2004), for example, Branch claimed on direct appeal that he was denied due process because he was burdened with proving himself ineligible for the death penalty. The Court rejected the claim as both "procedurally barred for failing to raise th[e] issue in the trial court" and meritless. *Id.* Then in post-conviction proceedings, the Court applied statutory *res judicata* when Branch raised the same claim again. *Branch v. State*, 961 So. 2d 659, 667, 667 n.3 (Miss. 2007). Even more on point here, in *Havard*, Havard argued on direct appeal that trial counsel was ineffective for omitting a lesser-offense instruction. 928 So. 2d at 789. The Court held that his claim lacked merit. *Id.* at 791. Then in post-conviction proceedings, the Court applied statutory *res judicata* when he raised the same claim again. *Havard v. State*, 988 So. 2d 322, 333 (Miss. 2008). Here, as in *Havard*, Powers argued on direct appeal that McIntosh was ineffective for an omission—*i.e.*, failing to raise

***Batson***—and the ***Powers I*** Court rejected the claim. Based on ***Havard***, *res judicata* applies here. Further, "[r]es judicata . . . extends to . . . claims that could have been raised in prior proceedings but were not." En Banc Order, ***Underwood v. State***, No. 2015-DR-01378-SCT, at \*3 (Miss. Dec. 16, 2021) (internal quotation marks omitted) (quoting ***Brown***, 306 So. 3d at 730).

¶226. The question, then, is whether any exception applies.

¶227. The intervening-decision exception is inapplicable. Strictly speaking, the State is right that the intervening-decision exceptions in Sections 99-39-5(2)(a)(i), -23(6), and 27(9) relate only to the time and successive-writ bars. At the same time, the Court has indicated that a "sudden reversal of law relative to th[e] issue" at stake would exempt a claim from the *res judicata* bar. *See* ***Dickerson v. State***, 357 So. 3d 1010, 1019 (Miss. 2021) (quoting ***Havard***, 988 So. 2d at 333) (finding that "Dickerson's intellectual-disability claim [wa]s barred, as he 'has not demonstrated a novel claim or a sudden reversal of law relative to this issue that would exempt it from the procedural bar of *res judicata* pursuant to' Mississippi Code Section 99-39-21(3) (Rev. 2020)"). Even so, ***Foster***, ***Snyder***, and ***Flowers*** most likely fall short of either that standard or the intervening-decision exception. Clearly, those cases were not sudden reversals of ***Batson***, and an intervening decision is one that announces a new rule of law, not an application of existing law. *See* ***Jackson v. State***, 860 So. 2d 653, 663 (Miss. 2003) (rejecting ***Kolberg v. State***, 704 So. 2d 1307 (Miss. 1997), as an intervening decision because it "announced no new rule of law that would adversely affect the conviction or sentence" and was "an application of existing law"); *see also* ***Patterson v. State***, 594 So. 2d 606, 608 (Miss. 1992) (rejecting ***Vittitoe v. State***, 556 So. 2d 1062 (Miss. 1990), as an

intervening decision because it created no "new rule, right, or claim," but "simply recognized and applied a pre-existing rule"). Not only was *Flowers* clear that it "br[o]k[e] no new legal ground" and "simply enforce[d] and reinforce[d] *Batson*," *Flowers*, 139 S. Ct. at 2235, but also it cited *Foster* and *Snyder* among cases that had "vigorously enforced and reinforced [*Batson*]." *Flowers*, 139 S. Ct at 2243.

¶228. The last two possible exceptions are newly discovered evidence and ineffective assistance of post-conviction counsel. The newly-discovered-evidence exception is unmet. Neither venire list qualifies as newly discovered evidence *here*. The RBH list was presented in *Powers I*. The new, unidentified list is unaccompanied by any affidavit or other form of authentication that would make it competent evidence. Miss. Code Ann. § 99-39-9(1)(d)-(e).

## II. Whether post-conviction relief counsel were ineffective in arguing trial counsel's *Batson* effectiveness.

¶229. We find that Powers fails to show that his post-conviction relief counsel were constitutionally ineffective. To determine if post-conviction counsel were ineffective, the Court must consider the circumstances that existed at the time of Powers's first post-conviction proceedings. *See Brawner v. State*, 947 So. 2d 254, 260 (Miss. 2006) (stating that counsel's performance must be viewed "from the totality of the circumstances at the time counsel acted and not through the lens of hindsight" (citing *Cole v. State*, 666 So. 2d 767, 775 (Miss. 1995))). With those circumstances in mind, as well as the presumption of competence, Powers fails to convince us.

¶230. The steps taken by post-conviction counsel are described above. To summarize, post-conviction relief counsel produced the RBH venire list and argued the significance of the

marks found there. They argued that disparate treatment of jurors and statistical problems similar to those found in *Miller-El* existed in Powers's case. They pointed to trial counsel's failure to raise *Batson* until post-trial motions. After reviewing the record of original post-conviction counsels' performance, we find that Powers fails to overcome the presumption of competence.

¶231. Moreover, Powers has failed to demonstrate that the outcome of his trial or first post-conviction petition would have been any different. *See Conner v. State*, 684 So. 2d 608, 610 (Miss. 1996) (citing *Nicolaou v. State*, 612 So. 2d 1080, 1086 (Miss. 1992); *Ahmad v. State*, 603 So. 2d 843, 848 (Miss. 1992)). Powers argues that he should not have to demonstrate traditional *Strickland* prejudice in the *Batson* context, but *Conner* shows otherwise. There, we followed the traditional different-result formulation in considering Conners's claim that his attorneys were ineffective in the *Batson* context.

¶232. In the two later cases of *Brown*, 749 So. 2d 82, and *Bell*, 879 So. 2d 423, we confirmed that traditional *Strickland* prejudice is required. The *Brown* Court, in the section of the opinion discussing the issue of counsel's alleged ineffectiveness in handling a *Batson* challenge, wrote, "Further, Brown makes no showing that the outcome of his trial would have been different had his *Batson* objections been sustained." *Brown*, 749 So. 2d at 88. Notably, the *Brown* Court noted the failure to show traditional prejudice in the same paragraph in which it earlier cited *Conner*, and it did so without any apparent need to address *Conner* as pronouncing a standard different from traditional prejudice. In *Bell*, the Court, after discussing other reasons that Bell's petition lacked merit, wrote, "Furthermore, Bell has failed to show 'a reasonable probability that, but for counsel's unprofessional errors, the result of

98

the proceedings would have been different.'" **Bell**, 879 So. 2d at 436 (quoting **Burns**, 813 So. 2d at 673))

## PART FOUR: GUILT PHASE

¶233. Lafferty invited Powers, "Junior" or "Jay" Otis Jr., and Eddie Barnes to drink beer at her home. **Powers I**, 883 So. 2d at 24. Barnes decided to cook out, too. Eventually, Otis and Barnes left, leaving Powers and Lafferty alone. **Id.**

¶234. The next morning, Parrigin and another person went to visit Lafferty. Lafferty's back door was wide open. Upon entry, they discovered Lafferty's dead body. She had been shot five times in the head, "three at point-blank range in the back of the head." **Id.** Crime-scene photos showed the "prone position" in which she was found:

> While words cannot fully illustrate the prone position in which the victim was found, suffice it to say that the victim's legs were spread open more than ninety degrees, with a foot in each of the doors of the bedroom and bathroom, which are on opposite sides of the hallway where she was found. The left leg was raised slightly higher than the right and wedged within the doorjam to the bedroom. Her shorts were "wadded up" around the left ankle (keeping in mind that except for these wadded up shorts, she was nude from the waist down).

**Id.**

¶235. After Powers emerged as a suspect, police searched his apartment and arrested him. **Id.** Eventually, he led police to a shed behind his apartment where they found a .22 caliber gun. Afterwards, Powers said, "you didn't have a case until I got the murder weapon for you." **Id.** at 28 (internal quotation marks omitted). In a later written statement, he admitted killing Lafferty. **Id.** at 24. He said that they had "struggled with the gun, and the gun went off[.]" **Id.** at 24 (internal quotation marks omitted). He "denied having sex with Lafferty and claimed that she voluntarily partially undressed herself because she was 'playing' around with

99

him." *Id.* In addition, Powers "admitted taking a computer from Lafferty's home and placing it in a nearby alley, where it was later picked up by Powers's brother and/or his girlfriend." *Id.*

¶236. Two other items of physical evidence were found. First, in a search of Powers's person, police found "what appeared to be a blood-stained note to his mother located in his crotch area." *Id.* It said, "Everything I do is wrong." *Id.* (internal quotation marks omitted). Second, Powers's mother, Dora Powers, found a used sanitary napkin in one of Powers's baseball hats. *Id.* at 25. The State Crime Lab tested the napkin but could not match it to the Lafferty. *Id.*

¶237. Pretrial, McIntosh "made numerous oral and written requests" for discovery, including moving for production of (a) Lafferty's school, medical, employment, court, criminal, and phone records; (b) the testifying officer's personnel and criminal records; and (c) photos that the prosecution intended to use at trial. He moved to quash the indictment, to suppress Powers's handwritten statement, and to discover information about the prosecution's witnesses. His proposed witness list had eleven names: Powers, Dora, Barnes, Charles Powers, Candace Owens, Wilbert Lee Otis Jr., Dr. Michael West, Chief Charles Sims, Arties L. Weathersby, Mrs. Arties L. Weathersby, and Mrs. Weathersby's daughter.

¶238. Dr. Hayne did the autopsy and testified at trial as an expert in forensic pathology. He said that Lafferty had been shot five times in the head and identified gunshot wounds as the cause of death. He identified two wounds as "consistent with defense posturing injuries." He said evidence showed that she was in her menstrual phase.

¶239. On cross-examination, Dr. Hayne said he saw no signs of rape. When asked how Lafferty's body could have gotten in that position, he said the "prone position . . . certainly presents in a sexually explicit position." In his opinion, it was unlikely that her body had gotten in that position from a "neurospasm" or that she had been killed before she could finish inserting a tampon or sanitary napkin.

¶240. Though he could not exclude the possibility, he did not consider her body's position consistent with consensual sex:

> [T]he reason I would have such an objection would be that she was shot three times in the back of the head. If she were in that position and her head was on the ground, then it would be impossible to shoot her from that position, and we know that she was shot.

¶241. On redirect examination, when asked if he had an opinion "within a reasonable degree of medical certainty" as to whether a person would "normally fall that way," he answered, "No, sir."

¶242. After the prosecution rested, McIntosh unsuccessfully moved for a direct verdict based on insufficient evidence of attempted rape.

¶243. As his first witness, McIntosh called Dr. West, a dentist, who was the county coroner at the time of Lafferty's murder and had responded to the crime scene. McIntosh wanted Dr. West to testify both on that basis and as an expert in "crime scene investigation and also gunshots." Over the course of twenty-three years, Dr. West said that he had investigated more than four thousand deaths.

¶244. The prosecution objected to Dr. West's qualifications as an expert. Though the trial court recalled having previously accepted Dr. West as an expert in forensic odontology and

101

gunshot reconstruction, it did not recall having accepted him as an expert in crime-scene investigation. So the court asked if McIntosh could offer more information. Dr. West then testified that he had been accepted as an expert in crime-scene reconstruction in prior cases and that he had some education or training in that area.

¶245. But because no crime-scene reconstruction was done in Lafferty's case, the prosecution questioned what Dr. West could testify to as an expert. When McIntosh conceded that no crime-scene reconstruction had been done in Lafferty's case, the court asked why Dr. West was being offered as an expert in crime-scene reconstruction. McIntosh replied that he "want[ed] to ask Dr. West about what he observed that night." Because McIntosh was not offering Dr. West as an expert, then, the court neither accepted nor rejected him as an expert in crime-scene reconstruction.

¶246. On direct examination, Dr. West said that he was never able to ascertain if Lafferty was putting her shorts on or taking them off, nor could he say if anyone else put the shorts around her ankle. Nothing at the scene, however, led him to believe that there had been a struggle. And "[o]ther than the body position," nothing indicated a rape. When asked what could have caused Lafferty's body to arrive in the position she was found in, the prosecution objected as "complete speculation." The court sustained the objection. When asked if he knew from his "own knowledge" how Lafferty's body got in that position, Dr. West answered, "No, sir, I do not know how she wound up in that final position."

¶247. As his second witness, McIntosh sought to call Jennifer Hale to testify about a statement she made to police. Hale did not appear, however, nor could she be found. According to McIntosh's proffer, Hale said that around 7:30 p.m. on the night Lafferty was

murdered, Lafferty came to Hale's house. Lafferty told Hale that "she thought that two of the guys wanted to have sex with her," but Lafferty did not act as though she felt threatened.

¶248. Without Hale, McIntosh rested and moved for a directed verdict. He highlighted (a) the lack of attempted-rape evidence; (b) the lack of physical evidence tying Powers to the gun; (c) and the prosecution's firearm expert's inability to match positively the bullets to the gun:

> [T]here is not one scintilla of evidence to the exclusion of every other hypothesis or supposition beyond a reasonable doubt that links [Powers] to the victim, number one, to the gun, number two, much less does it show in any manner the underlying crime of attempted rape against the will of the victim or in any other manner whatsoever the proof simply isn't there . . . .

¶249. In closing argument, McIntosh emphasized the lack of evidence for rape or attempted rape. As to how Lafferty's body got in the position she was found, McIntosh said "no one knows." "Nobody has come here and testified to y'all, me and the State and the Court and the defendant, I know exactly how the body got in that position, because nobody knows," he said. McIntosh also noted that jury instruction S-4 allowed the jury to find Powers guilty of the lesser-included crime of murder.

¶250. At the post-trial supplemental hearing, McIntosh said Powers told him that, on the day of Lafferty's murder, he had been drinking heavily:

> [Powers] stated that on the date of the incident that he started drinking I think before noon, drank through the afternoon, was over at [Lafferty's] house that night; they went out once and got more beer and drank some more and the next morning he told me that he drank some then.

McIntosh conceded that intoxication might have been an issue as to the voluntariness of Powers's statement to police, but at the same time, McIntosh added that the officers who interviewed Powers saw no signs of intoxication.

¶251. For the guilt phase, McIntosh interviewed Powers; several family members, including Dora, Powers's brother Charles, and Charles's girlfriend; Dr. West; and the testifying police officers. He read witnesses' statements too and tried unsuccessfully to find Barnes. In addition, he checked Lafferty's background, and his investigator spoke to several of her friends. "I kept hoping [Powers] could give me something else to go on," McIntosh said. "The 'leads,' if you will, [Powers] g[a]ve us up front cost us about 40 hours of chasing a ghost and it led to absolutely nowhere."

¶252. McIntosh was asked about his shift from offering Dr. West as an expert offering him a to a nonexpert. McIntosh expressed surprise at what he perceived as the prosecution's and the court's hostility to Dr. West. When McIntosh was asked if he thought it was "confusing to the jury and perhaps harmful to [the] case and [Powers] to go from offering [Dr. West] as an expert to then . . . a nonexpert, " he answered, "No, I did not." "I believe at the time I did not feel like that I had any choice."

*Powers I*

¶253. In ***Powers I***, Powers claimed that the attempted-rape charge was based solely on circumstantial evidence and, therefore, the jury should have received a circumstantial-evidence instruction. 883 So. 2d at 26. We disagreed. ***Id.*** at 26–27. We held that the "sexually explicit position in which Lafferty's body was found" plus Powers's written confession removed his case "outside the realm of circumstantial evidence"; thus, the trial court correctly refused Powers's proposed circumstantial-evidence instruction. ***Id.***

¶254. Further, the Court held that sufficient evidence supported attempted rape. ***Id.*** at 27. "The physical evidence," the court said, "clearly reveals that there was an attempt and [a]

104

direct ineffectual act performed toward the commission of rape." *Id.* The Court conceded

that Dr. Hayne was unable "testify to a 'reasonable degree of medical certainty'" about the

cause of Lafferty's apparent defensive-posturing wounds. *Id.* He also "testified that the

position of the body was 'sexually explicit' and 'not consistent' with consensual sex

particularly in light of the fact that she was shot three times in the back of the head." *Id.* The

crime-scene photos, the Court said, were key. *Id.* "We cannot overemphasize the importance

of the color photographs of the victim at the scene as they relate to the attempted rape charge."

*Id.* Words, the Court added, were insufficient to "visually re-create" the images. *Id.*

"Certainly," it concluded, "based upon all the direct evidence, and especially the physical

evidence at the crime scene as depicted, inter alia, by the color photographs of the victim, the

jury could reasonably find that an attempted rape occurred." *Id.*

¶255. In addition, the Court rejected Powers's claim that McIntosh was ineffective (1)

regarding the admissibility of Powers's written statement; (2) in selecting the jury; (3) in

presenting a coherent defense; (4) in offering Dr. West's testimony after the trial court refused

to accept him as an expert in crime-scene reconstruction; (5) and for failing to request lesser-

included-offense or lesser-offense instructions on murder or manslaughter. *Id.* at 29–34.

*Powers II*

¶256. The ***Powers II*** Court held, in part, that Powers's challenge to the sufficiency of the

attempted-rape evidence and his claim that McIntosh was ineffective for failing to obtain an

expert to counter Dr. Hayne were barred and meritless. 945 So. 2d at 392–94, 398. To

support their claim that McIntosh was ineffective for failing to obtain expert assistance, post-

105

conviction counsel offered an affidavit from forensic dentist Dr. Michael Bowers. *Id.* at 392.

Dr. Bowers said that

4.    The forensic testimony in this case is silent regarding any post mortem proof of attempted rape inflicted on or in the murder victim.

5.    The crime scene photos and video presented to the court in this case [do]es not present sufficient or convincing forensic evidence to support the charge of attempted rape in the commission of a murder.

6.    The location and positioning of the body are strong signs that the positioning was "staged" for reasons other than attempted rape. The positioning of the legs and panties are surely shocking, even to experienced investigators but the perpetrator's intent is open to multiple interpretations. The absence of autopsy findings of sexual activity on or in the decedent's body clearly makes the State's theory of "attempted rape" only a hypothesis which can't be tested scientifically. The alternative intent of the perpetrator such as "staging" exists is an equally viable explanation.

7.    The lack of physical findings regarding an attempt to rape makes the positioning of the body as just seen in the photographs insufficient to determine with medical certainty that an attempted rape was committed.

*Id.* at 393.  Applying the test set forth in ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509

U.S. 579 (1993), the Court held that Powers's claim lacked merit:

[S]uch a conclusion by Dr. Bowers that the positioning of Lafferty's body was somehow "staged" is speculative at best, and such testimony does not counter the State's evidence by way of Dr. Hayne, the forensic pathologist who performed the autopsy, who testified that the victim suffered defensive wounds. It is highly doubtful that any expert testimony regarding the positioning of the body would have likely resulted in a different verdict. After all, the victim was found nude from the waist down with her shorts and underwear bunched at one ankle, as well as with five gunshot wounds to her head.

945 So. 2d at 394.

I.    **Whether the attempted-rape evidence was sufficient, as a matter of federal due process, to support Powers's capital-murder conviction.**

106

¶257. Attempted rape requires (1) "an intent to commit rape, [(2)] a direct ineffectual act done towards its commission, and [(3)] the failure to consummate its commission." ***Powers I***, 883 So. 2d at 26–27 (citing ***Ross v. State***, 601 So. 2d 872, 874 (Miss. 1992)). The relevant question in reviewing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Jackson v. Virginia***, 443 U.S. 307, 319 (1979) (citing ***Johnson v. Louisiana***, 406 U.S. 356, 362 (1972)).

¶258. Here, Powers claims that the attempted-rape evidence was insufficient under the federal due-process standard—*i.e.*, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The crime-scene photos and Dr. Hayne's opinions about them were insufficient. He emphasizes Dr. Hayne's testimony that Lafferty could not have been shot three times in the back of the head while lying with the back of her head on the ground. Her positioning, Powers insists, occurred post-shooting and is no evidence of any prior attempted sexual assault. The ***Powers I*** dissent made the same "logically irrefutable" point:

> [D]espite the fact that the victim is lying face up with the back of her head against the floor, the evidence clearly showed that she suffered three gunshot wounds to the back of the head. Simply stated, this is not the position that the body would have been in during the alleged attempted rape. Therefore, the position is not directly, or circumstantially, probative of an attempted rape.

***Powers I***, 883 So. 2d at 40 (McRae, P.J., dissenting).

¶259. Powers adds that the trial court erred by refusing to grant a circumstantial-evidence instruction.

107

¶260. As for the bars, he argues that neither *res judicata* nor Section 99-39-21(2) waiver applies because sufficiency of the evidence has not previously been challenged on federal due-process grounds. Regardless, he contends that his claim is excepted from the bars for three reasons. First, he argues that the fundamental-rights exception applies. If denial of due-process at sentencing is excepted, he reasons that due-process violations in the guilt phase should be excepted too.

¶261. Second, he argues that relief from the bars is merited based on trial and post-conviction counsel's ineffectiveness. Neither challenged the sufficiency of the evidence on federal due-process grounds. Still more, post-conviction counsel failed to retain a proper expert to support their state-law based challenge to the sufficiency of the evidence. Now, however, Powers has an affidavit from board-certified forensic pathologist and physican Dr. James R. Lauridson. To a reasonable degree of medical certainty, Dr. Lauridson offers the following opinions:

> There is no scientific evidence to support a sexual assault in this case. Specifically, this includes: the absence of semen, absence of any injuries of the external genitalia, vagina, anus and rectum of the deceased.
>
> In reviewing the photographs from the death scene, I cannot see any blood pattern that would confirm that the body had been dragged after death. However, it appears that the left leg and foot are being wedged against the door frame. The overall position is not one I would expect for sexual intercourse, as testified to by Dr. Hayne, and not indicative of attempted rape.

¶262. Finally, Powers argues that newly discovered evidence concerning Dr. Hayne's credentials merits relief from the bars. For example, citing K.C. Meckfessel Taylor, Marielle Elisabet Dirkx, William Mcintosh, W. Tucker Carrington, *CSI Mississippi: The Cautionary Tale of Mississippi's Medico-Legal History*, 82 Miss. L.J. 1271, 1306–10 (2013), he contends

108

Dr. Hayne lacked American Board of Pathology certification. In 2008, Dr. Hayne was "removed from the list of designated pathologists and may no longer conduct autopsies at the State Medical Examiner Facility." *Id.* at 1312 (citation omitted).

¶263. In response, the State maintains Powers's claim is *res judicata* barred. No fundamental-rights exception is implicated. Nor does Powers explain how any evidence regarding Dr. Hayne's credentials meets the newly-discovered-evidence standard. Such evidence, according to the State, is merely impeaching and thus insufficient to show that a different result was reasonably probable. *See Crawford*, 867 So. 2d at 204 (stating that newly discovered evidence must be "material and . . . not merely cumulative or impeaching"). In addition, Dr. Hayne is not unqualified as an expert per se. *See Brandon v. State*, 109 So. 3d 128, 135 (Miss. Ct. App. 2013) (stating that even though Dr. Hayne "has been rightly criticized for certain aspects of his work," the Court has "consistently found [him] qualified to render expert opinions in the field of forensic pathology in criminal cases").

¶264. Even if an exception applies, the State insists that Powers's claim has no arguable basis. Less evidence has been deemed sufficient to affirm an attempted-rape conviction. *See Harden v. State*, 465 So. 2d 321, 325 (Miss. 1985) (affirming defendant's attempted-rape conviction when no injury occurred, but the defendant had "propositioned [the victim] in a lewd manner, exposed himself, seized [her] and attempted to drag her away with him"). Dr. Lauridson's conclusory affidavit offers nothing new.

¶265. We conclude that Powers's sufficiency-of-the-evidence and circumstantial-evidence claims are *res judicata* barred. The propriety of a circumstantial-evidence instruction was decided at trial and in *Powers I*. And though Powers tries to distinguish his sufficiency of the

evidence claim here by basing it on federal due process, ***Powers I*** applied the same standard: ***Jackson***, the case Powers relies on here, provides "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]" 443 U.S. at 319 (citing ***Johnson***, 406 U.S. at 362). Likewise, the ***Powers I*** Court said that reversal is proper "only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." 883 So. 2d at 25 (quoting ***Sheffield v. State***, 749 So. 2d 123, 125 (Miss. 1999)); *see* ***Cowart v. State***, 178 So. 3d 651, 666 (Miss. 2015) ("This Court may reverse only when, 'with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.' Thus, if *any* rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand." (citations omitted)). Even if *res judicata* is inapplicable, Section 99-39-21(2)'s waiver bar applies because Powers could have raised the federal due-process theory in ***Powers I***.

¶266. No exception merits relief from the bars. First, sufficiency of the evidence is not a recognized fundamental-rights exception. Second, no extraordinary or exceptional circumstances merit relief from the bars for Powers's ineffective-assistance-of-trial-counsel claim.

¶267. Further, Powers presents no substantial showing that post-conviction counsel were ineffective. Dr. Lauridson's affidavit does not rebut Dr. Hayne's testimony. *See* ***Howard***,

110

945 So. 2d, 352 (stating that in order for Howard to proceed on his claim that trial counsel was ineffective for failing to call an expert witness, he "must offer an affidavit from an expert witness who rebuts the State's expert testimony"). Dr. Hayne saw no signs of rape either. Dr. Lauridson partly agrees with Dr. Hayne about the positioning of Lafferty's body: "The overall position is not one I would expect for sexual intercourse," Dr. Lauridson avers, "*as testified to by Dr. Hayne . . . .*" (Emphasis added.) Still more, Dr. Lauridson's opinion that the positioning of Lafferty's body was "not indicative of attempted rape" is conclusory: he offers no explanation or alternative, nor does he refute Dr. Hayne's opinion that Lafferty had defensive wounds. In any event, Dr. Hayne did not offer an opinion on whether an attempted rape occurred. He simply stated the obvious: that the positioning "certainly presents in a sexually explicit position" and that a person would not normally fall that way. Though he said that her body's positioning was inconsistent with consensual sex, he could not exclude consensual sex either. He even acknowledged that the gunshot wounds were the only serious trauma to her body.

¶268. Finally, any new impeaching evidence regarding Dr. Hayne's credentials (or lack thereof) does not meet the newly-discovered-evidence exception. *See Brown*, 306 So. 3d at 744 (stating that the new evidence must be material and "not merely cumulative or impeaching"(citing *Crawford*, 867 So. 2d at 203–04)).

## II. Trial and post-conviction counsel were ineffective concerning the guilt phase.

¶269. "Counsel in a death-penalty case has 'a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary.'" *Walker v.*

***State***, 303 So. 3d 720, 728 (Miss. 2020) (internal quotation mark omitted) (quoting ***Andrus v. Texas***, 140 S. Ct. 1875, 1881 (2020)). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." ***Id.*** (internal quotation marks omitted) (quoting ***Andrus***, 140 S. Ct. at 1881).

¶270. Powers argues that McIntosh's guilt-phase performance was deficient for two reasons.

¶271. First, McIntosh failed to investigate, lacked a consistent strategy or understanding of the meaningful evidence, and called only one witness. Powers gives three examples.

¶272. For one, McIntosh spoke with witnesses, but failed to follow up on what he learned. For example, McIntosh learned of an "obvious line of defense": that Powers had alcohol problems and had been drinking the night of Lafferty's murder. Yet McIntosh failed to pursue that defense.

¶273. To that example, the State responds that no prejudice resulted. No "obvious line of defense" existed because "voluntary intoxication does not negate criminal liability." ***Evans v. State***, 226 So. 3d 1, 34 (Miss. 2017) (citing ***Abeyta v. State***, 137 So. 3d 305, 312 (Miss. 2014)).

¶274. Next, Powers maintains McIntosh was unaware of evidence that disproved the prosecution's theory of the case. At trial, Detective Mark Berry said that he believed officers took a camera with a roll of film from Lafferty's bedroom; however, Detective Berry was unaware of any developed film from that camera. Powers maintains he has now learned that Hattiesburg Police Department not only developed film from that camera but also obtained Lafferty's diary.

¶275. To that example, the State counters it is speculative to assume that McIntosh was unaware that Lafferty's camera and diary had been logged as evidence. The State notes that Powers offers no supporting affidavit about McIntosh's or post-conviction counsel's unawareness of those items. "It is just as likely," the State maintains, "that both knew about and examined the items and determined they lacked probative value." Regardless, the State contends current post-conviction counsel failed to tell what the camera and diary show.

¶276. As a third example, Powers maintains McIntosh failed to question witnesses about (a) Lafferty's boyfriend, (b) her kicked-in back door, (c) a bloody handprint on her arm, or (d) a bloody footprint in the hall. Because he had been invited to Lafferty's home as a guest, Powers asks why the back door was kicked in. As for the bloody handprint and footprints, he points out that no blood was found on his shoes or clothes.

¶277. The State responds that the *Powers I* Court already held that McIntosh's guilt-phase strategy was reasonable. "[McIntosh] pursued a clear defense strategy[,]" it said, including "extensively call[ing] into question the gun and the forensics regarding the bullet fragments." *Powers I*, 883 So. 2d at 33. That an alternate strategy existed or that most defense attorneys would have handled the differently is insufficient. *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011) ("[W]e may not, in hindsight, second-guess counsel's strategy regarding [a certain witness's] testimony merely because an alternative course of action existed during trial." (citing *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997))); *Green v. Lynaugh*, 868 F.2d 176, 178 (5th Cir. 1989) ("It is not enough to show that some, or even most, defense lawyers would have handled the case differently.").

¶278. *Second*, Powers argues that McIntosh was deficient for failing to present a qualified expert to refute the prosecution's theory of the case. The Dr. West debacle, he argues, undermined the defense. Dr. West's going from an expert to a fact witness not only confused the jury, but also Dr. West was unable to say how Lafferty ended up positioned as she was found.

¶279. Powers likens his case to ***Payton v. State***, 708 So. 2d 559 (Miss. 1998), and ***Howard***, 945 So. 2d 326. In ***Payton***, "the attorney's independent investigation was almost nonexistent," and "[t]here was a total break down of the adversarial system[.]" ***Payton***, 708 So. 2d at 562–63. In ***Howard***, the Court held that counsel was deficient for failing to call an expert witness to rebut bite-mark identification. ***Howard***, 945 So. 2d at 351-52.

¶280. Prejudice resulted, Powers argues, because the jury never heard evidence that contradicted the prosecution's theory of the case. Had they heard such evidence, a high probability exists that at least one juror would have voted for a different outcome.

¶281. As for post-conviction counsel, Powers contends they were ineffective for much the same reasons. Not only did they fail to raise McIntosh's deficient guilt-phase investigation as an issue, but also they failed to investigate adequately themselves.

¶282. Specifically, Powers argues post-conviction counsel failed to pursue "potentially explosive, exonerating leads." In a February 12, 2004 investigative report, post-conviction counsel investigator Tomika Harris conveyed the following.

¶283. First, Dora told Harris that Dora's cousin, Ben McNair, served as Chief of Police in Hattiesburg at the time of Powers's arrest. Dora said she "begged [McNair] to tell the attorneys what he knew about [Powers's] case," but "[McNair] told her that he could not say

anything because he had to live in Hattiesburg, he had to work and he needed his job." "Later that night," according to Harris, "[McNair] died." In a footnote, Powers notes that McNair apparently died on December 18, 2001. Similarly, Powers's sister Joa Margarette Oatis avers that after Powers's conviction, McNair told Dora that "[Powers] . . . t[oo]k[] the fall for something a white police officer did, but [McNair] had to think about his family."

¶284. Second, Harris said that Powers's brother James Powers contacted attorney Albert Necaise about representing Powers. Necaise did "'some' checking into the case" and offered to take it for a $75,000 retainer. In his preliminary investigation, Necaise "f[ou]nd out that Officer Mark Berry stated 'We finally got a N***A boy to take the fall for what a WHITE man done[.]'" Powers maintains those leads are now lost. Dora and Neciase suffer from dementia. McIntosh, McNair, and James are all deceased. So too is Eddie Barnes, who was at Lafferty's house on the evening before she was murdered.

¶285. The State responds that not only are there a "number of good reasons" why post-conviction counsel did not present the "multi-layer hearsay statements" (*e.g.*, a finding that they lacked merit), but also Powers fails to show prejudice (*i.e.*, that his petition would have been granted had post-conviction counsel followed up on the leads). Because of hearsay, Powers, citing ***Turner v. State***, 673 So. 2d 382 (Miss. 1996), adds that statements would have been inadmissible as newly discovered evidence.

¶286. Generally, the State argues that Powers's guilt-phase ineffective-assistance-of-trial-counsel claims are *res judicata* barred and meritless. The ***Powers I*** Court rejected Powers's claims that McIntosh was ineffective at the guilt phase for (a) failing to have Powers's statement suppressed; (b) failing to present a "plausible, coherent defense"; (c) having Dr.

West testify after the trial court refused to accept him as an expert; (d) "failing to move to have the capital murder charge reduced to manslaughter"; and (e) failing to request murder or manslaughter instructions. *Powers I*, 883 So. 2d at 28–29, 31, 33. The *Powers II* Court likewise rejected Powers's claims that McIntosh was ineffective for failing to obtain expert assistance. *Powers II*, 945 So. 2d at 392–94. Any new grounds for challenging McIntosh's ineffectiveness at the guilt phase, then, could have been raised in prior proceedings.

¶287. Powers also argues that post-conviction counsel were ineffective for failing to offer a qualified expert. He complains that McIntosh's ineffectiveness in failing to obtain a proper expert has never been addressed because the *Powers II* Court focused on post-conviction counsel's unqualified expert. Powers criticizes the *Powers II* Court for substituting a *Daubert* analysis—a trial court function—for a *Strickland* prejudice inquiry. To the extent that the *Powers II* Court's discussion could be interpreted as a *Strickland* prejudice inquiry, Powers argues, the Court applied an incorrect standard. *Strickland* prejudice requires only a reasonably probability of a different result, but the *Powers II* Court said, "It is *highly doubtful* that any expert testimony regarding the positioning of the body *would have likely resulted in a different verdict*." *Powers II*, 945 So. 2d at 394 (emphasis added).

¶288. Powers now offers Dr. Lauridson as a qualified expert to rebut Dr. Hayne's opinions. Dr. Lauridson, he maintains, would have "called into question" the crime-scene photos.

¶289. The State responds that "a close reading" of *Powers II* shows that the Court concluded that McIntosh was not ineffective for failing to offer an expert. In any event, "[t]he decision to call a witness is generally considered a matter of trial strategy." *Brown*, 306 So. 3d at 747 (alteration in original) (internal quotation marks omitted) (quoting *Brown*, 749 So. 2d at 91).

Dr. Lauridson's opinion would not have changed the outcome because the jury found attempted rape based on the evidence, not Dr. Hayne's opinions. Moreover, Dr. Hayne's opinions were not offered as evidence to show attempted rape. He only testified about his examination of Lafferty's body and the cause and manner of death. It was McIntosh who asked Dr. Hayne about rape or intercourse in an effort to show that the attempted-rape evidence was purely circumstantial and unsupported by expert findings.

¶290. As for any bar, Powers disputes the *Powers II* Court's assertion that he could have raised McIntosh's guilt-phase ineffectiveness on direct appeal. He had no meaningful opportunity to do so because extra-record evidence was required. So he asserts that he has been deprived an adequate means to challenge McIntosh's ineffectiveness. The Court can now remedy the deprivation, however, by granting review.

¶291. The State responds that Powers is unable to show prejudice.

¶292. We find that Powers's ineffective-assistance-of-trial counsel claim is *res judicata* barred and is insufficient to merit waiving that or any other bars and that Powers does not present a substantial showing that post-conviction counsel were ineffective.

¶293. Powers's claim that McIntosh was ineffective in the guilt phase is *res judicata* barred. The *Powers I* Court rejected Powers's claim that McIntosh was ineffective in presenting a coherent defense. *Id.* at 33. To the contrary, it said that he "pursued a clear defense strategy." *Id.* The *Powers II* Court rejected Powers's claim that McIntosh was ineffective for failing to obtain expert assistance. *Powers II*, 945 So. 2d at 392–94. It held that claim was both barred and meritless. *Id.* at 394.

¶294. Further, Powers's claim is insufficient to merit relief from any bar. McIntosh made discovery requests, conducted interviews, and pursued the leads that Powers gave him. Intoxication would not have been a defense. *See Evans*, 226 So. 3d at 34 (citing *Abeyta*, 137 So. 3d at 312). Nor is it likely that intoxication would have affected the admissibility of his written statement: Detective Berry testified that Powers did not appear to be intoxicated when he wrote the statement. Further, Powers does not show how Lafferty's diary or any developed film from the recovered camera would have caused a different result. Lafferty's boyfriend would have been an obvious angle, of course, and it is unclear if McIntosh pursued it. But that angle was not fully ignored: Barnes testified that Lafferty's boyfriend had dumped her, and police spoke to an ex-boyfriend named Ray Jeffus. As for the bloody hand and footprints, those very well could have been caused by Parrigin and her friend, the two people who discovered Lafferty's body. Upon discovering Lafferty's body, Parrigin grabbed Lafferty's wrist and tried to get a pulse. Parrigin said that she and her friend "walked over [Lafferty's] body into her bedroom" and then back into the hallway.

¶295. No doubt, calling Dr. West as an expert did not go as McIntosh had planned, but given that Dr. West had testified as an expert in prior cases and was the coroner who responded to the crime scene, McIntosh's decision to call him was reasonable. It is hard to fault Dr. West for his inability to do what no one else—including Dr. Lauridson—has been able to do: to say how Lafferty's body became positioned in the way she was found.

¶296. Powers does not present a substantial showing that post-conviction counsel were ineffective either. Although he points to what he characterizes as the "potentially explosive, exonerating leads," he falls short. Also, the State seems to misconstrue the issue: it is not the

118

statements' admissibility, but whether they should have prompted post-conviction counsel to investigate further. As the State notes, however, it is unknown if post-conviction counsel did so and found the allegations meritless. Current post-conviction counsel does not say why they did not try to contact former attorneys Ryan or Williams about the issue. Though current post-conviction counsel claim the leads are now all lost, they do not say why they did not try to contact Detective Berry or others who worked at the police department at the time of Lafferty's murder.

## PART FIVE: SENTENCING PHASE

¶297. Both the prosecution and McIntosh simply resubmitted all guilt-phase evidence. The jury was given two aggravators:

1.  Whether the capital offense was committed while the defendant was engaged in the commission of or an attempt to commit the crime of rape.

2.  Whether the capital offense was especially heinous, atrocious or cruel.

And they were given six mitigators:

1.  Whether the defendant has no significant history of prior criminal activity.

2.  Whether the defendant was an accomplice in the capital offense committed by another person, and his participation was relatively minor.

3.  The capacity of the defendant to appreciate the criminality of his conduct as to conform his conduct to the requirements of law was substantially impaired.

4.  The age of the defendant at the time of the crime.

5.  The Defendant acted under extreme duress or under substantial domination of another person.

6. Any other matter, any other aspect of the Defendant's character or record, and any other circumstance of the offense brought before you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the Defendant.

¶298. In closing arguments, the prosecution concluded by stating that "the facts justify the imposition of the death penalty, and . . . the law allows it." McIntosh then began by saying, "I cannot argue with anything Mr. Helfrich just said." McIntosh affirmed that, based on the jury's verdict, the law indeed allowed them "to do a legal killing," but he told them to search their consciences and to "prayerfully consider" the gravity of the decision before them. "[I]t's probably going to be one of the most trying decisions you ever make in your life," he told them. He argued that the prosecution had failed to prove the aggravating circumstances beyond a reasonable doubt and that mitigating circumstances merited "saving [Powers's] life." "I can't tell you what to do," McIntosh said, "but I am going to ask for mercy for my client. Don't kill him."

¶299. In the post-trial supplemental hearing, McIntosh said that he did nothing to investigate or prepare for the sentencing phase:

Q. [F]aced with the prospect of having essentially two trials and always the looming possibility that your client might be found guilty of capital murder and you are faced with a second sentencing hearing, what investigations or preparations did you make for the sentencing hearing?

A. Nothing separate.

¶300. Dora, he said, had been supportive, and he discussed with her the possibility of her testifying at sentencing. Ultimately, he decided against it. "I saw no reason of putting a weeping mother back on during the sentencing phase," he said.

120

¶301. Aside from Dora, McIntosh said that other family members were not fully supportive. McIntosh did not think or feel that their testimony would be useful or helpful.

¶302. McIntosh said he "simply r[a]n out of time" to fully prepare for the sentencing phase:

> I was unable to do all of this prior to trial by myself as I explained to [Dora]. I needed some help and I never got it. There is only so many hours in a day, and there is only so much that I can do in each hour, and I do admit readily that I could have done -- possibly should have put on proof during the sentencing phase . . . .

Still, he "d[id]n't think it would have made one bit of difference":

> I did not think it would be helpful in this case [to have witnesses testify at sentencing] and that is why I didn't do it; and I didn't have the time to look up old high school chums and all of that. In fact I did not have the names of any from the family. All I had was basically family members and guys that he had been running around with down here, a couple of drinking buddies, which I certainly did not think would help.

¶303. McIntosh said he was "hoping that the jury would understand the basic facts of the case; that [Powers] just had not been proven guilty of murder much less while attempting a rape." He felt that the jury would understand that no rape occurred.

¶304. When asked if he considered an expert regarding Powers's alcohol problem, McIntosh said he lacked money for experts. At the same time, he was unaware how much such expert would cost.

¶305. McIntosh acknowledged Powers's character and lack of any prior felonies or assaults as mitigating factors, but Powers had also had a "domestic squabble" with a prior girlfriend and had been arrested "several times" for public drunkenness or something to that effect. "[R]ightly or wrongly," McIntosh said, "I did not think that [mitigating factors] would make that much difference with the jury as it was sitting."

121

¶306. McIntosh was surprised to learn that he had not objected to the prosecution's aggravators. He though he had, and he acknowledged that his failure to do so "was definitely a mistake."

¶307. Eight people provided post-trial supplemental hearing affidavits:

- **Dora Powers.** Dora said that she neither was asked to testify nor was she even told that she had the opportunity to do so. In describing Powers, she said his father left when Powers was a baby. A "kind man" named Herman Fairly then lived with her and the family for fifteen years, and she never saw any problems between Fairly and Powers. Dora described Powers as an "easy going" child. "He was about babysitting for friends and relatives and seemed to want to go out of his way to help people," she said. He graduated from high school and attended junior college for one year before having to drop out for financial reasons. Two years before his arrest, she said, he developed a problem with alcohol. Still, he went to church and she never saw him act violently.

- **James Watts.** Watts, who had dated Dora, said he was not asked to testify. Watts admired Powers and found him "very amenable" and nonviolent. Powers's "biggest problem," Watts said, was alcohol. "[Powers] would drink too much and would pass out," Watts said. But even when Powers was drinking, Watts never saw him act violently. Watts said he would have asked the jury to spare Powers's life. "I do not believe that [Powers] is a cold-blooded killer," he said.

- **Armond Barnes.** Armond, a close, lifelong friend of Powers's, said he was neither interviewed nor asked to testify. Armond had hired Powers on occasion and described him as "a good worker." Armond said that he had never seen Powers act violently, even when Powers drank.

- **Joa Margarette Oatis.** Oatis, Powers's sister, said that she was not asked to testify. She described Powers as "a pleasant child," who "appeared to be . . . very average . . . in terms of his emotional development and emotional needs." Though she believed that he had an alcohol problem, she said she had never seen him act violently, even when drinking.

122

- **Estella Louise Durr.** Durr, Powers's aunt, said that she was not asked to testify. Durr said that Powers had helped her move. She described him as "quiet" and "seem[ed] to really like people." She said she never saw him act violently, even when drinking.

- **Betty Stapleton.** Stapleton, Powers's aunt, said that she would have asked the jury to spare Powers's life if given the chance. She described him as "a very nice person, honest and hard working." Indeed, she "c[ould] [not] say anything bad about [him]." "If I asked him to do anything," she said, "he would do it without hesitating."

- **James Powers.** James, Powers's brother, said he was not asked to testify. James described Powers as "a fun person who loved sports" and "never got into any kind of trouble."

- **Wilbert Lee Oatis.** Otis, Powers's brother-in-law, said he was not asked to testify. Otis described Powers as "always good with people." Otis added that Powers "did develop a drinking problem."

*Powers I*

¶308. The ***Powers I*** Court rejected Powers's claim that McIntosh was ineffective for "failing to (1) investigate and present mitigation evidence, (2) give adequate closing arguments, and (3) object to the two aggravating circumstances submitted by the State." ***Powers I***, 883 So. 2d at 34. The record, it said, showed that McIntosh

> personally interviewed family members and friends of Powers, the girlfriend of Powers's brother, the officers involved, Dr. West, Powers's mother, and Powers. Counsel also spoke with several of Lafferty's friends and reviewed the State's discovery, including witness statements and photos. Counsel also filed a list of eleven potential witnesses. Trial counsel also ultimately concluded that while Powers and his family were in the best position to know of any possible mitigating witnesses, the family was not very supportive.

*Id.* at 35. As for Powers's alcohol problem, the Court said that such evidence is "double-edged" and could have prejudiced him. *Id.*

123

¶309. The ***Powers I*** Court saw "very little" in terms of mitigating factors. ***Id.*** The post-trial supplemental hearing affidavits, it said, "indicated that Powers had a nice home life and was emotionally developed and also that Powers was a high school graduate who had attended college." ***Id.*** "[McIntosh]," it concluded, "should not be faulted for failing to put on mitigation evidence which apparently did not exist." ***Id.*** The Court contrasted Powers's case with ***Williams v. Taylor***, 529 U.S. 362 (2000), in which the Supreme Court held that counsel had been "defective for failing to present evidence that the defendant was committed at age [eleven], suffered abuse and neglect, and that he was borderline mentally retarded, had suffered head injuries, and may have had organically rooted mental impairments[.]" ***Id.*** (citing ***Williams***, 529 U.S. at 370–71). The Court also noted that the prosecution would have been allowed to rebut Powers's mitigation evidence. ***Id.***

¶310. Next, the Court held that McIntosh's plea-for-mercy strategy was not a "poor strategic choice" under the circumstances. ***Id.*** (citing ***Manning v. State***, 735 So. 2d 323, 347–48 (Miss. 1999)). "Powers confessed to killing Lafferty, and Lafferty was shot in the head at point blank or close range five times," it said. ***Id.*** "[McIntosh] was not ineffective because he chose to pursue the path of mercy instead of rehashing the information produced during the guilt phase, producing unsupportive family members, emphasizing evidence of a drinking problem, and utilizing testimony of his drinking friends." ***Id.***

¶311. Finally, the Court held that McIntosh was not ineffective for failing to object to the two aggravators. ***Id.*** at 36. Throughout trial, it said, McIntosh consistently attacked the sufficiency of the attempted-rape evidence. ***Id.*** The heinousness, atrociousness, or cruelty

124

of the crime was not "constitutionally objectionable": Lafferty was shot five times in the head, and "[her] death was classified as lingering and not immediate." *Id.*

¶312. The *Powers I* Court thus concluded that McIntosh effectively represented Powers:

> We certainly cannot by any stretch of the imagination conclude on this record that the performance of Powers's trial counsel was deficient; and, even assuming arguendo that we could, there is absolutely no indication in this record that any such perceived deficiency prejudiced the defense of this case. Indeed, given the evidence in this case, Powers has failed to produce anything that would "undermine the confidence in the outcome" of the jury's determination of guilt as to Lafferty's murder. Finally, we note that Powers stated on the record that he did not want to testify and that he was satisfied with his attorney's services.

*Id.*

*Powers II*

¶313. In *Powers II*, Powers argued, in part, that McIntosh was ineffective for failing to investigate and present mitigating evidence. *Powers II*, 945 So. 2d at 394-95. To support his claim that "[r]elevant, significant and material mitigating evidence could have been obtained from Power[s]'s family members but [McIntosh] failed to take the time to investigate or interview any of them," he attached an affidavit from Dr. Gary Mooers. Based on his self-described "extremely cursory and certainly incomplete assessment," Dr. Mooers "believe[d] there [we]re mitigating factors . . . that ha[d] not been adequately examined and evaluated."

¶314. Dr. Mooers said that Powers began drinking alcohol at age eight or nine and developed a "longstanding problem with alcohol abuse." "At least some of [Powers's] problems in later life," Dr. Mooers said, "are attributable to his earlier misuse of alcohol."

¶315. Dr. Mooers said that Powers's father deserted the family when Powers was four-years old. Dora, who was busy working two full-time jobs, probably did not notice Powers's

125

drinking problem. Had she had more time, money, and knowledge, Dr. Mooers said, then Powers could have received help and avoided problems (like poor decision making) associated with substance abuse.

¶316. Dr. Mooers noted that Powers had no prior criminal record, worked steadily cleaning houses and maintaining lawns, and attended church. As an inmate, Powers posed no problems.

¶317. Dr. Mooers thus found two main mitigators:

> The first is a long-standing problem with alcohol abuse that was never addressed by family, friends, or official agencies, or organizations. This substance abuse problem seems to be part of a family pattern among male members of this family. The other mitigating factor consists of a previous record of self-support and employment, no previous criminal record, and no previous history of violent acts against males or females.

"An expanded mitigation investigation with access to additional records and documents and interviews with other family members, friends, teachers, employers, and others," he said, "could provide a much more complete and meaningful mitigation report."

¶318. Dr. Mooers's affidavit is dated October 17, 2005. Powers filed his first post-conviction petition four days later on October 21, 2005. That same day, he moved to amend or supplement the petition. Motion for Leave to Proceed in the Trial Court & Motion to Amend and/or Supplement the Petition for Post-Conviction Relief, *Powers v. State*, No. 2003-DR-02810-SCT (Miss. filed Oct. 21, 2005). Post-conviction counsel argued that more time was needed because of the devastation caused by Hurricane Katrina. *Id.* at *4. In an attached supporting affidavit, paralegal Deirdre Jackson said that she and two other post-conviction counsel staff had interviewed two seated jurors at Powers's trial, but had been unable to locate

126

others. **Id.** ex. 1. The motion was denied. Order, **Powers v. State**, No. 2003-DR-02810-SCT (Miss. Oct. 25, 2005).

¶319. The **Powers II** Court held that Powers's ineffective-assistance claim based on McIntosh's failure to present mitigating evidence was barred and "still without merit." **Powers II**, 945 So. 2d at 395.

## I. Whether *Cronic* applies.

¶320. "*Cronic* recognized a narrow exception to **Strickland**'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." **Florida v. Nixon**, 543 U.S. 175, 190 (2004). **Cronic** identified three circumstances that are so likely to prejudice the accused that prejudice is presumed: "(1) when counsel is completely denied; (2) when counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing; (3) and when counsel is called upon to render assistance under circumstances where competent counsel very likely could not." **Johnson v. State**, 29 So. 3d 738, 748 (Miss. 2009) (citing **Cronic**, 466 U.S. at 659–60); *see also* **Garza v. Idaho**, 139 S. Ct. 738, 744 (2019) (stating that prejudice is presumed "if the accused is denied counsel at a critical stage of his trial" or "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing" (internal quotation marks omitted) (quoting **Cronic**, 466 U.S. at 659)).

¶321. While conceding that **Cronic** deficiencies are rare, Powers argues that it applies here because of McIntosh's complete lack of assistance at sentencing.

¶322. Powers maintains McIntosh effectively abandoned representation by failing to submit any mitigating evidence. Such evidence is critical for the sentencing phase. **State v. Tokman**,

127

564 So. 2d 1339, 1342 (Miss. 1990) (citing *Leatherwood v. State*, 473 So. 2d 964, 970 (Miss. 1985)). "[A] broad inquiry into all relevant mitigating evidence . . . allow[s] [for] an individualized [sentencing] determination." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) (citing *Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994)). Yet McIntosh "conducted *no* mitigation investigation, offered *no* mitigating evidence, and called *no* witnesses" at sentencing. To worsen matters, he even agreed that the facts merited a death sentence.

¶323. Powers argues that the Court "entertained and effectively agreed with a *Cronic* claim" in *Payton*. There, after stating Payton's *Cronic* claim, the Court said that there had been "a total break down of the adversarial system" in that case. *Payton*, 708 So. 2d at 563. The Court then said that "ample facts" supported its conclusion that *Strickland* deficiency and prejudice had been shown. *Id.* (citing *Strickland*, 466 U.S. 668). Powers reasons that if there had there been no *Strickland* claim in *Payton*, then Payton "would have crossed *Cronic*'s high bar."

¶324. To support his *Cronic* claim, Powers cites *Lewis v. Zatecky*, 993 F.3d 994 (7th Cir. 2021), and *Phillips v. White*, 851 F.3d 567 (6th Cir. 2017).

¶325. In *Lewis*, the United States Court of Appeals for the Seventh Circuit held that *Cronic* applied because the petitioner's counsel totally abandoned him at sentencing. *Lewis*, 993 F.3d at 1006. With the petitioner facing up to one hundred and thirty years in prison, trial counsel's sole participation at sentencing was as follows: "Judge I'm going to defer to Mr. Lewis if he has any comments. I don't have anything to add." *Id.* at 998 (internal quotation marks

omitted).  That statement, the Seventh Circuit said, "went beyond a failure to conduct adversarial testing; it was an announcement of abandonment."  *Id.* at 1006.

¶326.  In *Phillips*, the Sixth Circuit held that *Cronic* applied because trial counsel's failure to mount a defense during capital sentencing effectively deprived Phillips of counsel at a critical stage of trial.  *Phillips*, 851 F.3d at 571.  Phillips's counsel "had no experience with death-penalty litigation and was unprepared for sentencing."  *Id.* at 578.  Then at sentencing, he "constructively deprived Phillips of counsel throughout sentencing by neglecting to make an opening statement; failing to investigate or present evidence, mitigating or otherwise; and offering a potentially off-putting and self-deprecating remark."  *Id.* at 581.  In the Sixth Circuit's view, counsel's performance made Phillips's sentencing "a presentation by one party, not a contest between adversaries."  *Id.*

¶327.  Powers maintains the State often relies on *Bell v. Cone*, 535 U.S. 685 (2002), to refute any *Cronic* claim.  There, in his opening statement at sentencing, defense counsel (a) "called the jury's attention to the mitigating evidence already before them"; (b) "suggested [the petitioner] was under the influence of extreme mental disturbance or duress, that he was an addict whose drug and other problems stemmed from the stress of his military service, and that he felt remorse"; (c) "urged the jury that there was a good reason for preserving his client's life if one looked at 'the whole man'"; and (d) "asked for mercy, calling it a blessing that would raise them above the State to the level of God."  *Id.* at 691.  As sentencing proceeded, defense counsel (a) "brought out that [the petitioner] had been awarded the Bronze Star in Vietnam"; (b) successfully prevented the admission of certain photos; and (c) waived final argument, thus preventing the lead prosecutor, "an extremely effective advocate," from

129

arguing in rebuttal. *Id.* at 691–92. Before the Supreme Court, the petitioner argued that defense counsel "fail[ed] to subject the prosecution's case to meaningful adversarial testing[,]" *id.* at 696 (internal quotation mark omitted) (quoting *Cronic*, 466 U.S. at 659), by not "mount[ing] some case for life." *Id.* (internal quotations marks omitted). The Supreme Court disagreed and held that *Strickland*, not *Cronic*, applied. *Id.* at 697–98. The Supreme Court reasoned that *Cronic* requires that counsel's failure be complete. *Id.* at 697. "[The petitioner's] argument," it said, "is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points." *Id.* at 697. The Supreme Court added that it had applied *Strickland* to ineffective-assistance claims based on defense counsel's failing to adduce mitigating evidence and waiving closing argument:

> In *Darden v. Wainwright*, 477 U.S. 168, 184, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986), for example, we evaluated under *Strickland* a claim that counsel was ineffective for failing to put on any mitigating evidence at a capital sentencing hearing. In *Burger v. Kemp*, 483 U.S. 776, 788, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987), we did the same when presented with a challenge to counsel's decision at a capital sentencing hearing not to offer any mitigating evidence at all.

*Id.* at 698.

¶328. Powers argues *Bell* is distinguishable. Here, unlike trial counsel in *Bell*, McIntosh neither prepped for sentencing nor did anything—except "make an artificial plea for mercy" and agree with the prosecution that the facts merited death.

¶329. Powers further argues that his *Cronic* claim is unbarred. As support, he cites *Fusi v. O'Brien*, 621 F.3d 1 (1st Cir. 2010), and *Higgins v. Cain*, No. 09-2330, 2010 WL 1855870

130

(E.D. La. Feb. 8, 2010). Those cases, according to Powers, show that *Cronic* and *Strickland* are distinct legal theories.

¶330. Alternatively, Powers asserts that his *Cronic* claim is unbarred based on post-conviction counsel's ineffectiveness.

¶331. The State responds that Powers "is really just repackaging his *Strickland* claim as a *Cronic* claim"; thus, the claim is waived and *res judicata* barred. Regardless, the State insists that Powers was "neither deprived of counsel nor did counsel entirely fail to subject the State's case to meaningful adversarial testing." The State disputes that McIntosh did no mitigation investigation. *Powers I*, 883 So. 2d at 35. At sentencing, he reintroduced guilt-phase evidence and submitted six mitigators.

¶332. The State counters that *Bell* is clear that *Strickland* applies here. Powers's actual claim is McIntosh's failure to call any sentencing witnesses. *Cronic* requires *complete* failure, and here McIntosh "subjected the State's case to meaningful adversarial testing . . . [by] fil[ing] pretrial motions, rais[ing] many objections throughout trial, gain[ing] many concessions in cross-examining witnesses, and strenuously f[ighting] to show that Powers did not commit an attempted rape and that the murder weapon was not conclusively linked to him."

¶333. Because Powers's *Cronic* claim could have been raised when McIntosh's effectiveness at sentencing was litigated on direct appeal and in prior post-conviction proceedings, the issue is waived. *See* Miss. Code. Ann. § 99-39-21(2). Powers does not present a substantial showing that post-conviction counsel were ineffective for failing to raise *Cronic*.

¶334. For *Cronic* to apply, "the attorney's failure must be complete." *Bell*, 535 U.S. at 697. To be sure, McIntosh said he did "[n]othing separate" to investigate or prepare for the

131

sentencing phase. Stopping there, *Cronic* probably would apply, but McIntosh did not "*entirely* fail[] to subject the prosecution's case to meaningful adversarial testing." *Id.* (internal quotation mark omitted) (quoting *Cronic*, 466 U.S. at 659). He reintroduced guilt-phase evidence and offered six mitigators. Of the potential sentencing witnesses he knew about, including Dora, he weighed having them testify, but thought better of it. In closing argument, he emphasized the gravity of the decision facing the jurors. Further, the Court already held that his performance at sentencing was not deficient. *Powers I*, 883 So. 2d at 34.

## II. If *Cronic* is inapplicable, whether trial and post-conviction counsel were ineffective under *Strickland*.

¶335. "An attorney representing a defendant in a death-penalty case has a duty to focus on both the guilt and penalty phases of the trial." *Bennett v. State*, 990 So. 2d 155, 158 (Miss. 2008) (citing *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999)).

¶336. Though counsel's judgments and strategies are afforded deference, at a minimum they must "interview potential witnesses and to make independent investigation of the facts and circumstances of the case." *Ross*, 954 So. 2d at 1005 (internal quotation mark omitted) (quoting *Ferguson v. State*, 507 So. 2d 94, 96 (Miss. 1987)). They are not "required to exhaust every conceivable avenue of investigation," but they "must at least conduct sufficient investigation to make an informed evaluation about potential defenses." *Id.* (citing *Tokman*, 564 So. 2d at 1343). Their duty is "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 691).

¶337. "[C]ounsel will not be deemed ineffective if there is proof of investigation or if there is no factual basis for the [petitioner's] claim," *id.* at 1006, but that "presuppose[s] a certain level of investigation." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Doss v. State*, 19 So. 3d 690, 695 (Miss. 2009) (quoting *Strickland*, 466 U.S. at 690). However, "strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a large body of mitigating evidence." *Ross*, 954 So. 2d at 1006 (internal quotation marks omitted) (quoting *Dickerson v. Bagley*, 453 F.3d 690, 696–97 (6th Cir. 2006)).

¶338. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Ronk*, 267 So. 3d at 1257 (quoting *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003)). Reasonableness depends not only on what counsel knew, but also on "whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

¶339. "Claims that additional witnesses should have been called are disfavored." *Hutto v. State*, 286 So. 3d 653, 661 (Miss. 2019) (internal quotation marks omitted) (quoting *Turner*, 953 So. 2d at 1074). "To prevail, [the petitioner] must prove that 'had the affiants been called to testify, there was a reasonable probability that the result of the proceeding would have been different.'" *Id.* (quoting *Moffett v. State*, 156 So. 3d 835, 849 (Miss. 2014)). No prejudice exists, however, if the new mitigating evidence "would barely have altered the sentencing profile." *Id.* (internal quotation marks omitted) (quoting *Chamberlin v. State*, 55 So. 3d 1046, 1054 (Miss. 2010)).

133

¶340. The duty to investigate extends to post-conviction counsel. *See **Grayson***, 118 So. 3d at 126–28 (holding that post-conviction counsel's minimal investigation was deficient); Am. Bar. Ass'n, *American Bar Association Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1015 ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.").

¶341. Powers argues that McIntosh was ineffective for failing to investigate for the sentencing phase, call a single sentencing witness, or obtain an expert regarding Powers's alcohol dependency.

¶342. Powers likens his case to ***Williams***, 529 U.S. 362; ***Wiggins***, 539 U.S. 510; ***Rompilla v. Beard***, 545 U.S. 374 (2005); ***Porter v. McCollum***, 558 U.S. 30 (2009); ***Sears v. Upton***, 561 U.S. 945 (2010); ***Andrus***, 140 S. Ct. 1875; ***Ronk v. State***, 267 So. 3d 1239 (Miss. 2019); ***Bennett***, 990 So. 2d 155; ***Doss***, 19 So. 3d 690; and ***Jones v. Thigpen***, 555 F. Supp. 870 (S.D. Miss. 1983), *aff'd in part, rev'd in part*, 741 F.2d 805 (5th Cir. 1984), *cert. granted, judgment vacated*, 475 U.S. 1003 (1986).

¶343. In ***Ronk***, this Court summarized ***Williams***, ***Wiggins***, and ***Rompilla*** as follows:

> In ***Williams***, the Supreme Court held that counsel was ineffective for failing to investigate and present substantial mitigating evidence. In that case, at sentencing, the prosecution produced evidence of Williams's prior violent crimes and called experts who said a "high probability" existed that he posed a serious, continuing threat to society. Defense counsel, in turn, produced three witnesses and a taped excerpt from a psychiatrist's statement. The three witnesses described Williams as a "nice boy" and nonviolent; the psychiatrist's statement simply showed that during a prior robbery, Williams had removed bullets from a gun so no one would be injured. Defense counsel also emphasized that Williams had turned himself in (which enabled police to solve several crimes), cooperated, and expressed remorse. The Supreme Court said

defense counsel's performance fell short of professional standards by not "fulfill[ing] their obligation to conduct a thorough investigation of [Williams's] background. Had counsel done so, they would have "uncovered extensive records graphically describing Williams'[s] nightmarish childhood." From those records, the jury

> would have learned that Williams'[s] parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

In addition, defense counsel failed to (a) "introduce available evidence that Williams was 'borderline mentally retarded' and did not advance beyond sixth grade in school"; (b) seek prison records that showed he had received commendations in prison; (c) seek favorable testimony from prison officials; and (d) return a phone call from someone who had offered to testify about Williams's participating in a prison-ministry program and earning a carpentry degree while in prison. While not all the additional evidence was favorable, the Supreme Court said that "the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence."

In *Wiggins*, likewise, the Supreme Court held that counsel was ineffective for failing to investigate Wiggins's background and to present mitigating evidence of his unfortunate life history. In that case, counsel did some investigation. First, counsel hired a psychologist who found that Wiggins "had an IQ of 79, had difficulty coping with demanding situations, and exhibited features of a personality disorder." The psychologist's reports said nothing, however, about his life history. Second, counsel had a one-page "'personal history' noting [Wiggins's] 'misery as a youth,' quoting his description of his own background as 'disgusting,' and observing that he spent most of his life in foster care." Finally, counsel had social-service records documenting his various foster-care placements. The latter showed (a) his mother was a chronic alcoholic; (b) he displayed emotional difficulties in foster care; (c) he frequently missed school for long periods of time; and (d) "on at least one occasion, his mother left him and his siblings alone for days without food." Instead of investigating further, counsel chose to emphasize that

135

Wiggins was not directly responsible for the murder and presented no evidence of his life history. The Supreme Court said counsel's investigation was unreasonable. Counsel's limited investigation, the Court said, fell short of both local and ABA standards because they neither prepared a social-history report nor did they try to discover all reasonably available mitigating evidence. "[C]ounsel abandoned their investigation of [Wiggins's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources," the Court continued. Counsel had "uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." To the contrary, further investigation would have revealed Wiggins's "bleak life history," which included physical and sexual abuse. What is more, sentencing proceedings suggested that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." Counsel put on a "halfhearted mitigation case," telling the trial court that they were prepared to present mitigating evidence and even asking the jury to consider "who [Wiggins] is" and his hard life, but never following up with specifics about his history. In sum, the Supreme Court concluded that if the jury had heard all the mitigating evidence, it may have assessed Wiggins's moral culpability differently.

Finally, in **Rompilla** the Supreme Court held that even if a capital defendant and his or her family members suggest no mitigating evidence exists, counsel still must "make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." In that case, counsel interviewed Rompilla, who was uninterested and even "actively obstructive" at times, and family members. They also had three mental-health experts evaluate him. But counsel did not examine Rompilla's school records or records of his prior convictions. Nor did they follow up on evidence of possible alcohol dependance. The Supreme Court said, at the very least, counsel were deficient for not examining Rompilla's prior-conviction records when they knew the prosecution intended to use his prior felony convictions as an aggravator. Had counsel examined those records, they would have found "a range of mitigation leads." The records showed that Rompilla (a) was raised in a "slum environment"; (b) quit school at age sixteen; (c) was in and out of jail; (d) abused alcohol; (e) showed signs of schizophrenia and other disorders; (f) and had a third-grade cognition level. And with further investigation, counsel presumably would have uncovered that (a) his parents were severe alcoholics; (b) his mom drank during pregnancy; (c) his dad severely beat his mom and bragged about cheating on her; (d) his parents fought violently; (e) his dad abused him verbally and physically; (f) he was forced to sleep in an unheated attic; and (g) he was not given clothes. In addition, mental-health experts retained by post-conviction counsel found that

136

he suffered from organic brain damage, could not appreciate the criminality of his conduct, and had an IQ in the mentally retarded range. All that mitigation evidence surpassed the "few naked pleas for mercy" that constituted counsel's mitigation case. And had the jury heard such evidence, the likelihood of a different result was "'sufficient to undermine confidence in the outcome' actually reached at sentencing."

*Ronk*, 267 So. 3d at 1258–60 (alterations in original) (citations omitted).

¶344. In *Porter*, the Supreme Court held that "if the sentencing judge and jury had heard the significant mitigation evidence that Porter's counsel neither uncovered nor presented," then a different sentence was reasonably probable. 558 U.S. at 31. There, Porter was sentenced to death for two murders. *Id.* at 32. For the sentencing phase, counsel had one short meeting with him, obtained no relevant records, interviewed no family members, and "ignored pertinent avenues for investigation of which [counsel] should have been aware." *Id.* at 39–40. "The sum total of the mitigating evidence," then, "was inconsistent testimony about [his] behavior when intoxicated and testimony that [he] had a good relationship with his son." *Id.* at 32. In state post-conviction proceedings, however, Porter presented "extensive mitigating evidence"—*i.e.*, "his abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity." *Id.* at 33. The Supreme Court held that counsel was deficient for failing to conduct some mitigation investigation. *Id.* at 40 (citing *Rompilla*, 545 U.S. at 381–82). It held that counsel's deficiency prejudiced Porter. *Id.* at 44. "Had the judge and jury been able to place Porter's life history 'on the mitigating side of the scale,' and appropriately reduced the ballast on the aggravating side of the scale," it said, "there is clearly a reasonable probability that the

137

advisory jury—and the sentencing judge—'would have struck a different balance[.]'" *Id.* at 42 (citing *Wiggins*, 539 U.S. at 537).

¶345. In *Sears*, the Supreme Court held that the state court incorrectly applied the *Strickland* prejudice inquiry. *Sears*, 561 U.S. at 946. There, Sears's counsel did some investigation and offered evidence, including seven witnesses, "describing [Sears's] childhood as stable, loving, and essentially without incident." *Id.* at 947, 952. In state post-conviction proceedings, however, new evidence showed that Sears's parents' relationship was physically abusive; they divorced when he was young; "an adolescent male cousin" sexually abused him; his mother referred to her sons as "'little m****r f*****s'"; his father verbally abused him and disciplined him with "age-inappropriate military-style drills"; he struggled academically and showed "substantial behavior problems from a very young age." *Id.* at 948 (internal quotation marks omitted). In addition, post-conviction evidence showed that he had "'significant' mental and psychological impairments." *Id.* at 949, 956. The Supreme Court said the state court failed to conduct "the type of probing and fact-specific analysis" that a *Strickland*-prejudice inquiry requires. *Id.* at 955.

¶346. In *Andrus*, the Supreme Court held that trial counsel's performance was deficient and remanded the case for the Texas Court of Criminal Appeals to consider the prejudice prong. *Andrus*, 140 S. Ct. at 1887. There, during sentencing, trial counsel called five witnesses, including an expert and Andrus himself. *Id.* at 1878–79. In later state *habeas* proceedings, a "tidal wave" of mitigating evidence about Andrus's life history came to light. *Id.* at 1878–79 (internal quotation mark omitted). In short, "[t]he evidence revealed a childhood marked by extreme neglect and privation, a family environment filled with violence and

138

abuse." *Id.* at 1879. The Supreme Court held that trial counsel was deficient for (1) "perform[ing] almost no mitigation investigation, overlooking vast tranches of mitigating evidence"; (2) presenting evidence that, due to counsel's failure to investigate, actually "backfired by bolstering the State's aggravation case"; and (3) "fail[ing] adequately to investigate the State's aggravating evidence, thereby forgoing critical opportunities to rebut the case in aggravation." *Id.* at 1881–82. Trial counsel, the Supreme Court said, "abandoned [his] investigation of [Andrus'] background after having acquired only rudimentary knowledge of his history from a narrow set of sources[,]" *id.* at 1882 (first and second alterations in original) (internal quotation marks omitted) (quoting *Wiggins*, 539 U.S. at 524), and "'ignored pertinent avenues for investigation of which he should have been aware,' and indeed was aware." *Id.* (quoting *Porter*, 558 U.S. at 40).

¶347. Powers asserts that McIntosh's ineffectiveness exceeds that of counsel's in *Andrus* because McIntosh never considered obtaining an expert regarding Powers's alcohol dependency. Though McIntosh claimed he lacked funds for such expert, he did not know how much one would cost either.

¶348. The State counters that *Andrus* changes nothing. Not only have we already held that McIntosh's mitigation investigation was adequate, but "the combination of circumstances and deficiencies present in *Andrus* are not present [here]."

¶349. Turning to *Ross*, the *Ronk* Court summarized it as follows:

> In *Ross*, we held that counsel was ineffective at sentencing for two reasons. First, counsel failed to investigate potential psychological problems simply because Ross had said he was not "crazy." Yet his life history included physical and sexual abuse; possible alcoholism; hallucinations; his sister's murder; and the tragic deaths of his ex-wife and four children in a car accident.

139

While the jury heard much of that information, counsel provided no expert to explain how those experiences had affected him psychologically. Second—and "[f]ar more problematic"—was counsel's failure to adequately investigate Ross's record as an inmate. For mitigation, counsel had emphasized Ross's good character, especially his reputation as a "good prisoner." That evidence, however, opened the door for the State to introduce Ross's bad acts while incarcerated: he had been moved to a higher security facility for possessing a hacksaw and trying to escape, and he had been punished for making alcoholic beverages in his cell. Those bad acts cast him "as unrepentant, a habitual criminal, and a danger to society." Given the severity of the charge, we said counsel's deficiencies undermined our faith in the sentence.

*Ronk*, 267 So. 3d at 1260 (alteration in original) (citations omitted).

¶350. In *Bennett* the Court granted death-row inmate Bennett leave to seek post-conviction in the trial court based on counsel's ineffectiveness at sentencing. *Bennett*, 990 So. 2d at 157. In post-conviction proceedings, one of Bennett's counsel provided an affidavit stating that counsel (1) knew Bennett had abused chemical substances but later learned that Bennett's substance-abuse problem was "much worse than my investigation [had] revealed"; (2) did not seek mental-health experts or a mitigation investigator; (3) had no psycho-social history prepared; (4) knew that Bennett had had a troubled childhood because of his parents' drug abuse; (5) and had no knowledge that Bennett had been diagnosed with mood disorder as a child. *Id.* at 159. In addition to counsel's affidavit, Bennett offered affidavits from "several witnesses [who] would have attested to Bennett's traumatic childhood, mood disorders, and substance-abuse history." *Id.*

¶351. Like counsel in *Bennett*, Powers maintains McIntosh knew about Powers's history of alcohol abuse and lacked any strategic reason for failing to investigate that or Powers's life history in general.

¶352. The State counters that **Bennett** is inconsequential. The Court already held that Powers's drinking problem was double-edged and that McIntosh was "not ineffective for choosing not to elaborate on it." **Powers I**, 883 So. 2d at 35. Further, Powers "had no childhood psychiatric diagnosis, treatment history, or traumatic childhood to discover and present at sentencing."

¶353. The **Ronk** Court summarized **Doss** as follows:

> [I]n **Doss**, we held counsel was ineffective at sentencing. There, we said that if counsel had reviewed records and followed up with potential witnesses, he would have uncovered mitigating evidence almost identical to that in **Rompilla**. Records showed that Doss (a) drank alcohol regularly and had started drinking at age eleven; (b) had tried other drugs; (c) attended special-education classes and did poorly in school; (d) had a low IQ; (e) had family and legal issues; and (f) showed signs of psychological disorders. In addition, counsel did not elicit testimony from Doss's mother about his abusive, poverty-stricken home environment. "[T]aken as a whole," the Court said, "[the mitigation evidence discovered by post-conviction counsel] might well have influenced the jury's appraisal of Doss'[s] culpability, and the likelihood of a different result if the evidence had gone in [was] sufficient to undermine confidence in the outcome."

**Ronk**, 267 So. 3d at 1260–61 (alterations in original) (citations omitted).

¶354. In **Jones**, the United States District Court for the Southern District of Mississippi vacated Jones's death sentence partly because of counsel's ineffectiveness at sentencing. **Jones**, 555 F. Supp. at 879–80. There, counsel presented no mitigation evidence at sentencing. **Id.** at 879. Instead, immediately after the prosecution rested, counsel did too. **Id.** Yet there was relevant evidence concerning Jones's competence at the time of the crime. **Id.** A licensed clinical psychologist testified that, "functionally," Jones was mildly intellectually disabled. **Id.**

141

¶355. Like counsel in *Jones*, Powers contends McIntosh rested without "present[ing] one scintilla of mitigation evidence."

¶356. Powers deems trial counsel's failure to investigate as an "identifiable lapse," *Tokman*, 564 So. 2d at 1342 (internal quotation mark omitted) (citing *Cabello v. State*, 524 So. 2d 313 (Miss. 1988)), that "must be viewed in light of the nature and seriousness of the charges and the potential penalty." *Doss*, 19 So. 3d at 695 (internal quotation marks omitted) (quoting *Ross*, 954 So. 2d at 1004). Doing nothing, he maintains, "might be the best evidence of incompetency, or infidelity, or ineffectiveness, or all three," *Williams v. Beto*, 354 F.2d 698, 706 (5th Cir. 1965), and simply hoping that the jury would either acquit Powers or find that no attempted rape occurred is no legal strategy.

¶357. To assess the probability of a different sentence, the Court must consider all available mitigating evidence—both that presented at trial and in post-conviction proceedings—and reweigh it against the aggravating evidence. *See Porter*, 558 U.S. at 41 (citing *Williams*, 529 U.S. at 397–98). To show that he was prejudiced, Powers offers the following post-conviction evidence.

¶358. Powers was the ninth of Dora and James Powers's ten children. Like Dora's own father, James was an abusive alcoholic. His drinking led to arguments and fights. Once, James had to be hospitalized after Dora threw him across an ironing board and struck him on the head with a glass jar.

¶359. According to Powers's aunt Betty Stapleton, James and Dora fought "in front of [Powers] and his siblings," and the fighting scared the children. "To keep the kids from

seeing James's drunk and abusive behaviors," Stapleton avers, "Dora would get the kids and they would go stay with our mom or grandma."

¶360. Though Stapleton's recollection may be mostly accurate, it is questionable whether Powers witnessed James and Dora's fighting. Dora said that James left when Powers was a baby, and Powers's sister Alisa Watts avers James "was not around when [Powers] was younger." "[James] [had] left and moved to Gulfport, MS," she avers. Powers's older brother Wayne Powers, too, avers James lived Gulfport and that the children saw him "maybe once or twice a year." Eventually, James's excessive drinking caused his and Dora's marriage to fail. After James left, Dora and the children lived with a grandmother for about a decade. To support her family, Dora worked two to three jobs, and Powers and his brothers did odd jobs for farm owners.

¶361. Dora was a "great provider." The family never lacked for food or decent clothing. Christmas morning, the living room would be full of toys, and almost every year, the children got a new bicycle. Eventually, Dora got her own place, and her boyfriend, Herman Fairly, moved in. He came and went, and he and Dora ended the relationship after they each shot each other in the leg.

¶362. As for Powers, family and friends describe him as easygoing, pleasant, humble, nice, friendly, helpful, respectful, honest, trustworthy, loving, hardworking, outgoing, and nonviolent. Lifelong friend Armond Barnes grew up fishing, playing sports, and singing in the church choir with Powers. Powers's youngest brother, Charles Powers, avers Powers was naive and that friends and girlfriends took advantage of Powers's openness, love, trust, and generosity.

¶363.  Powers loved and babysat children.  Charles called him "a built-in babysitter." Powers especially loved his niece Delisha Barnes, a child with special-needs.  She fondly remembers their time together, so much so that her dream is to care for him when he gets out of prison. Powers himself has a son, who serves in the National Guard.

¶364.  Early in life, Powers developed a drinking problem. He began drinking at age seven. By age eighteen or nineteen, he was drinking heavily.  Once while living with his sister, he wrecked her car while driving drunk.  After he moved out of his sister's place and got his own apartment, his drinking escalated.  He drank before and after work.  His older brother Wayne unsuccessfully tried to intervene and help Powers's alcohol abuse.

¶365.  About a month before Lafferty's murder, Powers's girlfriend broke up with him. Depressed, he drank more and more.  Even on the day he was arrested for Lafferty's murder, he had been drinking all day.

¶366.  According to Powers, then, a requisite minimal investigation would have shown that

- his violent, alcoholic father raised him;

- his drunken father abused Dora in front of the children;

- to protect herself, Dora became the aggressor;

- his father abandoned the family, leaving Dora to fend for herself and her ten children by working multiple jobs;

- Powers began drinking at age seven, drank increasingly more throughout his life, and was even drunk on the day he was arrested for Lafferty's murder;

- Powers was honest, hardworking, loving, and had great relationships with family;

- Powers loved children, babysat them, and has a son himself.

144

Had the jury heard about his "violent upbringing, alcohol issues, perseverance, love for family, and care for children," he contends, had they learned about his life and seen him "as a unique and complex individual"—"as a son, a brother, an adored uncle, and a father"—then at least one juror would have voted differently.

¶367. Powers argues that post-conviction counsel were ineffective in presenting McIntosh's ineffectiveness. First, they failed to note that McIntosh spoke to individuals about only the guilt phase, not sentencing. The *Powers II* Court said, "The record reflects that [McIntosh] personally interviewed family members and friends of Powers, the girlfriend of Powers's brother, the officers involved, Dr. West, Powers's mother, and Powers." 945 So. 2d at 395 (internal quotation marks omitted) (quoting *Powers I*, 883 So. 2d at 35). Powers does not dispute that; however, the record shows that McIntosh listed those individuals in response to the following question: "*Limited to the guilt phase only*, did you interview any witnesses other than [Powers] prior to trial?"

¶368. Second, Powers argues that post-conviction counsel failed to investigate and find mitigation evidence uncovered by current post-conviction counsel. Though Dr. Mooers advised that "[a]n expanded mitigation investigation with access to additional records and documents and interviews with other family members, friends, teachers, employers, and others could provide a much more complete and meaningful mitigation report." Instead, just four days after receiving Dr. Mooers's report, they filed Powers's first post-conviction petition. Though they argued that McIntosh failed (1) to investigate or interview family members concerning mitigating evidence or (2) "to investigate [Powers's] mental retardation," they offered no supporting evidence, like an evaluation by a mental-health expert.

145

¶369. Now, Powers argues current post-conviction counsel offers "a plethora of supporting affidavits from renowned experts and family members," including from board-certified toxicologist Dr. Susan M. Skolly-Danziger. Dr. Skolly avers Powers began drinking at age seven and had two prior DUIs. "Studies," she avers, ". . show a clear link between early adolescent alcohol use and poor executive functioning," which "involves cognitive skills that are needed for managing behaviors and self-control." "Poor executive functioning," she adds, "has also been linked to risky decision-making in alcohol-dependent individuals."

¶370. Quoting from page twelve of her affidavit, Powers maintains Dr. Skolly "opined that [his] early-aged and continued drinking had 'a disruptive effect on his brain function and neurobiology in areas critical to cognition, perception, motivation, memory, learning, judgment, decision making, behavior, and impulse control.'" Notably, part of page twelve is omitted, including the language Powers quotes.

¶371. Powers argues that both McIntosh and post-conviction counsel were ineffective for failing to consult a psychological or psychiatric expert. *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) ("Counsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult."); *Ross*, 954 So. 2d at 1006 (holding that trial counsel was ineffective at sentencing, in part, for "provid[ing] no expert evidence about how [certain] events had affected Ross psychologically"); *Hall v. McPherson*, 663 S.E.2d 659, 667 (Ga. 2008) (stating that lay testimony about McPherson's treatment for drug addiction "did not provide him 'with the meaningful scientific and psychiatric evidence' that counsel reasonably had available to them (citing *Bright v. State*, 455 S.E.2d 37, 51 (Ga. 1995))); *Bright*, 455 S.E.2d at 50–51 (holding that the trial court erred by failing to provide

146

funds for toxicologist); Am. Bar Ass'n, *American Bar Association Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.11 cmt., 31 Hofstra L. Rev. 913, 1061 (2003) ("Counsel should choose experts who are tailored specifically to the needs of the case . . . ."); *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, Guideline 10.11.(E)(1)(a), 36 Hofstra L. Rev. 677, 690 (stating that defense-team members have a duty to aid counsel in selecting and preparing "[e]xpert witnesses, or witnesses with specialized training or experience in a particular subject matter," including "[m]edical doctors, psychologists, toxicologists, pharmacologists, social workers and persons with specialized knowledge of medical conditions, mental illnesses and impairments; substance abuse, physical, emotional and sexual maltreatment, trauma and the effects of such factors on the client's development and functioning").

¶372. Powers thus maintains that post-conviction counsel's "failure to investigate known mitigating factors thoroughly, and their failure to give effect to such important evidence by retaining proper experts to explain them, violated . . . [his] right to effective post-conviction counsel . . . ." A comparison of post-conviction counsel's "scant mitigating evidence" to current post-conviction cousnel's ample evidence, he argues, shows that his first post-conviction petition was "a sham, and [that] he was denied an opportunity to present a meritorious [post-conviction] motion."

¶373. The State responds that McIntosh's ineffectiveness is *res judicata* barred. Powers replies that but for appellate counsel's unreasonable decision to raise McIntosh's ineffectiveness without the requisite mitigating evidence, the claim would not have been

barred in ***Powers II***, and in any event, he argues the State ignores his argument that post-conviction counsel were ineffective.

¶374.  Because the ***Powers I*** and ***Powers II*** Courts rejected Powers's claim the McIntosh was ineffective at sentencing, his ineffective-assistance-of-trial-counsel claim is *res judicata* barred.  *See* Miss. Code. Ann. § 99-39-21(3).  No extraordinary or exceptional circumstances merit relief from the bar.  Further, Powers does not present a substantial showing that post-conviction counsel were ineffective.

¶375.  Even if McIntosh and post-conviction counsel were deficient in failing to investigate mitigation evidence no prejudice is shown.  No "large body of mitigating evidence" is offered. *See* ***Ross***, 954 So. 2d at 1006 (internal quotation mark omitted) (quoting ***Dickerson***, 453 F.3d at 696–97).  What is offered barely alters Powers's sentencing profile.  *See* ***Hutto***, 286 So. 3d at 661 (quoting ***Chamberlin***, 55 So. 3d at 1054).

¶376.  In rejecting Powers's claim that McIntosh was ineffective for failing to investigate and present mitigation evidence, the ***Powers I*** Court said that the post-trial supplemental hearing affidavits "indicated that Powers had a nice home life and was emotionally developed and also that Powers was a high school graduate who had attended college." ***Powers I***, 883 So. 2d at 35.  The new mitigating evidence barely alters that profile.

¶377.  Even if Powers's biological father, James, was an abusive alcoholic, it appears that James was not around as Powers grew up. In her post-trial supplemental hearing affidavit, Dora indicated that Fairly was a positive influence in Powers's life.  "Fairly lived with me in the house for approximately fifteen years after [James] left," she said.  "Fairly," she said, "was a kind man and took the boys fishing. He and [Powers] seemed to get along well."  Though

148

Powers's family was "less fortunate," as his sister Alisa Watts put it, they never lacked for food or clothing. Indeed, Watts's fondest family memories were Christmases "wak[ing] up to a living room full of toys."

¶378. As for Powers's drinking problem, the ***Powers I*** Court held that McIntosh was not ineffective for failing to elaborate on that. ***Powers I***, 883 So. 2d at 35. Such evidence, it said, "is double-edged, however, and could have prejudiced Powers." ***Id.***

¶379. In sum, the new mitigation evidence Powers offers here "is nowhere near the magnitude of the undiscovered evidence" in the cases he cites as support. ***Ronk***, 267 So. 3d at 1274; ***Williams***, 529 U.S. at 395 (stating that "uncovered extensive records graphically describ[ed] Williams'[s] nightmarish childhood"); ***Wiggins***, 539 U.S. at 516–17 (describing Wiggins's "bleak life history"); ***Rompilla***, 545 U.S. at 390–93 (discussing Rompilla's background as including him being raised in a "slum environment" by alcoholics who physically abused him; quitting school at age sixteen; having an IQ in the intellectually disabled range; and suffering from organic brain damage and possibly schizophrenia or other disorders); ***Porter***, 558 U.S. at 33 ("[N]ew evidence described [Porter's] abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity."); ***Sears***, 561 U.S. at 948–50 (stating that Sears's was "far from 'privileged in every way'" and "suffer[ed] from substantial cognitive impairment"); ***Andrus***, 140 S. Ct. at 1879 (stating that a "tidal wave" of evidence "revealed a childhood marked by extreme neglect and privation, a family environment filled with violence and abuse" (internal quotation mark omitted)); ***Ross***, 954 So. 2d at 1006 (stating that further investigation and expert assistance was merited regarding "potential psychological

149

problems"; physical and sexual abuse; hallucinations; and the tragic loss of multiple family members); **Bennett**, 990 So. 2d at 159 (noting Bennett's "traumatic childhood, mood disorders, . . . substance-abuse history[,] . . . long history of psychiatric and drug-related treatment, . . . [and] mental disorders due to his traumatic childhood"); **Jones**, 555 F. Supp. at 879 (stating that evidence showed Jones was "functionally" intellectually disabled).

## PART SIX: CUMULATIVE ERROR

¶380. The cumulative-error doctrine "holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." **Ross**, 954 So. 2d at 1018 (citing **Byrom**, 863 So. 2d at 847). "[P]rejudicial rulings or events that do not even rise to the level of harmless error will not be aggregated to find reversible error." **Id.** In considering a cumulative-error claim, "relevant factors . . . include whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged. **Id.**

¶381. Powers argues that cumulative error merits post-conviction relief. He urges the Court to focus on the "synergistic prejudice caused by the combination of errors and improprieties[.]" **United States v. Munoz**, 150 F.3d 401, 418 (5th Cir. 1998) (internal quotation marks omitted).

¶382. Cumulative error does not merit relief here.

## CONCLUSION

¶383. Powers's oral-argument reconsideration motion, his motion for the Court to rehear its June 21, 2022 order, and his First Successive Petition for Post-Conviction Relief are denied.

150

¶384. **POST-CONVICTION RELIEF DENIED**.

**RANDOLPH, C.J., MAXWELL, BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND ISHEE, J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶385. Respectfully, I dissent. First, as I expressed in my separate statement to this Court's previous order, we should not forsake our well-established precedent that a defendant "must be competent at all stages of the criminal process," including post-conviction proceedings. *Neal v. State*, 687 So. 2d 1180, 1183 (Miss. 1996). For this reason alone, this case should be remanded for a competency hearing. Second, looking to Powers's remaining arguments, I would find that he has made a substantial showing that is sufficient to warrant an evidentiary hearing on whether his post-conviction counsel were ineffective in advocating the ***Batson***[1] issue.

> **I.     This Court should adhere to its longstanding position that criminal defendants must be competent at all stages of the criminal process, including post-conviction proceedings.**

¶386. This Court long has recognized defendants' right to mental competency during post-conviction proceedings, and we have remanded many cases for hearings to determine post-conviction petitioners' mental competency to proceed. ***Dickerson v. State***, 291 So. 3d 344, 347 (Miss. 2020);  En Banc Order, ***Goff v. State***, No. 2009-DR-01394-SCT (Miss. Dec. 15, 2011); En Banc Order, ***Walker v. State***, No. 2005-DR-00788-SCT (Miss. Mar. 9, 2006). Indeed, this Court has preserved that right for nearly three decades. ***Neal***, 687 So. 2d at 1183.

---

[1] ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

***Neal*** held that "a defendant must be competent at all stages of the criminal process, 'whether trial, ***Gammage v. State***, 510 So. 2d 802 (Miss. 1987); appeal, ***Tarrants v. State***, 231 So. 2d 493 (Miss. 1970); post-conviction, ***Rumbaugh v. Procunier***, 753 F.2d 395 (5th Cir.1985); or at the point of execution, ***Billiot v. State***, 478 So. 2d 1043 (Miss. 1985), *cert. denied*, 475 U.S. 1098, 106 S. Ct. 1501, 89 L. Ed. 2d 901 (1986).'" ***Neal***, 687 So. 2d at 1183.

¶387.  With today's decision, the right to mental competency remains intact during direct appeal and at execution, but disappears during the period between direct appeal and execution. This is particularly concerning in the context of state post-conviction proceedings, which, *unlike federal* habeas *proceedings*, entail investigation outside the record, an investigation in which the defendant usually is a vital source of information—and in some cases the only source of information.

¶388.  The state post-conviction attorney has a duty to "brin[g] to the trial court's attention facts not known at the time of judgment." ***Williams v. State***, 669 So. 2d 44, 52 (Miss. 1996) (citing ***Smith v. State***, 477 So. 2d 191 (Miss. 1985)). Nonexhaustive issues about which the defendant may be a critical source of information include: coerced confessions; post-arraignment use of jailhouse informers; ineffective assistance of counsel at trial, sentencing, or on appeal; excessive courtroom security; improper contacts between jurors and court officers or others during trial; prosecutorial suppression or misrepresentation of evidence; and in a capital case, the excessiveness of the penalty given the circumstances of the offense and background and status of the client.

¶389. For death-sentenced petitioners, "PCR proceedings are a critical stage of the death-penalty appeal process *at the state level*[.]" ***Grayson v. State***, 118 So. 3d 118, 126

152

(Miss. 2013) (emphasis added) (citing *Jackson v. State*, 732 So. 2d 187, 191 (Miss. 1999)). Why is it that, despite the fact that criminal defendants must be mentally competent at trial, during the direct appeal proceedings, and at execution, their mental competence has become unimportant during post-conviction collateral proceedings designed to root out and attack any errors that might have occurred during pretrial, trial, and appellate proceedings?

¶390. Powers is correct in his assertion that "the distinction between representing inmates in state post-conviction cases versus federal habeas cases is a difference of kind–-not only degree." The majority abandons our longstanding comprehension of this distinction by relying on a decision of the United States Supreme Court that found the Sixth Amendment to the United States Constitution does not provide a right to mental competence during federal *habeas* proceedings. *Ryan v. Gonzales*, 568 U.S. 57, 64-65, 133 S. Ct. 696, 184 L. Ed. 2d 528 (2013). But that case is inapplicable because these are not federal *habeas* proceedings. These are state post-conviction proceedings brought under the Mississippi Uniform Post-Conviction Collateral Relief Act. Miss. Code Ann. § 99-39-1 to - 119. A critical difference exists between federal *habeas* review of a state prisoner's claims and a prisoner's state post-conviction proceedings because "the federal court may review the claim based solely on the state-court record[.]" *Shinn v. Ramirez*, 142 S. Ct. 1718, 212 L. Ed. 2d 713. (2022) (citing *Cullen v. Pinholster*, 563 U.S. 170, 180, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011)).

¶391. Because intensive factual investigation of the petitioner's claims must occur at the level of state post-conviction proceedings, usually necessitating investigation outside the trial court record, the petitioner must be mentally competent and able to point post-conviction counsel toward relevant information. Now, under the majority holding, post-conviction

153

counsel may be stymied hopelessly by their inability to get meaningful assistance from mentally dysfunctional clients. The majority holding is inconsistent with the state constitutional right of death-sentenced petitioners such as Powers to the effective assistance of post-conviction counsel. *Grayson*, 118 So. 3d at 126 (citing *Jackson*, 732 So. 2d at 191 (Miss. 1999). My colleagues in the majority deprive post-conviction counsel of the effective assistance of competent, rational clients.

¶392. The doctrine of *stare decisis* should prevent our abandonment of a right of this importance that has been extant in Mississippi for more than a quarter century. As a reminder, I reiterate the well-established principle that "*[s]tare decisis* [i]s the 'doctrine of precedent, under which it is necessary for a court to follow earlier judicial decisions when the same points arise again in litigation.'" *Caves v. Yarbrough*, 991 So. 2d 142, 150 (Miss. 2008) (quoting *stare decisis*, Black's Law Dictionary, (8th ed. 2004)). This Court has pledged that it will not depart from a prior decision without a determination that the decision was "pernicious," "impractical," or "mischievous in . . . effect, and resulting in detriment to the public." *Id.* at 152 (internal quotation marks omitted) (citations omitted) (quoting *State ex rel. Moore v. Molpus*, 578 So. 2d 624 (Miss. 1991)). The majority makes no mention of *stare decisis*, and does not attempt to provide any sort of explanation of why we should forsake our long-established position that a post-conviction petitioner has a right to be mentally competent during all judicial proceedings that will bear upon the ultimate question of whether he lives or dies.

¶393. It is the *removal* of the right to mental competence during post-conviction proceedings that falls easily into the realms of pernicious, impractical, and mischievous. Indeed, several

154

of our sister states have recognized, in varying degrees, a due process right of mental competency in post-conviction proceedings, including Maine, Tennessee, Florida, and Illinois. *Haraden v. State*, 32 A.3d 448, 452 (Me. 2011); *Reid v. State*, 197 S.W.3d 694, 702 (Tenn. 2006); *Carter v. State*, 706 So. 2d 873, 875 (Fla. 1997); *People v. Owens*, 564 N.E.2d 1184, 1189 (Ill. 1990). Powers has presented compelling evidence that he is not mentally competent to participate in legal proceedings concerning his conviction and death sentence. During Powers's incarceration, he has suffered multiple strokes. He has been diagnosed with a cerebral brain aneurysm. An examining physician has deemed Powers "seriously cognitively impaired" with "no signs of malingering." Neuropsychological testing has confirmed his mental deficits, including vascular dementia. Powers's attorneys have represented that his severe neurological defects have rendered him unable to discuss his case rationally with them. Powers (who shows "no signs of malingering") lacks any memory of the crime or of the crime victim. Yet in the face of Powers's strong claim of mental incompetency, the majority revokes his right to be competent during post-conviction proceedings, forcing his lawyers to advance his arguments without their being able to communicate rationally with their client.

¶394. To be deemed mentally competent to stand trial, a criminal defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and . . . a rational as well as factual understanding of the proceedings against him." *Beasley v. State*, 136 So. 3d 393, 398 (Miss. 2014) (alterations in original) (internal quotations marks omitted) (quoting *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). This standard should apply also at the state post-conviction stage. The majority's decision will foster the deplorable circumstance of mentally incompetent post-

155

conviction petitioners journeying through the justice system with no ability to communicate rationally with their lawyers. This Court in *Neal* and other cases rightly rejected such an untenable dilemma. As the Office of Capital Post-Conviction Counsel argues, preserving the right to competency recognizes not only the "moral imperative of upholding human dignity but also the functional concern of protecting against false conviction." I continue to oppose this Court's elimination of the right to mental competency during PCR proceedings. I would, as has been our practice in similar instances, remand for a hearing to determine whether Powers is mentally competent to confer rationally with his attorneys.

> II.     **This Court should grant an evidentiary hearing on whether Powers's post-conviction counsel was ineffective in arguing trial counsel's *Batson* effectiveness.**

¶395.   The influence of race on jury selection in this case should not be ignored or brushed aside. When trial counsel presented a post-trial motion arguing that "the court erred in not requiring *Batson* challenges during jury selection," the trial judge stated: "I was shocked and appalled that *Batson* was not raised, but as I understand and appreciate the law . . . a trial judge does not have the authority to invoke [*Batson*] on his own initiative." Trial counsel subsequently acknowledged in an evidentiary hearing that he was not experienced with *Batson* and was not "fully prepared to raise it" at trial. In its briefing for this PCR, the State's response does not rebut or respond to Powers's argument that there is more than a reasonable probability that a *Batson* objection would have been successful. This silence is telling. At the time of Powers's first post-conviction proceeding, his post-conviction counsel knew or should have known the following:

156

¶396. First, there was disparate questioning of Black prospective jurors during *voir dire*. *See Batson*, 476 U.S. at 97 ("[T]he prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose."). Three prospective jurors (all Black) with a "B" beside their name—Rolanda Boyd, Cynthia Hill, and Michael Tate—were asked whether the victim's or the defendant's race would affect them. The prosecution struck Boyd and Hill. And though the jury selection was completed before Tate was reached, the prosecution's venire list shows an indication to strike beside his name.

¶397. Second, trial counsel's failure to raise *Batson* was not strategic. This Court (denying relief) in *Powers v. State (Powers I)*, 883 So. 2d 20 (Miss. 2003), correctly stated that Lawyer McIntosh was not ignorant of *Batson*; however, McIntosh mistakenly believed that the responsibility to raise *Batson* rested with the trial court. Omissions by trial counsel made due to mistaken beliefs are not based on strategy. *See Kimmelman v. Morrison*, 477 U.S. 365, 383–87, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). While post-conviction counsel briefly mentioned that McIntosh acknowledged he was not prepared to raise *Batson* issues during jury selection, they neither developed that argument nor cited any authority other than American Bar Association Guidelines. *See Wiley v. State*, 750 So. 2d 1193, 1199 (Miss. 1999) ("In order to prevail on an ineffective assistance of counsel claim, 'the post-conviction applicant to this Court must demonstrate with specificity and detail the elements of the claim.'") (quoting *Woodward v. State*, 635 So. 2d 805, 808 (Miss. 1993); *Perkins v. State*, 487 So. 2d 791, 793 (Miss. 1986)).

157

¶398. Third, a reasonable probability exists that Powers could have satisfied **Batson**'s first step—a *prima facie* case. That showing is a "light burden." **Price v. Cain**, 560 F.3d 284, 287 (5th Cir. 2009). In **Price**, sixteen of the fifty-four venirepersons (30 percent) were Black. **Id.** at 285. The prosecution used six of its twelve peremptory strikes (50 percent) against Blacks, and the jury was all white. **Id.** The trial court rejected defense counsel's **Batson** challenge, reasoning that the all-white jury was insufficient to establish a *prima facie* case. **Id.** at 286. The United States Court of Appeals for the Fifth Circuit disagreed:

> To make a prima facie case, Price needed to show only that the facts and circumstances of his case gave rise to an inference that the State exercised peremptory challenges on the basis of race. This was a light burden, and Price carried it. Price, an African-American man, was tried for the rape of a Chinese-American woman. The State used six of its twelve peremptory challenges to strike African-Americans from the venire, and the resulting jury was all-white. Under **Batson**'s "permissive terms," these facts and circumstances were "sufficient to permit the trial judge to draw an inference that discrimination has occurred."

**Id.** at 287 (citation omitted). The Fifth Circuit thus remanded the case for a hearing. **Id.**

¶399. Here, eleven of the seventy-two prospective jurors (15 percent) were Black; the prosecution used two of its six strikes (33 percent) on Black prospective jurors; and one Black juror was seated. Considering those numbers alongside the case's racial overtones (i.e., a Black male defendant and a white female victim), the disparate voir dire questioning, the prosecutions' use of two of its first three strikes on black prospective jurors (Harris and Boyd), and the trial judge's statement post-trial that he was "shocked and appalled" that McIntosh had not raised **Batson**, it is reasonably probable that Powers could at least have shown a *prima facie* case. See **Birkhead v. State**, 57 So. 3d 1223, 1230 (Miss. 2011) (stating that "*all* relevant circumstances" must be considered in deciding whether a defendant has

158

made a *prima facie* showing) (quoting ***Chamberlin v. State***, 989 So. 2d 320, 337 (Miss. 2008)).

¶400. Fourth, at least one of the ***Powers I*** Court's stated reasons for the striking of potential juror Harris is problematic. The Court said the record showed that Harris "knew one of the testifying officers and had child care problems." ***Powers I***, 883 So. 2d at 31. Yet the prosecution tendered five individuals who knew officers on the potential witness list: Juror Murphy Bond (knew Chief Sims and Detective Robbie Suber); Juror Kevin Cuevas (knew Chief Charlie Sims), Juror William Russell (knew Chief Sims); Juror Gardner (knew Detective-Captain Danny Rigel); Maureen E. Johnson (knew Detective-Captain Rigel). If the "proffered reason for striking a black [prospective juror] applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . ." ***Miller-El v. Dretke***, 545 U.S. 231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (citing ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 147, 420 S. Ct. 2097 L. Ed. 2d 105 (2000)). The entirety of post-conviction counsel's argument on this point was a single sentence: "[o]ther members of the venire were allowed to serve who also had similar problems and concerns as those of the African American Jurors who were 'tagged' and not selected to serve on the jury." Specificity and detail were lacking. *See **Wiley***, 750 So. 2d at 1199 (quoting ***Woodward***, 635 So. 2d at 808). And though it is true that this Court would not have been *required* to do a comparative-juror analysis for the first time on appeal, it may do so in "exceptional circumstances." *See **Clark v. State***, 343 So. 3d 943, 961–63 (Miss. 2022).

¶401. Knowing a testifying officer was not the only reason the *Powers I* Court gave for the prosecution's strike against Harris. It noted also that she had "child care problems." As to that reason, Powers argues that Juror Bond's father's being terminally ill made Juror Bond similarly situated to Harris. On one hand, the two situations are distinct: Juror Bond was concerned about having to leave the trial if something happened to his terminally ill father, whereas Harris was concerned about her seventy-three-year-old mother's ability to watch Harris's four children. But the comparison does not have to be identical to suggest discriminatory intent. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2249, 204 L. Ed. 2d 638 (2019) (citing *Miller-El II*, 545 U.S. at 247 n.6). And a similar conflict need only be at least as serious. *See Snyder v. Louisiana*, 552 U.S. 472, 483, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008). Notably, though Lawyer McIntosh struck her, the prosecution tendered Lee Ann James, who, at that time, was pregnant and had two young children (a one- and two-year old). But James's concern was the effect the stress of trial might have on her unborn child, not child care. "I have never been through [a trial] before, and it might be stressful[,]" she said. "I don't want to subject my child at this time in the early nature of pregnancy to that." In addition to Harris's childcare problems, the venire list indicates another possible reason the prosecution struck her: "Bored" is handwritten beside her name.

¶402. "[D]isinterested demeanor" is a valid, race-neutral reason for a strike. *Moore v. Keller Indus., Inc.*, 948 F.2d 199, 202 (5th Cir. 1991) (internal quotation marks omitted) (citing *United States v. Roberts*, 913 F.2d 211 (5th Cir. 1990)). But what weight, if any, to afford Harris's possible boredom is questionable given that there is no on-the-record observation by the trial judge. *See Thaler v. Haynes*, 559 U.S. 43, 48–49, 130 S. Ct. 1171, 175 L.

Ed. 2d 1003 (2010) (affirming the importance of a trial judge's observations for demeanor-based explanations, but rejecting that such explanation cannot be sustained if the trial judge neither observes nor can recall the person's demeanor).

¶403.  Therefore, as to Harris, post-conviction counsel would or should have known of three possible reasons the prosecution struck her: (1) that she knew a testifying officer; (2) that she had childcare problems; and (3) that she appeared bored. If the prosecution had multiple reasons for striking her, pretext would not be shown just because one of those reasons was shared by others tendered by the prosecution. *See Moore*, 948 F.2d at 202 ("[B]ecause multiple reasons led . . . counsel to strike [two individuals] the existence of other jurors with some of their individual characteristics does not demonstrate that the reasons assigned were pretextual."); *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 941 (7th Cir. 2001) ("[W]here a party gives multiple reasons for striking a juror, it is not enough for the other side to assert that the empaneled juror shares one attribute with the struck juror." (citing *Dunham v. Frank's Nursery & Crafts*, 967 F.2d 1121, 1126 (7th Cir. 1992))).

¶404.  As with Harris, the venire list offers another possible reason the prosecution struck Boyd: "cell phone went off during voir dire – got up + moved" is handwritten beside her name. As stated, "disinterested demeanor" is a valid, race-neutral reason for a strike. *Moore*, 948 F.2d at 202 (internal quotation marks omitted) (citing *Roberts*, 913 F.2d 211). But what, if any, weight to afford that possible reason is questionable given that there is no on-the-record observation by the trial judge. *See Thaler*, 559 U.S. at 48–49.

¶405.  Fifth, the venire list did more than simply identify prospective jurors' races. Of the eight people on the venire list with a "B" beside their name, all except Harris and Juror

161

Duckworth have either a "?" or an "S" beside their names. And no other names have a "?" beside them except those with a "B" too. Anticipated strikes are also indicated on prosecutor's venire list. Jury selection ended at prospective juror number 37. Of the remaining names on the list, only two have an "S" beside their names—Shannon L. Estes and Tate. So it would appear that, if reached, the prosecution intended to strike them. The record shows good reason for striking Estes: As a newspaper reporter, she knew most of the testifying officers. And when asked whether she could be fair and impartial, she answered, "I think so."

¶406. Tate is more problematic. A possible reason for wanting to strike him is be that he did not complete his jury questionnaire. Specifically, he did not answer question numbers 52 to 58: "52) Has any other member of your immediate family or a close friend ever been accused of a crime?"; 53) In regard to a person charged with committing a crime, which of the following best describes your general attitude[]"; "54) If you belong to a religious denomination/church, does it support death penalties for certain crimes?"; "55) Do you believe in the death penalty?"; "56) In regard to police officers, which of the following best describes your general attitude[]"; "57) In regard to an accused person on trial, which the following best describes your general attitude[]"; and "58) List the motor vehicles you, you spouse or children living in your home own[.]" Yet Keith W. Sumrall, who sat on the jury, answered only three of those same questions: He marked that no immediate family or close friend had ever been accused of a crime and that he believed in the death penalty, and he listed two vehicles. During individual, in-chambers questioning, Tate said he did not complete his jury questionnaire because he filled it out late at night and had to go to work the next morning.

Yet three times he affirmed his belief in the death penalty. And when asked whether Powers's and Lafferty's race would make any difference to him, he said, "None whatsoever."

¶407. Powers makes enough of a substantial showing to merit an evidentiary hearing on whether his post-conviction counsel were ineffective concerning the *Batson* issues. Counsel's deficiency includes failure to (a) highlight the disparate *voir dire* questioning; (b) cite authority to support that McIntosh's mistaken belief about *Batson* meant that his decision to forgo raising it could not have been strategic; (c) argue the likelihood of a *prima facie* case; (d) show that jurors similarly situated to Harris (in at least one way) were allowed to serve; (e) assert that the venire list constituted newly discovered evidence that merited relief from the bars; (f) pinpoint problems with the handwritten notations on the venire list—mainly, that except for Harris (who was struck) and Juror Duckworth (who served), every person with a "B" beside their name had either a "?" or an "S", and "?s" appear only next to "Bs"; and (g) question the basis for the apparent anticipated future strike of Tate.

¶408. Based on Powers's showing and to ensure as complete a record as possible on *Batson*, I would hold that Powers makes enough of a substantial showing to merit an evidentiary hearing on whether his post-conviction counsel were ineffective on the *Batson* issue. In any case, but especially a death penalty case, "the harmless error standard has no place in the *Batson* analysis." ***Manning v. State***, 765 So. 2d 516, 521 (Miss. 2000). And, "when a trial judge erroneously denies a defendant a peremptory strike by failing to conduct the proper *Batson* analysis, prejudice is automatically presumed[.] ***Hardison v. State***, 94 So. 3d 1092, 1102 (Miss. 2012). Given the "shocking" and "appalling" absence of a *Batson* challenge at this trial, and the subsequent ineffectiveness of post-conviction counsel, further investigation

is warranted to assist in the determination of whether race played an impermissible factor in jury selection.

¶409. Powers should be granted evidentiary hearings on two disjunctive grounds. First, he has made a sufficient showing that his medical conditions render him incompetent to participate in post-conviction proceedings. This Court gravely errs by eliminating this right. Second, Powers has made a sufficient showing of merit to warrant an evidentiary hearing on whether race played an impermissible role in jury selection. I therefore dissent.

**KING, P.J., AND ISHEE, J., JOIN THIS OPINION.**